# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Mille Lacs Band of Ojibwe, a federally recognized Indian tribe; Sara Rice, in her official capacity as the Mille Lacs Band Chief of Police; and Derrick Naumann, in his official capacity as Sergeant of the Mille Lacs Band Police Department, | Case No. 17-cv-05155 (SRN/LIB) |
| Plaintiffs, | |
| v. | |
| County of Mille Lacs, Minnesota; Joseph Walsh, individually and in his official capacity as County Attorney for Mille Lacs County; Brent Lindgren, individually and in his official capacity as Sheriff of Mille Lacs County, | |
| Defendants, | **MEMORANDUM OPINION AND ORDER** |
| and | |
| County of Mille Lacs, Minnesota, | |
| Counterclaim Plaintiff, | |
| v. | |
| Mille Lacs Band of Ojibwe, a federally recognized Indian tribe; Sara Rice, in her official capacity as the Mille Lacs Band Chief of Police; Derrick Naumann, in his official capacity as Sergeant of the Mille Lacs Band Police Department; Melanie Benjamin, individually and in her official capacity as Chief Executive of the Mille Lacs Band of Ojibwe Tribal Council; Carolyn Shaw-Beaulieu, individually and | |

| | |
|---|---|
| in her official capacity as Secretary/Treasurer of the Mille Lacs Band of Ojibwe Tribal Council; Sandra L. Blake, individually and in her official capacity as District I Representative of the Mille Lacs Band of Ojibwe Tribal Council; David Aubid, individually and in his official capacity as District II Representative of the Mille Lacs Band of Ojibwe Tribal Council; and Harry Davis, individual and in his official capacity as District III Representative of the Mille Lacs Band of Ojibwe Tribal Council, | |
| Counterclaim Defendants. | |

Marc D. Slonim, Beth Ann Baldwin, and Wyatt Golding, Ziontz Chestnut, 2101 Fourth Avenue, Suite 1230, Seattle, WA 98121; Charles A. Nauen, Arielle Wagner, and David J. Zoll, Lockridge Grindal Nauen PLLP, 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401; and Todd R. Matha, Mille Lacs Band of Ojibwe, Office of the Solicitor General, 43408 Oodena Drive, Onaima, MN 56359 for Plaintiffs and Counterclaim Defendants.

Randy V. Thompson, Nolan Thompson & Leighton, 5001 American Boulevard West, Suite 595, Bloomington, MN 55437 for Defendant and Counterclaimant County of Mille Lacs;

Scott M. Flaherty and Scott G. Knudson, Briggs & Morgan, PA, 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402 for Defendant Joseph Walsh; and

Douglas A. Kelley and Steven E. Wolter, Kelley, Wolter & Scott, PA, 431 South Seventh Street, Suite 2530, Minneapolis, MN 55414 for Defendant Brent Lindgren.

SUSAN RICHARD NELSON, United States District Judge

This matter comes before the Court on Plaintiffs' and Counterclaim Defendants' Motion to Dismiss Defendant Mille Lacs County's Counterclaim under Rules 12(b)(1), 12(b)(6), and 12(f) ("Motion to Dismiss") [Doc. No. 25]. Because the Court finds that Mille

Lac County lacks standing to assert its counterclaims, it will grant the Motion to Dismiss under Rule 12(b)(1).

## I.      BACKGROUND

This case involves important and complex issues concerning the boundaries of the Mille Lacs Indian Reservation and, consequently, the law enforcement authority of the Mille Lacs Band within those boundaries. However, because the Motion to Dismiss revolves around the narrower question of Mille Lacs County's standing to assert its counterclaims, and not the merits of either party's claims or defenses, the Court will limit this background to only the facts necessary to explain its ruling.

### A. The Parties and Their Relationship to the Reservation

Plaintiffs are the Mille Lacs Band of Ojibwe, a federally recognized Indian tribe, and two members of its Police Department, Chief Sara Rice and Sergeant Derrick Naumann. (collectively, "the Band") (Compl. [Doc. No. 1] ¶ 1.)[1] The Band has a Chief Executive, legislative Assembly, and court system. (*Id.* ¶ 5E.) The Band also owns and operates public infrastructure and commercial establishments, including a "major gaming and entertainment complex." (*Id.*) In addition, the Band maintains a police department. Its officers are authorized to make arrests and carry handguns, and "are all peace officers licensed by the Minnesota Board of Police Officer Standards and Training." (*Id.* ¶¶ 5I – 5J.)

Approximately 1,850 Band members reside on the Mille Lacs Indian Reservation ("the Reservation"), which is located in Mille Lacs County. (*Id.* ¶ 5D.) The Band claims that the Reservation "comprises 61,000 acres of land," as established under Article 2 of the 1855 Treaty between the Chippewa and the United States. (*Id.* ¶ 5A (citing 10 Stat. 1165 (Feb. 22, 1855)).) ("The 1855 Reservation"). According to the Band, "the boundaries of the Reservation as established in 1855 have not been disestablished or diminished." (*Id.* ¶ 5B.) However, of the 61,000 acres, only 9,694 acres are owned in fee simple by the Band or its members (6,122 acres), or by the United States in trust for the Band (3,572 acres). (*Id.* ¶ 5A.) The remaining 51,306 acres are owned by non-Band members.

---

[1]     As explained below, Defendant Mille Lacs County named five additional Band members as Counterclaim Defendants. Counterclaim Defendants are all elected officials of the Mille Lacs Band Assembly. Because Counterclaim Defendants share identical interests to Plaintiffs for purposes of this motion, the Court will refer to all eight parties as "the Band."

Defendants are the County of Mille Lacs, County Attorney Joseph Walsh, and County Sheriff Brent Lindgren (collectively, "the County").[2] The County agrees that "the original 1855 Mille Lacs Reservation is located in Mille Lacs County," (Def. Answer [Doc. No. 17] ¶ 5F), but asserts that, because the 1855 Reservation has been "disestablished" by federal treaties and statutes, any land within the 1855 boundaries that has "passed at any time into non-Indian fee ownership" is no longer part of the Reservation. (*Id*. Affirmative Defense ¶ 16.) In the County's opinion, then, the Reservation only consists of land held in trust by the United States for the Band. (*Id*. Affirmative Defense ¶ 17.) This boundary dispute underlies this litigation.

### B.   2002 Litigation

Before describing how this dispute resulted in the present suit, the Court will briefly discuss the last time these parties attempted to litigate the Reservation's boundaries in this District, as that history looms large over this motion.

In the "late 1980s or early 1990s," the Band began to more vigorously assert its views about the continuing viability of the 1855 Reservation. (County Def.'s Counterclaim ("Counterclaim") [Doc. No. 17] ¶ 42.) In the County of Mille Lacs, these assertions allegedly "creat[ed] [an] atmosphere of extreme distrust and social unrest." *Cty. of Mille Lacs v. Benjamin*, No. 02-cv-00407 (JMR/RLE), Compl. ¶ 37 (D. Minn. Feb. 20, 2002).

---

[2]    As also explained below, only the County of Mille Lac brought counterclaims against the Band. However, for convenience, the Court will refer to all Defendants in this background section as "the County."

("The 2002 Complaint").[3] So, in 2002, the County sued the Band for a declaratory judgment that "the exterior boundaries of the 1855 Mille Lacs Indian Reservation have been disestablished or diminished." *Id.* Prayer for Relief ¶ 1. In the 2002 Complaint, the County stated that Band politicians and various federal agencies, including the Bureau of Indian Affairs, the Environmental Protection Agency, and the Army Corps of Engineers, had publicly endorsed the Band's claim to the 1855 Reservation. *Id.* ¶¶ 36-41 (statements by Band politicians and in official Band documents); ¶¶ 53A-B, E-F (Bureau of Indian Affairs); ¶¶ 53C-D (Environmental Protection Agency); ¶¶ 53G-I (Army Corps of Engineers). Because of these official pronouncements, the County claimed, among other things, that County law enforcement would not be able to arrest Band members for civil infractions on disputed land,[4] and that its citizens would be unfairly subject to the Band's regulatory regime. *See, e.g., id.* ¶¶ 48-52, 54-62. The County further alleged that time was of the essence, warning that, if the Court dismissed its suit, "by the time the County could return here . . . the Band would probably argue that the County was too late." *Id.* ¶ 73.

On summary judgment, Judge Rosenbaum rejected the County's arguments and dismissed the suit for lack of standing and for being unripe. In so ruling, he noted that the

---

[3]     The Band attached the 2002 Complaint to its Memorandum in Support of the Motion to Dismiss as "Exhibit A." (*See* Pl.'s Mem. Ex. A [Doc. 28].) The Court takes judicial notice of the document as a matter of public record, and accordingly considers it in this Order. *See Roe v. Nebraska*, 861 F.3d 785, 788 (8th Cir. 2017).

[4]     Although federal law (Public Law 280) authorizes Minnesota law enforcement to exercise criminal jurisdiction over Tribe members on reservations, the Minnesota Supreme Court has ruled that this authorization does not extend to civil regulatory enforcement regimes like traffic fines. *See State v. Stone*, 572 N.W. 2d 725 (Minn. 1997). Hence the County worried that, were the Band to treat its Reservation as including the disputed 51,000 acres, County police would not be able to enforce traffic regulations against Band members on those lands.

6

County was not suffering an "actual, concrete, or imminent" injury. *Cty. of Mille Lacs v. Benjamin*, 262 F. Supp. 2d 990, 995 (D. Minn. 2003). Without some evidence that County citizens were facing actual penalties from tribal regulatory bodies, or that Band members were refusing to heed County law enforcement, the County's "mere interest in the proper enforcement of law and community safety [would] not provide standing." *Id.* at 997. The Eighth Circuit affirmed in relevant part, stating that, because, "[t]he County presented no evidence that its ability to enforce state or local law on the reservation has been usurped or even affected by the Band's alleged intentions[,] . . . it is not in immediate danger of sustaining threated injury traceable to an action of the Band." *Cty. of Mille Lacs v. Benjamin*, 361 F.3d 460, 464 (8th Cir. 2004).

### C. Subsequent Developments

The dismissal of the 2002 litigation did not mark the end of this dispute. Indeed, several recent events culminated in the parties once more appearing before this Court.

First, at some undisclosed point in time, the Environmental Protection Agency began to regulate the underground storage tanks of "one or more Band businesses" on disputed land, in lieu of the traditional state regulator, the Minnesota Pollution Control Authority. (Counterclaim ¶ 50.)

Second, in 2013, the Band petitioned the U.S. Department of Justice for an Assumption of Concurrent Federal Criminal Jurisdiction over the lands encompassed in the 1855 Reservation. (*Id.* ¶ 46.) The Band was apparently motivated by a desire to combat high crime rates in Mille Lacs County, as "a disproportionate amount of criminal activity occurs within the Reservation." (Compl. ¶ 5L.)

7

Third, on November 20, 2015, the Office of the Solicitor in the United States Department of the Interior issued an opinion letter, Opinion M-37032, which stated that the 1855 Reservation had not been diminished or disestablished. (Counterclaim ¶ 47.) This letter resulted in the Justice Department granting the Band concurrent federal criminal jurisdiction in January 2016 (*id*. ¶ 46), and in the Bureau of Indian Affairs ("BIA") entering into a Deputation Agreement with the Band in December 2016. (*Id*. ¶ 48.) The Deputation Agreement allows individual Band police officers to exercise federal law enforcement authority throughout the 1855 Reservation as if they were BIA officers, so long as the officers apply for and receive a "Special Law Enforcement Commission" ("SLEC"). (*Id*.) Plaintiff Sergeant Naumann, among others, has received a SLEC from the BIA. (Compl. ¶ 5K; Answer ¶ 5K (admitting that Plaintiff Naumann, and "some other licensed police officers employed by the Band police department," hold SLECS).)

Fourth, in response to the Deputation Agreement and the conferral of SLECs on Band police officers, County Attorney Walsh allegedly "threatened Band police officers, including Plaintiffs Rice and Naumann, with arrest and prosecution if they exercise law enforcement authority on non-trust lands within the [1855] Reservation or with respect to Band members." (Compl. ¶ 5O; *but see* Answer ¶ 5O (denying allegation).) The County Attorney also allegedly asserted that he will not prosecute criminal cases based on investigations conducted by Band police officers, and that the County will not arrest subjects apprehended by Band police officers. (Compl. ¶¶ 5P-5Q; *but see* Answer ¶¶ 5P-Q (denying allegations).)

8

Finally, on November 8, 2017, days before the Band filed this suit, the Solicitor of the Department of the Interior sent a letter to County Attorney Walsh, "claiming in part that there was 'no basis in law' to dispute the Band's exercise of criminal jurisdiction throughout the original boundaries of the 1855 Reservation." (Counterclaim ¶ 49.)[5]

### D.  Current Litigation and Procedural History

In light of these developments, and in a role reversal from the 2002 litigation, the Band filed a declaratory judgment action on November 17, 2017. In its complaint, the Band described the County's aforementioned "assertions, threats of prosecution and instructions" as contrary to both federal law and the Band's "inherent authority," and accordingly requested two declarations from this Court. First, it seeks a declaration that "the Band possesses the inherent sovereign authority to authorize Band police officers to investigate violations of federal, state, and tribal law [within the 1855 Reservation]." (Compl. Demand for Relief ¶ 1A.) Second, it seeks a declaration that "pursuant to [various federal statutes, the Deputation Agreement, and the SLECs], Band police officers have federal authority to investigate violations of federal law [within the 1855 Reservation]." (*Id.* ¶ 1B.) In addition, the Band requested that the Court "enjoin Defendants from taking or failing to take any

---

[5]     The County also noted in its briefing that the County is currently litigating a Freedom of Information Act suit against the Department of Justice and the Department of the Interior, in which the County "seek[s] records related to tribal law enforcement activities, the assumption of concurrent federal jurisdiction, and communications regarding these matters with the Band." (Def.'s Mem. [Doc. No. 35] at 12.) The case is ongoing. *See Cty. of Mille Lacs v. U.S. Dep't of Justice and Dep't of Interior*, No. 17-cv-04863 (MJD/LIB), Joint Letter to Magistrate Judge, Doc. No. 23 (D. Minn. July 27, 2018) (describing a recent production of 57 documents from the Department of Justice to the County). However, because this separate litigation does not affect the Court's ruling, the Court will not address it further in this motion.

actions that interfere with the authority of Band police officers as declared by the Court."
(*Id.* ¶ 1C.) As such, though the Complaint implicitly asks this Court to determine the Reservation's boundaries, it does so in a more focused manner than the County's 2002 declaratory judgment suit.

The County of Mille Lacs answered on December 21, 2017. Its Answer included the following affirmative defenses, among others: (1) that the 1885 Reservation "has been disestablished," and that the Band therefore lacks civil regulatory or criminal authority over lands not "currently held in trust by the United States for the Mille Lacs Band, the Minnesota Chippewa Tribe, or tribal members" (Affirmative Defenses ¶¶ 16-20); (2) that the Band's claims are barred by res judicata, collateral estoppel, and judicial estoppel (Affirmative Defenses ¶¶ 3-5); and (3) that the Band's claims are barred by the Indian Claims Commission Act. (Affirmative Defenses ¶¶ 1-2, 12.) [6]

The County's Answer also set forth a 21 page, four-count Counterclaim, which is the subject of this motion ("the Counterclaim"). The Counterclaim in large part mirrored the 2002 complaint,[7] with the addition of the facts noted in Section I.C, *supra*, and concluded with four separate requests for declaratory and injunctive relief. First, it asks the Court to

---

[6]    In separate Answers, Defendants Walsh and Lindgren also asserted affirmative defenses. However, neither Defendant raised counterclaims. (*See* Lindgren Answer [Doc. No. 19]; Walsh Am. Answer [Doc. No. 21].)

[7]    *Compare, e.g.*, 2002 Compl. ¶¶ 7-13 *with* Counterclaim ¶¶ 10-16 (identical background allegations); 2002 Compl. ¶ 29 *with* Counterclaim ¶ 32 (identically alleging that "the actual controversy in this case . . . causes conflict and uncertainty affecting the lives and property of County residents on a daily basis"); 2002 Compl. ¶¶ 48-50 *with* Counterclaim ¶¶ 52-54 (identically alleging that "the conflict over the Reservation status . . . . creates conflict over the enforcement of civil regulatory laws [in the County]").

declare that the 1855 Reservation has been disestablished. (Counterclaim ¶¶ 58-62.) Second, it asks the Court to enjoin the Band from "exercising tribal inherent criminal authority or federal criminal authority" on lands not "held in trust by the United States for the Mille Lacs Band, the Minnesota Chippewa Tribe, or individual Band members." (*Id.* ¶¶ 63-64.) Third, it asks the Court to declare that the Band is "estopped from asserting that the 1855 Mille Lacs Indian Reservation exists." (*Id.* ¶¶ 65-71.) Fourth, it asks the Court to declare that the Indian Claims Commission Act of 1946 "precludes [the Band] from resurrecting the 1855 Reservation." (*Id.* ¶¶ 72-73.)

As evident from this description, the counterclaims present essentially the same issues as several of the affirmative defenses. However, according to the County, the declaratory and injunctive relief requested in the counterclaims is necessary because "it is possible that the status of the disputed lands will not be resolved in this litigation." (Def.'s Mem. at 42.) Further, the Counterclaim named five additional Band officials as counterclaim Defendants, "to ensure that the Court ha[s] jurisdiction over [the Counterclaim's requests for relief] in the event that the Band asserts sovereign immunity." (*Id.* at 13); *see Ex Parte Young*, 209 U.S. 123 (1908) (allowing suits in federal courts against officials acting on behalf of a governing entity, despite the entity's sovereign immunity).

On February 5, 2018, the Band, including the Counterclaim Defendants, moved to dismiss the Counterclaim under Rules 12(b)(1), 12(b)(6), and 12(f), relying in large part on the case law arising out of the 2002 litigation. The Court held oral argument on May 18, 2018.

## II.    DISCUSSION

11

The Band offers three arguments in support of dismissal. First, it argues that the Court lacks subject matter jurisdiction over the Counterclaim because the County does not sufficiently allege standing under Article III. Second, it argues that the County fails to allege a cognizable legal theory on which relief can be granted. Finally, it argues that, at the least, the Court should strike the Counterclaim as "redundant" under Rule 12(f).

Because Article III standing "is a jurisdictional prerequisite that must be resolved before reaching the merits of a suit," the Court will address that issue first. *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007). Further, because the Court finds that it lacks subject matter jurisdiction over the County's counterclaim, it declines to address the Band's other two arguments in support of dismissal. *See Shoots v. iQor Holdings U.S., Inc.*, No. 15-cv-00563 (SRN/SER), 2016 WL 6090723, at *2 (D. Minn. Oct. 18, 2016) ("[W]here standing is absent, the Court has no authority to go further than dismissing the case.").

## A.   Motion to Dismiss for Lack of Subject Matter Jurisdiction

### 1.   Article III Standing

Article III of the Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. Const., art. III, § 2, cl. 1.  Accordingly, any federal court plaintiff must have case-or-controversy "standing" to assert a claim—specifically, a plaintiff must show "(1) that he has suffered an 'injury in fact' that is 'actual or imminent, not conjectural or hypothetical'; (2) that the injury is causally connected to the defendant's allegedly illegal conduct and not to the 'independent action of some third party not before the court'; and (3) that 'it [is] likely, as opposed to merely speculative, that the injury will be 'redressed by a favorable decision.'" *Wieland v. U.S. Dep't of Health and Human Servs.*, 793 F.3d 949, 954

(8th Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Because "standing is not dispensed in gross," this constitutional requirement applies to counterclaimants like the County. *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017); *cf. Western Heritage Ins. Co. v. Asphalt Wizards*, 795 F.3d 832, 836 (8th Cir. 2015) (affirming the dismissal of a defendant's counterclaims based on lack of standing).

When a party makes a facial attack on a pleading in a 12(b)(1) motion, as is the case here, the court "accept[s] as true all facts alleged in the [counter]complaint," and "considers only the materials that are necessarily embraced by the pleadings and exhibits attached to the [counter]complaint." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) (internal citations and quotation marks omitted). Courts also accept "general factual allegations of injury resulting from the defendant's conduct," since, at this stage of litigation, courts "presume that general allegations embrace those specific facts necessary to support the claim." *City of Clarkson Valley*, 495 F.3d at 569 (citing *Lujan*, 504 U.S. at 561). However, even at the pleading stage, the party invoking the court's jurisdiction (here, the County) bears the burden of "clearly . . . alleg[ing] facts demonstrating each element" of standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "Strict compliance with this jurisdictional standing requirement is mandated." *Delorme v. U.S.*, 354 F.3d 810, 815 (8th Cir. 2004).

### 2.   The County's Standing to Assert its Counterclaim

The parties primarily dispute whether the County has sufficiently alleged the "injury in fact" element of standing, such that the Counterclaim's allegations can be distinguished

from the standing evidence that both this Court and the Eighth Circuit found lacking in the prior litigation.[8] Then as now, the County cannot claim injury merely because it believes the Band's "campaign to influence state and federal agencies that the 1855 Reservation was never diminished or disestablished" is illegal. (Counterclaim ¶ 42); *see Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 482-83 (1982) (noting that standing does not arise from "the right, possessed by every citizen, to require that the Government be administered according to law"). Rather, the County must clearly allege that, because of the Band's post-2002 actions, "its ability to enforce state or local law on the reservation has been usurped or . . . affected by the Band's alleged intentions," *Benjamin*, 361 F.3d at 464, or that it has "personally . . . suffered some actual or threatened injury as a result of the putatively illegal conduct of [the Band]," *Valley Forge Christian Coll.*, 454 U.S. at 472.

As best the Court can tell, the Counterclaim alleges that the Band's post-2002 actions are tangibly injuring, or threatening to injure, the County in three ways. *First*, the Band's actions potentially subject the County to concurrent law enforcement, which is causing confusion and uncertainty for County officials. *Second*, the Band's actions potentially inhibit the ability of County police to prosecute civil violations like speeding. *Third*, the Band's actions will depress property values and, in turn, reduce the tax base and income for the County.

---

[8]     The Court acknowledges that the 2002 litigation arose under summary judgment motions, whereas this case comes before the Court on a motion to dismiss under Rule 12(b)(1). As such, the Court relies on the precedents for their factual descriptions and their general statements of law, while simultaneously applying the appropriate standard of review for this motion.

The first two allegations do not evince an actual or imminent injury to the County's legal interests, even when taken as true and viewed in a light most favorable to the County. And to the extent the third allegation properly shows injury in fact, it fails to adequately plead causation.

*First*, the County argues that "the assertion by the Band that it possesses law enforcement authority on non-trust lands" constitutes "a threat to the County's jurisdiction and regulatory authority." (Def.'s Mem. at 20.) Far from being a hypothetical worry, the County contends, the Band has "sought and obtained" various agreements with federal agencies recognizing the Band's right to police the entire 1855 Reservation, *see supra* Section I.C., and has initiated the underlying lawsuit to enforce those agreements. (Def.'s Mem. at 8-11.) The County alleges that this looming jurisdictional infringement "ha[s] caused an ongoing dispute and controversy between the Band and the County, and confusion for residents of Mille Lacs County," (Counterclaim ¶ 51) such that the County "need not wait any longer for the injury to worsen before bringing its claim for declaratory relief." (Def.'s Mem. at 20.)

The Court disagrees. The Band and its allied federal agencies made similarly strong jurisdictional assertions in 2002, as that complaint detailed at length. *See, e.g.*, 2002 Compl. ¶¶ 36-41 (statements by Band politicians and in official Band documents); ¶¶ 53A-B, E-F (Bureau of Indian Affairs); ¶¶ 53C-D (Environmental Protection Agency); ¶¶ 53G-I (Army Corps of Engineers). Indeed, the Counterclaim recites much of this history. (Counterclaim ¶¶ 39-45.) However, the Eighth Circuit declined to find such assertions sufficiently injurious without some "definite controversy that exists from the Band's purported expansion of tribal

15

jurisdiction over the disputed portion of the reservation." *Benjamin*, 361 F.3d at 464. The County ripostes that the Band's lawsuit, alongside the federal agency agreements, demonstrates that such a "definite controversy" now exists. (*See* Def.'s Mem. at 18-24.) The Court is not convinced that this distinction is strong enough to overcome the prior case law. For one, because standing "is not dispensed in gross," the County must allege injury beyond being a defendant in this suit. *Town of Chester, N.Y.*, 137 S. Ct. at 1650.

What's more, even assuming this suit for injunctive relief presents a more serious threat to the County than the Band's prior actions, the County still does not allege that the Band's lawsuit is causing a "concrete and particularized" injury to a "legally protected interest." *Carlsen*, 833 F.3d at 908 (citing *Lujan*, 504 U.S. at 560). The County concedes that the Band's desired police powers would not displace the County's criminal jurisdiction. (*See* Counterclaim ¶ 52 (stating that "all state crimes committed by Indians or non-Indians within Indian country in Minnesota are prosecuted by state and local governments without reference to reservation status.").) And neither the Counterclaim nor the County's brief in opposition state how the Band's potential exercise of concurrent jurisdiction harms the County, other than to call it "controversial" and "confusing." (*See, e.g.*, *id.* ¶¶ 51, 55.) [9] Although the County is correct that "we don't need to wait until there is actually conflict between officers in the field," (Hr'g Tr. 30:18-19), the County needs to at least allege that its "ability to enforce the law is being affected" by the Band's recent actions, *Benjamin*, 361 F.3d at 464.

---

[9]     The Court addresses the County's argument about *Virginia v. Hicks* and potentially displaced civil regulatory jurisdiction below.

Recent reservation boundary litigation out of Nebraska offers a useful comparison. *See Smith v. Parker*, 996 F. Supp. 2d 815 (D. Neb.), *aff'd* 774 F.3d 1166 (8th Cir. 2014), *aff'd sub. nom Nebraska v. Parker*, 136 S. Ct. 1072 (2016). There, the Village of Pender, along with various businesses within the Village, disagreed with the Omaha Tribal Council about the proper boundaries of the Omaha Reservation. In particular, the Village did not believe it lay within reservation boundaries. However, the Village did not sue for declaratory and injunctive relief until after the Omaha repeatedly attempted to enforce its Beverage Control Ordinance against individual Pender businesses, including through threatened fines and enforcement actions in tribal court. *Id*. at 820-21. While *Smith* did not directly concern standing, its facts illustrate the kind of injury a plaintiff (or counter-plaintiff) might allege in a case like this one. Here, the County does not allege that the concurrent law enforcement the Band seeks through its lawsuit threatens to harm the County in a similarly concrete way. For instance, the County does not allege that the Band is threatening to impose conflicting regulations on it, or that County officials will be disrupted by tribal officers carrying SLECs. *Cf. Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 1144, 1153-54 (9th Cir. 2017) (finding that a an Indian Tribe had sufficiently alleged ripeness when its police force "ha[d] been ordered to cease and desist exercising what it believe[d] to be its proper inherent authority," which "cost the Tribe money" and "interfered with [its] ability to maintain peace and security on the reservation").[10]

---

[10]   The County points to Judge Rosenbaum's comment, "[i]t is clear that potential liability stemming from a filed complaint can be sufficient to create standing," as evidence that being a defendant in this suit affords it standing to advance a counterclaim. (Def.'s Mem. at 9 (citing *Benjamin*, 262 F. Supp. 2d at 997).) The Court disagrees. "Can"

*Second*, the County argues that, even if concurrent law enforcement won't necessarily inhibit County criminal jurisdiction, the Band's lawsuit, if successful, will result in the County losing prosecutorial power over Band members for certain civil infractions. (*See, e.g.*, Hr'g Tr. 25: 14-19 (arguing that ruling for the Band in its lawsuit will "immediately" lead to loss of civil jurisdiction)); *see also supra* note 4 (describing how recognizing the full 1855 Reservation would limit County civil jurisdiction over Band members on disputed land). The County asserts that the Supreme Court recognized the injury of "inability to prosecute" in *Virginia v. Hicks*, 539 U.S. 113, 121 (2003), and that the County adequately alleged that injury here. (*See* Def.'s Mem. at 18.)

Again, the Court disagrees. As a threshold matter, *Virginia v. Hicks* does not appear to stand for the proposition the County cites it for. In that case, the Supreme Court briefly discussed standing as it related to the State of Virginia's standing to appeal an overturned criminal conviction from the state Supreme Court to the federal Supreme Court. *See Virginia*, 539 U.S. at 121. Although the case is cited frequently as a matter of First Amendment law, the Court cannot find any instance in which it has been used to justify standing in a context analogous to this one.

Still, assuming governments can claim injury when a third party's actions wrongfully limit their ability to prosecute crime, the County does not allege that the Band's actions pose

---

does not mean "must." And the one case Judge Rosenbaum cited in support of that principle, *Va. Sur. Co. v. Northup Grumman Co*., 144 F.3d 1243, 1246 (9th Cir. 1998), involved an insurance company seeking a declaratory judgment against a defendant in response to the defendant's agent filing a $14 million lawsuit against the company in a foreign court. The County does not allege that the Band's suit poses a similarly concrete harm here.

an "actual or imminent" threat to its ability to enforce the civil code across the 1855 Reservation. *Wieland*, 793 F.3d at 954; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (noting that the alleged injury must be "*certainly* impending") (emphasis in original). In the Complaint, which is arguably the factor most distinguishing this case from the 2002 litigation, (*see, e.g.*, Def.'s Mem at 19 (calling the Band's suit "the greatest single difference between the *Benjamin* case and today")), the Band does not ask the Court to enjoin the County from enforcing civil infractions against Band members on the 1855 Reservation. Its request for injunctive relief is limited to protecting *its own* policing power, as recognized in the federal agreements. In its briefing, the Band re-affirmed that, "[a]lthough the 'Indian Country' status of non-trust lands could affect the County's civil regulatory authority, the Band seeks no relief regarding such authority." (Pl.'s Reply Mem. [Doc. No. 38] at 6.) The County does not contradict these assertions. Indeed, the Counterclaim's allegations related to this issue almost entirely mirror the 2002 Complaint's allegations. *Compare* 2002 Compl. ¶¶ 48-50 *with* Counterclaim ¶¶ 52-54. Thus, then just as now, the County fails to allege that its purported "inability to prosecute" civil regulations "has created a real injury." *Benjamin*, 262 F. Supp. 2d at 997.[11]

---

[11]      In a similar vein, the County alleges that the Band's actions have undermined *the State's* jurisdiction over waste treatment facilities. (*See* Counterclaim ¶ 50.) This allegation does not help the County's cause because the County must show that it "*personally* . . . suffered some actual or suffered some actual or threatened injury as a result of the putatively illegal conduct of [the Band]." *Valley Forge Christian Coll.*, 454 U.S. at 472 (emphasis added). That said, the Court takes the County's point that it must raise the issue, because, if it did not, "the Band would almost certainly cite the EPA's unchallenged exercise of regulation over underground tanks as evidence that the disputed land is Indian Country." (Def.'s Mem. at 11 n.3.)

*Finally*, the County maintains that "these controversies further undermine property tax values for residents on fee lands within the original boundaries of the 1855 Reservation, and reduce the tax base and income for the County." (Counterclaim ¶ 55.) The Court will assume for purposes of this motion that a "reduce[d] tax base and income" injures the County. *See Sierra Club v. Morton,* 405 U.S. 727, 733–34 (1972) ("[P]alpable economic injuries have long been recognized as sufficient to lay the basis for standing"). However, this allegation nonetheless falters on the second prong of the standing analysis, causation.

As noted above, a party asserting federal court jurisdiction must clearly allege that its "injury is causally connected to the defendant's allegedly illegal conduct and not to the independent action of some third party not before the court." *Wieland*, 793 F.3d at 954; *see also St. Louis Heart Center, Inc. v. Nomax, Inc.*, 899 F.3d 500, 504 (8th Cir. 2018) (dismissing claim where plaintiff failed to show that "its alleged injury is traceable to" the alleged illegal behavior). Here, the County does not allege that its economic injury is "causally connected" to any of the Band's recent actions. The Counterclaim generically asserts that "these controversies" are lowering property tax revenues. (Counterclaim ¶ 55.) More importantly, though, neither the Counterclaim nor the County's brief distinguish this cursory allegation of economic injury from the nearly-identical claims of economic injury that Judge Rosenbaum rejected in 2002 (albeit on summary judgment). Per Judge Rosenbaum, even taking the County's allegations related to lowered property tax values as true, "the claimed diminution of land value would result from the disinterest of third-party potential-purchasers in owning land in the reservation—not from legal uncertainty."

20

*Benjamin*, 262 F. Supp. 2d at 998. "The impact of this Court's decision depends, therefore, on actions of third-party buyers and owners who are not parties to this litigation." *Id*. (citing *Lujan*, 504 U.S. at 560-61). This is equally true here. Even assuming "general allegations" of reduced revenue "embrace those specific facts necessary to support the claim," *City of Clarkson Valley*, 495 F.3d at 569, the County has not alleged anything to show that the Band's actions, including the filing of this lawsuit, are impacting its coffers, as opposed to the independent actions and beliefs of "third-party potential purchasers," *Benjamin*, 262 F. Supp. 2d at 998.

For these reasons, the County has not sufficiently pled standing under Article III. The Court accordingly lacks subject matter jurisdiction over the Counterclaim.

## III.    CONCLUSION

The Court reiterates that this decision concerns only standing. The Court makes no assessment of the merits of the parties' claims and defenses. *See Red River Freethinkers v. City of Fargo*, 679 F.3d 1015, 1023 (8th Cir. 2012). To the extent the County's affirmative defenses overlap with its counterclaims, the County may advance those defenses as this case proceeds through discovery. Furthermore, "because the basis for this decision is jurisdictional[,] . . . the dismissal necessarily is without prejudice." *Shoots*, 2016 WL 6090723, at *8 (citing *Benjamin*, 361 F.3d at 464-65).

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' and Counterclaim Defendants' Motion to Dismiss Defendant County of Mille Lacs's Counterclaim [Doc. No. 25] is **GRANTED**; and

2. County Defendant's Counterclaim [Doc. No. 17] is **DISMISSED** without prejudice.


Dated:  September 19, 2018                              **s/Susan Richard Nelson**
                                                                              SUSAN RICHARD NELSON
                                                                              United States District Judge