UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Mille Lacs Band of Ojibwe, et al.,　　　　　　File No. 17-cv-5155 (SRN/LIB)

　　　　　　Plaintiffs,

v.　　　　　　　　　　　　　　　　　　　　**ORDER**

County of Mille Lacs, Minnesota, et al.,

　　　　　　Defendants.

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment made in accordance with the provisions of 28 U.S.C. § 636, and upon Defendants' Motion to Compel Against Plaintiffs and to Enforce Third-Party Subpoena, [Docket No. 86], and Plaintiffs' Motion for Protective Order and to Quash Defendant's Third-Party Subpoena, [Docket No. 96].

For the reasons discussed below, Defendants' Motion to Compel Against Plaintiffs and to Enforce Third-Party Subpoena, [Docket No. 86], is **DENIED**, and Plaintiffs' Motion for Protective Order and to Quash Defendant's Third-Party Subpoena, [Docket No. 96], is **GRANTED**.

I.　　BACKGROUND AND RELEVANT FACTS

　　　　A.　Relevant Background and Factual Allegations

The Mille Lacs Band of Ojibwe (the "Band") is a federally recognized Indian tribe. (Compl. [Docket No. 1] ¶ 1). The Mille Lacs Indian Reservation (the "Reservation") was established in 1855 by Article 2 of the Treaty with the Chippewa. (Id. ¶ 5.A (citing 10 Stat. 1165 (Feb. 22, 1855)). The Band contends that "[t]he Reservation comprises of approximately 61,000 acres of land" (the "1855 Reservation"). (Id.). Of that land, however, "[t]he United States owns

approximately 3,572 acres of land within the Reservation in trust for the Band, the Chippewa Tribe and Band members" (the "Trust Lands"). (Id.). "In addition, the Band owns approximately 6,038 acres within the Reservation in fee simple and, as of February 2015, Band members owned approximately 84 acres within the Reservation in fee simple." (Id.).

The Band contends that "[t]he boundaries of the Reservation as established in 1855 have not been disestablished or diminished," and all lands within the 1855 Reservation "are Indian country within the meaning of 18 U.S.C. § 1151." (Id. ¶ 1.B, 5.C). Conversely, Defendants contend that the 1855 Reservation "has been disestablished," and that "the extent of Indian country in Mille Lacs County, Minnesota is land held in trust by the United States for the benefit of the Minnesota Chippewa Tribe or the Mille Lacs Band or its Members. (Answers [Docket Nos. 17, 21] ¶¶ 5.F–G; see also, Mem. Op. & Order [Docket No. 46], at 5).

"Under Band law, the Band established and maintains a police department authorized to promote public safety, protect members of the Band and Band property, preserve the peace, and work with other law enforcement agencies to promote the peace." (Compl. ¶ 5.I). "The Band has authorized its law enforcement officers to make arrests and to carry handguns, other firearms, and other weaponry for their personal protection and the protection of others." (Id.).

In June 2016, the County of Mille Lacs, Minnesota (the "County") revoked the 2008 cooperative law enforcement agreement between the Band and the County. (Ex. E [Docket No. 99-1], at 19). The instant case concerns the authority of the Band to establish a police department and the authority of the Band police officers to conduct law enforcement activities in the absence of such an agreement. (See, Compl. [Docket No. 1). The Parties dispute the extent of Band police officers' authority to conduct law enforcement activities related to violations of federal, state, and/or tribal law. Particularly, the Parties dispute whether Band police officers have the

authority to conduct law enforcement activities throughout the 1855 Reservation or whether such authority is restricted to the Trust Lands, and the extent of Band police officers' authority to conduct law enforcement activities involving non-Band members. (See, e.g., Compl. [Docket No. 1] ¶¶ 5.M–N; Answers [Docket Nos. 17, 21], ¶¶ 5.M–N; Ex J [Docket No. 99-1], at 46–61; Ex. K [Docket No. 99-1], at 63; Ex. M [Docket No. 99-1], at 67–68).

Following the revocation of the 2008 cooperative law enforcement agreement, Defendants issued a protocol stating that it was "Mille Lacs County's position that inherent tribal criminal authority doesn't exist (1) outside trust lands or (2) to non-members of Mille Lacs band" and listing what Band police officers could and couldn't do in lieu of such authority. (Ex. K [Docket No. 99-1], at 63). In accordance with that Protocol, the County Attorney, Defendant Walsh, issued an opinion in July 2016 which stated in part that Band police officers, if they conduct law enforcement activities outside of the Trust lands, could be guilty of using their firearms to cause fear in another of immediate bodily harm or death (a felony with a mandatory sentence of three years), false imprisonment (a felony), pretending to be a peace officer (a gross misdemeanor), unauthorized practice of a law enforcement officer (a misdemeanor), or obstructing or interfering with a peace officer (a misdemeanor). (Ex. J [Docket No. 99-1], at 57–58).

In a letter to the Band's Police Chief, dated August 25, 2016, Defendant Walsh reiterated that Band police officers' law enforcement related actions could constitute crimes. (Ex. N [Docket No. 99-1], at 72). Moreover, in a letter to a Band police officer, dated September 20, 2016, Defendant Walsh informed the officer that a particular case had been dismissed and stated, "[i]f you wish for controlled substance offenders to be prosecuted in Minnesota District Court in

the future, . . . please comply with the Opinion and Protocol . . . ." (Ex. O [Docket No. 99-1], at 75).

On November 11, 2017, Plaintiffs filed their Complaint in this Court. In relevant part, the Complaint makes the following factual allegations.

The Band's Police officers "are all peace officers licensed by the Minnesota Board of Police Officer Standards and Training." (Id. ¶ 5.J).

> In December 2016, the United States Bureau of Indian Affairs entered into a Deputation Agreement with the Band and subsequently issued Special Law Enforcement Commissions (SLECs) to Band police officers under 25 U.S.C. §§ 2801 and 2804. Pursuant to the Deputation Agreement, the SLECs and federal law, Band police officers have authority to investigate violations of federal law throughout the Reservation and to arrest suspects (including Band members and non-Band members) as federal law enforcement officers.

(Id. ¶ 5.K; see also, Ex. Q [Docket No. 99-1], at 79–88).

> According to statistics published by the Minnesota Bureau of Criminal Apprehension, Mille Lacs County had the highest crime rate of any county in Minnesota during 2015 and 2016. Within Mille Lacs County, a disproportionate amount of criminal activity occurs within the Reservation. Criminal activity within the Reservation is not limited to trust lands, but takes place on Band and non-Band member fee lands as well.

(Id. ¶ 5.L).

Defendants "assert that Band police officers have no law enforcement authority within the Reservation except on trust lands" and also that "Band police officers have no authority to investigate violations of federal, state or tribal law by non-Band members, even on trust lands." (Id. ¶¶ 5.M–N).

"The County Attorney has threatened Band police officers, including Plaintiffs Rice and Naumann, with arrest and prosecution if they exercise law enforcement authority on non-trust lands within the [1855 Reservation] or with respect to non-Band members." (Id. ¶ 5.O). "The

County Attorney has asserted that he will not prosecute criminal cases based on investigations conducted, or evidence gathered, by Band police officers on non-trust lands within the Reservation or with respect to non-Band members." (Id. ¶ 5.P). "The County Sheriff and the County Attorney have instructed the Sheriff's deputies not to arrest suspects apprehended by Band police officers exercising their inherent tribal and federally delegated law enforcement authority." (Id. ¶ 5.Q).

Defendants' threats and assertions "are based on an erroneous understanding of the authority possessed by Band law enforcement officers" and "have deterred Band police officers from exercising law enforcement authority conferred upon them by the Band pursuant to: (1) the Band's inherent authority under federal law; (2) the Deputation Agreement between the Band and the Bureau of Indian Affairs; and (3) the SLECs issued to Band police officers by the Bureau of Indian Affairs." (Id. ¶¶ 5.O–S). Defendants' threats and assertions have also "deterred Band police officers from responding to criminal activity within the Reservation, including drug trafficking, gang activity and violence that threatens the safety, health, welfare and well-being of Band and non-Band members who live and work within, and visit, the Reservation." (Id. ¶ 5.T). Therefore, Defendants' "have interfered with the lawful exercise of federal tribal enforcement authority." (Id.).

For relief, Plaintiffs seek, pursuant to 28 U.S.C. § 2201, a declaration that:

A. As a matter of federal law, the Band possesses inherent sovereign authority to establish a police department and to authorize Band police officers to investigate violations of federal, state and tribal law within the Mille Lacs Indian Reservation as established in Article 2 of the Treaty with the Chippewa, 10 Stat. 1165 (Feb. 22, 1855), and, in exercising such authority, to apprehend suspects (including Band and non-Band members) and turn them over to jurisdictions with prosecutorial authority; and

5

> B. Pursuant to 18 U.S.C. § 1162(d), 25 U.S.C. §§ 2801 and 2804, the Deputation Agreement between the Band and the Bureau of Indian Affairs, and the SLECs issued to Band police officers by the Bureau of Indian Affairs, Band police officers have federal authority to investigate violations of federal law within the Mille Lacs Indian Reservation as established in Article 2 of the Treaty with the Chippewa, 10 Stat. 1165 (Feb. 22, 1855), and, in exercising such authority, to arrest suspects (including Band and non-Band members) for violations of federal law.

(Compl. [Docket No. 1]). Plaintiffs further "request that the Court enjoin Defendants from taking or failing to take any actions that interfere with the authority of Band police officers as declared by the Court." (Id.).

### B. The Report

Years earlier, on August 5, 2013, an Executive Order was signed by Mille Lacs Band Chief Executive Melanie Benjamin which stated that "recent events have raised concerns among many persons and elected leaders of the Mille Lacs Band regarding the conduct and oversight of members of the Police Department" and which appointed outside attorney's Wallace G. Hilke and Mark D. Larsen of Lindquist & Vennum LLP[1] as hearing officers (together, the "Hearing Officers") "for the purpose of investigating potentially improper conduct by one or more officers of the Mille Lacs Band Police Department . . . and to develop recommendations for policies, procedures and further steps for improving the operations and oversight of the Police Department." (Ex. AA [Docket No. 99-1], at 183–84).

Following their investigation, the Hearing Officers compiled their findings and recommendations into a report (the "Report"). (See, e.g., Ex. A [Docket No 92-1]). The Report has not been distributed to more than a select-few members of Band leadership. ((Benjamin Decl. [Docket No. 100] ¶ 13). Moreover, the Hearing Officers did not provide any Band

---

[1] Now Ballard Spahr LLP.

members with the underlying documents related to the Report such as interview notes. (See, Id. ¶ 17).

In a March 2014, Message from the Chief Executive, Melanie Benjamin only generally discussed the Report. (Ex. A [Docket No 92-1]). Chief Executive Benjamin stated that the Report was completed in December 2013.[2] (Id.). She further stated that the Report "address[ed] concerns regarding the conduct and oversight of members of the Tribal Police Department" and concluded that "public safety on the Reservation was in decline." (See, Id.). In addition, Chief Executive Benjamin loosely described several of the Report's recommendations to improve the situation.[3] (See, Id.).

Although not publicly disclosed in the March 2014, Message from the Chief Executive, the Report further "concluded that there [we]re profound public safety problems on the Mille Lacs Reservation that [could not] be solved without a change in leadership on the Band Police Department," and the Report recommended that the Band's then Police Chief be terminated. (Ex. W [Docket No. 99-1], at 150). As a result, the Band's Police Chief in 2013 and 2014, was asked to step down. (Id.; see also, Sealed Ex. N [Docket No. 93]). In a letter to various Band leadership representatives informing them of the Police Chief's departure, Chief Executive Benjamin stated that the decision was "made out of concern for public safety," and that "[w]hile [the Police Chief] was not responsible for the actions of Mille Lacs County, we have compelling evidence

---

[2] However, according to the deposition testimony of Chief Executive Benjamin, she only "received an early or abbreviated version of [the Report] . . . in December 2013, but the final report was presented to the Band's elected leadership in mid-February 2014." (Benjamin Decl. [Docket No. 100] ¶ 11).

[3] The recommendations described by Chief Executive Benjamin included that the Band "create the position of Commissioner of Public Safety" with various responsibilities, and that "the band should develop a plan for comprehensive law enforcement in District II and III including better relations with county sheriffs." (Id.). In addition, the Report suggested "that over the next five years the Band should consider expanding the size and authority of its tribal court to handle more non-violent crimes," the Band should "charge the Commissioner of Public Safety with evaluating whether to form a citizen review board to receive and investigate complaints regarding [the Tribal Police Department] and to recommend discipline," the Band should conduct a five-year study "of the root causes of crime on the reservation," and "the Band may want to consider retroceding Public Law 280." (Id.).

that his professional and personal actions and behaviors significantly contributed to the toxicity of the relationship between the Band and county law enforcement not just in Mille Lacs County but with other counties as well with whom we have had previously positive relationships." (Sealed Ex. N [Docket No. 93]).

### C. Relevant Discovery History

The Parties "have been engaged in ongoing fact discovery for over one year." (Baldwin Decl. [Docket No. 99] ¶ 4). The Pretrial Scheduling Order has been extended twice. (See, e.g., Second Am. Pretrial Scheduling Order [Docket No. 84]).

On March 28, 2019, Defendants served on Plaintiffs their First Set of Requests for Production of Documents, and on June 6, 2019, Plaintiffs responded. (Baldwin Decl. [Docket No. 99] ¶ 7). Plaintiffs' Privilege Log identified the Report as "Confidential report prepared for Chief Executive by outside counsel under Exec. Order 166-13" and specified that it was being withheld under attorney-client privilege. (Ex. E [Docket No. 92-5], at 5). The Privilege Log listed the Report as having been created on February 14, 2014, and listed its recipients, however, the Privilege Log did not provide any other information concerning the Report. (See, Id.).

On December 18, 2019, Defendant Walsh subpoenaed Ballard Spahr and Hearing Officer Hilke (the "Subpoena"). (See, Ex. A [Docket No. 92-1]). The Subpoena demanded the production of the Report and related documents. (Id.). Specifically, the Subpoena requested:

> 1. The report completed at the end of December 2013 described in Exhibit 1, attached hereto.
>
> 2. Any transcripts, written summaries, or memorialization of the 'interviews with Band Members' described in Exhibit 1.
>
> 3. The documents reviewed in the 'several document reviews' described in Exhibit 1.

          4. All invoices for services provided by Lindquist & Vennum LLP in connection with preparing the report described in Exhibit 1.

(Id. at 2). Exhibit 1 of the Subpoena is the aforementioned March 2014 Message from the Chief Executive in which Chief Executive Benjamin describes the Report. (See, Id. at 3).

        On January 2, 2020, Ballard Spahr LLC objected to the Subpoena on grounds that the Report and related documents are protected by attorney-client privilege and the work-product doctrine. (Ex. CC [Docket No. 99-1], 191).

**II.**     **Defendants' Motion to Compel Against Plaintiffs and to Enforce Third-Party Subpoena, [Docket No. 86], and Plaintiffs' Motion for Protective Order and to Quash Defendant's Third-Party Subpoena, [Docket No. 96].**

The Parties met and conferred by telephone on January 3, 2020, in an attempt to resolve the present dispute. (Meet and Confer Statement [Docket No. 101]). The Parties were unable to reach a resolution; however, they agreed to simultaneously file cross-motions on this matter. (Id.).

On January 17, 2020, the Parties filed their present cross-motions, both of which relate to the production of the Report. Defendants' Motion to Compel Against Plaintiffs and to Enforce Third-Party Subpoena, [Docket No. 86], seeks an Order of this Court compelling Plaintiffs to produce the Report and enforcing Defendant Joseph Walsh's Subpoena on Ballard Spahr and Hearing Officer Hilke which seeks the Report and related documents. Plaintiffs' Motion for Protective Order and to Quash Defendant's Third-Party Subpoena, [Docket No. 96], seeks an Order of this Court finding that Plaintiffs are not required to produce the Report and quashing Defendant Walsh's Subpoena. As the present motions are different sides of the same coin, the Court will consider them together.

### A. Standard of Review

Federal Rule of Civil Procedure 26(b)(1) provides that "Parties may obtain discovery regarding any nonprivileged matter that is <u>relevant</u> to any party's claim or defense . . . ." Fed. R. Civ. P. 26(b)(1) (emphasis added). Courts generally have construed Rule 26(b)(1) broadly. <u>Oppenheimer Fund, Inc. v. Sanders</u>, 437 U.S. 340, 351 (1978); <u>see</u> <u>also</u>, <u>Hofer v. Mack Trucks, Inc.</u>, 981 F.2d 377, 380 (8th Cir. 1992) (Rule 26 "is liberal in scope and interpretation, extending to those matters which are relevant"). Likewise, "[p]ursuant to a subpoena, a non-party can be compelled to produce evidence regarding any matter <u>relevant</u> to the claim or defense of any party, unless a privilege applies." <u>Keefe v. City of Minneapolis</u>, No. 09-cv-2941 (DSD/SER), 2012 WL 7766299, at *3 (D. Minn. May 25, 2012) (emphasis added) (citing Fed. R. Civ. P. 26(b)(1) (defining scope of discovery); Fed. R. Civ. P. 34(c) ("As provided in Rule 45, a nonparty may be compelled to produce documents and tangible things or to permit an inspection.")).

However, to preclude fishing expeditions in discovery, courts require the party seeking discovery to make a threshold showing of relevance before production of information is required. <u>Hofer</u>, 981 F.2d at 380. This threshold showing "is met if the information sought is 'relevant to the subject matter involved in the pending action.'" <u>Orduno v. Pietrzak</u>, No. 14-cv-1393 (ADM/JSM), 2016 WL 5853723, *3 (D. Minn. Oct. 5, 2016) (quoting <u>Archer Daniels Midland Co. v. Aon Risk Servs., Inc. of Minn.</u>, 187 F.R.D. 578, 579 (D. Minn. 1999)); <u>see</u> <u>also</u>, <u>Castle Aero Fla. Int'l, Inc. v. Mktg. & Fin. Servs., Inc.</u>, No. 11-2672 (PAM/JJG), 2013 WL 12152475, at *2 (D. Minn. Jan. 4, 2013) ("Information is relevant if it 'bears on, or [] reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case.'").

**B. Analysis**

As clearly evident above, in this case, Plaintiffs are seeking, pursuant to 28 U.S.C. § 2201, a declaration that:

> A. As a matter of federal law, the Band possesses inherent sovereign authority to establish a police department and to authorize Band police officers to investigate violations of federal, state and tribal law within the Mille Lacs Indian Reservation as established in Article 2 of the Treaty with the Chippewa, 10 Stat. 1165 (Feb. 22, 1855), and, in exercising such authority, to apprehend suspects (including Band and non-Band members) and turn them over to jurisdictions with prosecutorial authority; and
>
> B. Pursuant to 18 U.S.C. § 1162(d), 25 U.S.C. §§ 2801 and 2804, the Deputation Agreement between the Band and the Bureau of Indian Affairs, and the SLECs issued to Band police officers by the Bureau of Indian Affairs, Band police officers have federal authority to investigate violations of federal law within the Mille Lacs Indian Reservation as established in Article 2 of the Treaty with the Chippewa, 10 Stat. 1165 (Feb. 22, 1855), and, in exercising such authority, to arrest suspects (including Band and non-Band members) for violations of federal law.

(Compl. [Docket No. 1]). Plaintiffs also "request that the Court enjoin Defendants from taking or failing to take any actions that interfere with the authority of Band police officers as declared by the Court." (Id.). Accordingly, the two controlling issues to be resolved in this case are (1) the geographical limits of the Reservation and (2) the scope of the Band's law enforcement authority within those limits under applicable law. (See, Id.).

The conduct of Band police officers or the Band police chief, in and before 2013, is not relevant to determining the geographical limits of the Reservation. The relevant inquiry is whether the Reservation has been disestablished or diminished.[4] "[O]nly Congress can divest a reservation of its land and diminish its boundaries." Solem v. Bartlett, 465 U.S. 463, 470 (1984);

---

[4] "Although the terms 'diminished' and 'disestablished' have at times been used interchangeably, disestablishment generally refers to the relatively rare elimination of a reservation while diminishment commonly refers to the reduction in size of the reservation." Yankton Sioux Tribe v. Gaffey, 188 F.3d 1010, 1017 (8th Cir. 1999).

11

see also, Gaffey, 188 F.3d at 1021 ("After land is set aside for an Indian reservation, it retains that status until Congress explicitly indicates otherwise."). "To determine whether a reservation has been diminished, we examine three factors: the statutory language, the historical context, and the population that settled the land." Duncan Energy Co. v. Three Affiliated Tribes of Fort Berthold Reservation, 27 F.3d 1294, 1297 (8th Cir. 1994); see also, Nebraska v. Parker, 136 S. Ct. 1072, 1079–82 (2016). Accordingly, the conduct of Band police officers years before the 2016 actions of Mille Lacs County which gave rise to this action has no bearing on whether the Reservation has been disestablished or diminished in any way.

The conduct of Band police officers, in and before 2013, is also not relevant to the scope of the Band's law enforcement authority within the geographical limits of the Reservation. The relevant inquiry is the scope of the jurisdictional authority of federal, state, and tribal law enforcement over persons within Indian country under applicable law. See gen., State v. Thompson, 929 N.W.2d 21, 29–34 (Minn. Ct. App. 2019), aff'd, 937 N.W.2d 418 (Minn. 2020) (discussing the law enforcement authority of federal, state, and Tribal police over tribe members and non-members on tribal land); cf., Negonsott v. Samuels, 506 U.S. 99, 102 (1993) (quoting Duro v. Reina, 495 U.S. 676, 680 n.1 (1990)) ("Criminal jurisdiction over offenses committed in 'Indian country,' 18 U.S.C. § 1151, 'is governed by a complex patchwork of federal, state, and tribal law.'"). Such an inquiry requires legal, not factual, analysis. Gen., Thompson, 929 N.W.2d at 29–34. Again, the conduct of individual Band police officers years before the actions of Mille Lacs County which gave rise to this action has no bearing on the scope of the sovereign law enforcement authority of the Band within the Reservation under applicable law.

Therefore, the Report and related documents, created during a 2013 Tribal government oversight investigation into the conduct of some members of the Tribal Police Department, are

not relevant in any way to the issues raised by the two claims being asserted in Plaintiff's Complaint. See gen., Parker, 136 S. Ct. at 1079–82; Solem, 465 U.S. at 470; Thompson, 929 N.W.2d at 29–34.

Likewise, the 2013 Report and related documents are not relevant to Plaintiffs' standing to bring the present case. "To satisfy the requirements of standing, a party must (1) allege to have suffered an injury in fact, (2) establish a causal relationship between the opposing party's conduct and the alleged injury, and (3) show that the injury would likely be redressed by a favorable decision." My Pillow, Inc. v. LMP Worldwide, Inc., 18-cv-196 (WMW/DTS), 219 WL 6727298, at *4 (D. Minn. Dec. 11, 2019). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). "A party has standing to bring a claim if it has suffered some actual or threatened injury." Cty. Of Mille Lacs v. Benjamin, 361 F.3d 460, 463 (8th Cir. 2004).

Here, Defendants argue that the 2013 Report and related documents are relevant to show that the County did not cause the Band's law enforcement problems, but rather, that they were caused by the Band itself. (See, Defs.' Mem. in Supp. [Docket No. 88], at 13–20; Defs.' Mem. in Opp'n [Docket No. 105], at 3–5). However, the injury in fact alleged in Plaintiffs' Complaint is not an issue with the efficacy of tribal law enforcement, rather it is the mere interference that Defendants' actions, beginning in 2016, have had on the exercise of the Band's sovereign law enforcement authority within the Reservation since 2016. (See, Compl. [Docket No. 1] ¶¶ 5.M–T).

Indeed, Plaintiffs allege that Defendants have asserted that the tribal law enforcement authority of the Band's police officers is exclusively limited to the Trust Lands and to Band members, which Plaintiffs contend is contrary to controlling law. (Id. ¶¶ 5.M–N). Plaintiffs further allege that Defendants threatened to prosecute Band police officers who engage in law enforcement activities on non-Trust Lands or with respect to non-Band members even on Trust Lands, and that Defendants have refused to prosecute criminal cases based on law enforcement investigations conducted by Band police officers on non-trust lands or with respect even to non-Band members on Trust Lands. (Id. ¶¶ 5.O–Q). Plaintiffs allege that this 2016 and later conduct by Mille Lacs County has effectively interfered with Band police officers from exercising the full sovereign law enforcement authority that they possess within the Reservation as a matter of law. (Id. ¶¶ 5.O–Q, 5.S–T). Thus, the relevant inquiry is simply whether Defendants improperly interfered with tribal law enforcement authority by taking steps to deter Band police officers from exercising the law enforcement authority conferred on them.

The Band has a legally protected interest in exercising its law enforcement authority. See, Bishop Paiute Tribe v. Inyo Cty., 863 F.3d 1144, 1153 (9th Cir. 2017) ("Here, the Tribe identifies its legally protected interest as its 'inherent sovereign authority to restrain, detain, and deliver to local authorities a non-Indian on tribal lands that is in violation of both tribal and state law."). "This interest is certainly concrete and particularized." Id.

Establishing the cause of some of the Band's law enforcement problems as they existed back in 2013 and earlier is not required, nor relevant, in ascertaining whether Defendants have interfered with and deterred Band police officers from exercising tribal authority from 2016 onward. Moreover, proof of any actual consequences of that deterrence is not an essential element of standing. See, e.g., Mashantucket Pequot Tribe v. Town of Ledyard, 722 F.3d 457,

464 (2d Cir. 2013) ("The standing inquiry only requires that the Tribe establish 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'"); Quapaw Tribe of Okla. v. Blue Tee Corp., 653 F. Supp. 2d 1166, 1179 (N.D. Okla. 2009) ("Indian tribes, like states and other governmental entities, have standing to sue to protect sovereign or quasi-sovereign interests.").[5]

Defendants also argue that the Report is relevant to show that Defendants' actions in 2016, et seq., were justified by the Band police officers' conduct. (See, Defs.' Mem. in Supp. [Docket No. 88], at 13–20; Defs.' Mem. in Opp'n [Docket No. 105], at 3–5). However, there is no justification defense available to the two controlling issues raised in the present case. As explained above, the singularly controlling issues to be resolved in this case are whether the geographical limits of the Reservation have been disestablished or diminished, and the lawful scope of the Band's sovereign law enforcement authority within those limits. (See, Compl. [Docket No. 1]). If the Reservation has not been disestablished or diminished, then the County cannot seek to interfere with the Band's exercise of sovereign and lawful tribal law enforcement authority within it to the fullest extent permitted by applicable law.[6]

---

[5] Moreover, the Court notes that even if Plaintiffs were hypothetically required to establish standing by showing Defendants contributed in some way to the Bands' generalized public safety issue problems after the alleged actions by the County in 2016, the 2013 Report would still not be relevant. The Parties "do not dispute that there were significant law enforcement problems on the Reservation when the events giving rise to this case took place." (Plfs.' Mem. in Opp'n [Docket No. 110], at 24). To establish standing, Plaintiffs do not have to show that Defendants were the sole cause of the injury in fact, but rather that Defendants contributed to the injury. See, e.g., City of Wyoming v. Proctor & Gamble Co., 21 F. Supp. 3d 1137, 1151–52 (D. Minn. 2016) ("A plaintiff is not deprived of standing merely because he or she alleges a defendant's actions were a contributing cause instead of the lone cause of the plaintiff's injury."); see also, Loescher v. Minn. Teamsters Pub. & Law Enf't Emps.' Union, 19-cv-1333 (WMW/BRT); 2020 WL 912785, at *6 (D. Minn. Feb. 26, 2020) (same). The Report is not relevant to whether—irrespective of any preexisting law enforcement problems as of 2016—Defendants, beginning in 2016, made the law enforcement problems on the Reservation worse.

[6] At the Motions Hearing, Plaintiffs also argued that the Report and related documents are relevant because, in addition to seeking declaratory judgements, Plaintiffs are seeking injunctive relief. However, an injunction is a remedy not a claim, and there is generally no basis for discovery on a remedy. See, Mooney v. Allianz Ins. Co. of N. Am., No. 06-545 ADM/FLN, 2010 WL 419962, at *2 n.2 (D. Minn. Jan. 29, 2010) ("A permanent injunction is an equitable remedy."). The relief sought by Plaintiffs does not alter that the Report and related documents covering a period of time prior to 2013 are not relevant to the claims asserted based on wholly separate conduct which occurred starting in 2016.

### III. CONCLUSION

For the foregoing reasons, and based on all of the files, records, and proceedings herein,

**IT IS HEREBY ORDERED THAT** Defendants' Motion to Compel Against Plaintiffs and to Enforce Third-Party Subpoena, [Docket No. 86], is **DENIED**, and Plaintiffs' Motion for Protective Order and to Quash Defendant's Third-Party Subpoena, [Docket No. 96], is **GRANTED**.


Dated: April 13, 2020                           s/Leo I. Brisbois
                                                Leo I. Brisbois
                                                U.S. MAGISTRATE JUDGE