# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Mille Lacs Band of Ojibwe, a federally recognized Indian Tribe; Sara Rice, in her official capacity as the Mille Lacs Band Chief of Police; and Derrick Naumann, in his official capacity as Sergeant of the Mille Lacs Police Department, | Case No. 17-cv-5155 (SRN/LIB) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| County of Mille Lacs, Minnesota; Joseph Walsh, individually and in his official capacity as County Attorney for Mille Lacs County; and Don Lorge, individually and in his official capacity as Sheriff of Mille Lacs County, | |
| Defendants. | |

Charles N. Nauen, Arielle Wagner, and David J. Zoll, Lockridge Grindal Nauen PLLP, 100 Washington Ave. S., Ste. 2200, Minneapolis, MN 55401; Beth Ann Baldwin, Marc D. Slonim, and Wyatt Golding, Ziontz Chestnut, 2101 Fourth Ave., Ste. 1230, Seattle, WA 98121, for Plaintiffs

Courtney E. Carter and Randy V. Thompson, Nolan, Thompson, Leighton & Tataryn, PLC, 5001 American Blvd. W., Ste. 595, Bloomington, MN 55437, for Defendant County of Mille Lacs, Minnesota

Scott M. Flaherty and Scott G. Knudson, Taft Stettinius & Hollister LLP, 80 S. 8th St., Ste. 2200, Minneapolis, MN 55402, for Defendant Joseph Walsh

Stacy L. Bettison, Brett D. Kelley, Douglas A. Kelley, Steven E. Wolter, Kelley, Wolter & Scott, P.A., 431 S. 7 St., Ste. 2530, Minneapolis, MN 55415, for Defendant Don Lorge.

SUSAN RICHARD NELSON, United States District Judge

This matter comes before the Court on Plaintiffs' Motion for Summary Judgment on Standing, Ripeness, and Mootness [Doc. No. 146], Defendants Joseph Walsh and Donald Lorge's Motion for Summary Judgment [Doc. No. 162], and Defendants County of Mille Lacs, Walsh, and Lorge's Motion to Strike and for Sanctions [Doc. No. 182]. For the reasons set forth below, Plaintiffs' Motion for Summary Judgment on Standing, Ripeness, and Mootness is **GRANTED**; Defendants Walsh and Lorge's Motion for Summary Judgment is **DENIED**; and Defendants County of Mille Lacs, Walsh, and Lorge's Motion to Strike and for Sanctions is **DENIED**.

## I.    BACKGROUND

This case involves important and complex issues regarding the boundaries of the Mille Lacs Indian Reservation and, consequently, the extent of the Mille Lacs Band's sovereign law enforcement authority within those boundaries. The present motions before the Court, however, do not seek to resolve these issues at this time. Rather, the present motions address: (1) this Court's subject matter jurisdiction; (2) threshold justiciability issues, including standing, ripeness, and mootness; and (3) certain defenses of immunity. Accordingly, the Court will limit its discussion of the facts to only those necessary to explain its rulings.

### A.  The Parties and the Mille Lacs Indian Reservation

The Plaintiffs are the Mille Lacs Band of Ojibwe (the "Band"), a federally recognized Indian tribe; Sara Rice, the Chief of Police of the Band; and Derrick Naumann,

a Sergeant in the Band's Police Department (collectively, "Plaintiffs"). (Compl. [Doc. No. 1]; *see* 85 Fed. Reg. 5462, 5464 (Jan. 30, 2020); Baldwin Decl. [Doc. No. 150] Ex. A at 7, Ex. B at 6, Ex. C at 6.) The Defendants are the County of Mille Lacs (the "County"); Joseph Walsh, the Mille Lacs County Attorney; and Don Lorge, the Mille Lacs County Sheriff (collectively, "Defendants"). (*See* Compl. [Doc. No. 1].) In March 2019, Magistrate Judge Brisbois substituted Lorge for Brent Lindgren, a former County Sheriff, after Lindgren left his position and Lorge became the new Sheriff. (Order on Stipulation [Doc. No. 63].)

Article 2 of the 1855 Treaty between the Minnesota Chippewa Tribe and the United States established the Mille Lacs Indian Reservation, which comprises about 61,000 acres of land. (10 Stat. 1165 (Feb. 22, 1855); Quist Decl. [Doc. No. 160] ¶ 3.) In Plaintiffs' view, the Reservation established by the 1855 Treaty has never been diminished or disestablished. (*See generally* Compl. [Doc. No. 1].) Within the Reservation, there are approximately 3,600 acres that the United States holds in trust for the benefit of the Band, the Minnesota Chippewa Tribe, or individual Band members. (Quist Decl. [Doc. No. 160] ¶ 4.) The Band owns in fee simple about 6,000 acres of the Reservation, and individual Band members own in fee simple about 100 acres of the Reservation. (*Id.* ¶¶ 5-6.) In Defendants' view, the Reservation established by the 1855 Treaty was diminished or disestablished by way of subsequent federal treaties, statutes, and agreements. (*See generally* County Answer [Doc. No. 17]; Walsh Answer [Doc. No. 18]; Lindgren Answer [Doc. No. 19].) Although the Court does not wade into this core issue today, it is important to recognize that this case rests on this boundary dispute.

**B.  The Opinion and Protocol**

On June 21, 2016, the County terminated the 2008 law enforcement agreement ("2008 Agreement") it had with the Band and County Sheriff. (Baldwin Decl. [Doc. No. 150] Ex. H.) The 2008 Agreement allowed Band officers to exercise concurrent jurisdiction with the Mille Lacs County Sheriff's Department to enforce Minnesota state law, as provided in Minn. Stat. § 626.90. (*Id.*)

On July 18, 2016, County Attorney Walsh issued the "Mille Lacs County Attorney's Office Opinion on the Mille Lacs Band's Law Enforcement Authority." (Baldwin Decl. [Doc. No. 150] Ex. I (hereafter, "Opinion").) In general, the Opinion outlines Walsh's views regarding the scope of the Band's law enforcement authority after the termination of the 2008 Agreement. (*Id.*) The Opinion concludes, *inter alia*, that the Band's "[i]nherent tribal jurisdiction is limited to 'Indian Country,'" which "is limited to tribal trust lands." (*Id.* at 14.) Moreover, the Opinion concludes that investigations conducted by Band officers outside Pine County are unlikely to be admissible in state court. (*Id.* at 8.) The Opinion explains that:

> As all investigations of state law violations must be completed by a peace officer within his or her state law jurisdiction, either the Mille Lacs County Sheriff's Office or the police department of a municipality must take possession of all evidence gathered regarding that investigation to ensure its admissibility in state court.

(*Id.* at 9.)

The "Northern Mille Lacs County Protocol" further clarifies Walsh's position on Band officers' sovereign law enforcement authority and "is intended to guide law enforcement officers regarding the lawful authority of law enforcement officers" within

4

the Reservation. (Baldwin Decl. [Doc. No. 150] Ex. J (hereafter, "Protocol").) According to the Protocol, the Band's "inherent tribal criminal authority doesn't extend (1) outside of trust lands or (2) to non-members of the Mille Lacs Band." (*Id.* (emphasis omitted).) The Protocol provides that Band officers "are peace officers of the State of Minnesota with state law enforcement jurisdiction within Pine County only." (*Id.* (emphasis omitted).) Under the Protocol, in Mille Lacs County, Band officers have certain arrest powers, but "must turn over arrested persons without delay to a Mille Lacs County peace officer so an investigation admissible in state court may be conducted." (*Id.* (emphasis omitted).)

Further, the Protocol provides that Band officers "[m]ay [n]ot [l]awfully … [c]onduct investigations regarding violations of state law including statements, investigative stops, traffic stops, and gathering evidence." (*Id.* (emphasis omitted).) Moreover, the Protocol provides that Band officers "[m]ay [n]ot [l]awfully … [i]mpersonate a state peace officer, obstruct justice, or engage in the unauthorized practice of a peace officer, primarily by interfering with investigations within Mille Lacs County." (*Id.*) In a footnote, the Protocol clarifies that Band officers "may conduct investigations where they have tribal jurisdiction (e.g., civil/regulatory citations to Band members and investigations related to inherent tribal criminal authority)." (*Id.*) And the Protocol warns that "State Peace Officers [m]ay [n]ot [l]awfully … [a]uthorize or knowingly allow the unauthorized practice of a peace officer." (*Id.*)

### C. Alleged Interference By Defendants with the Band's Sovereign Law Enforcement Authority In Response to the Opinion and Protocol

The record evidence makes clear that Walsh fully expected Band officers to comply with the Opinion and Protocol. The record is also replete with evidence that, pursuant to the Opinion and Protocol, County law enforcement officers repeatedly interfered with law enforcement measures undertaken by Band officers. In fact, Walsh testified that he never "suggested [compliance with the Protocol] was voluntary." (Baldwin Decl. [Doc. No. 150] Ex. K, Walsh Dep. at 305.) In an email to the Band's former Chief of Police Jared Rosati on July 25, 2016, Walsh stated he "trust[s] that [the Protocol] has been provided to all of your officers and that they have been directed to follow it." (*Id.*, Ex. M.) In an August 23, 2016, email to Rosati, after quoting the Protocol, Walsh stated that a Band officer did not have "inherent tribal criminal authority" to investigate a non-Native suspect on the Reservation. (*Id.*, Ex. P at 5.) In an August 25, 2016, letter to Rosati, Walsh wrote that Band officers' conduct in violation of the Opinion and Protocol "could … constitute obstruction of justice and the unauthorized practice of a law enforcement officer." (*Id.*, Ex. N at 2; *see id.*, Ex. K, Walsh Dep. at 297-98 (stating that Band officers' violations of the Opinion and Protocol could constitute violations of state criminal law).)

There is no evidence in the record that compliance with the Opinion and Protocol was voluntary. In a September 20, 2016, letter to Band Police Officer Kintop, Walsh wrote that he "expect[s] all tribal police officers to follow the [Opinion and Protocol] for as long as [they are] in place." (*Id.*, Ex. O at 1.) He told Officer Kintop that "[i]f you wish for controlled substance offenders to be prosecuted in Minnesota District Court in the future, … please comply with the Opinion and Protocol as long as [they are] in effect to ensure that the investigations conducted will be admissible in state court." (*Id.* at 2.) Kali Gardner,

6

a former Assistant County Attorney under Walsh, testified that she understood that Walsh expected Band officers "to adhere to the prohibitions and the opinion in the [P]rotocol," and that "other officers were advised that they could arrest tribal police officers if they violated the Protocol. (*Id.*, Ex. L, Gardner Dep. at 60.)

After Walsh issued the Opinion and Protocol, then-Sheriff Lindgren "instructed [his] staff and deputies to follow the County Attorney's Opinion and Protocol." (Lindgren Decl. [Doc. No. 180] ¶ 3.) Indeed, Lindgren's employees all received the Opinion and Protocol and, according to Lindgren, began to follow them. (Baldwin Decl. [Doc. No. 150] Ex. P at 2.) Further, the Sheriffs' deputies monitored Band officers' compliance with the Protocol and tracked violations. (*See id.*, Ex. U (email from County Sergeant Daniel Holada to Lindgren summarizing interactions with Band police over a weekend and listing alleged violations of the Protocol); Ex. V (email from Lindgren instructing Sheriff's deputies to "continue to keep your direct supervisors apprised of day to day operations involving cooperation of Band Officers following County Attorney Opinion and Protocol").) In a June 21, 2016, letter, Lindgren wrote that, when the 2008 Agreement was terminated, "previously dispatched calls for service to the … Band Police Department will be handled by the … County Sheriff's Office." (*Id.*, Ex. W.)

Lindgren made clear that the Opinion and Protocol would be enforced. In an August 22, 2016, email, Lindgren told Band Chief of Police Rosati that the "Sheriff's deputy in charge of the Sheriff's office has the ultimate discretion to control any designated crime scene" and that Lindgren appreciated Rosati's "willingness to undertake [a deputy's] direction and control" on a particular evening. (*Id.*, Ex. P at 6.) In an August 26, 2016,

email, Lindgren directed Sheriff's deputies "to complete independent investigations consistent with the … Opinion and Protocol" and advised that "Band Police are to notify [deputies] before any investigation takes place regarding evidence of criminal activity." (*Id.*, Ex. X.) Lindgren also stated that if Band officers are conducting a civil or regulatory stop of a Band member on trust lands, Band officers' "role in any joint investigation is over" once the civil or regulatory stop is completed, "unless and until [Band officers] are given direction by [Sheriff's deputies] to provide assistance." (*Id.*) In a November 21, 2016, email, a Sheriff's Captain told a Sheriff's deputy that he must take a recorded statement from a Band officer "every time a [B]and officer becomes involved in a criminal investigation and either handles evidence or collects information needed during a criminal investigation." (*Id.*, Ex. Y.)

Sheriff's deputies at times took control of crime scenes from Band officers and repeated investigations that Band officers had completed. Ashley Burton, a former Band officer, described an encounter with a Sheriff's deputy on August 24, 2016, after an arrest of a Band member. (A. Burton Decl. [Doc. No. 154] at ¶¶ 12-16.)[1] She arrested a Band

---

[1] Defendants move the Court to strike the declarations of Ashley Burton (formerly "Stavish"), Bradley Gadbois, and Scott Heidt, on the grounds that Plaintiffs violated Rules 26(a)(1)(A)(i), 26(e)(1)(A), and 33(b) of the Federal Rules of Civil Procedure. Defendants seek to exclude consideration of these declarations on the grounds that the declarants' identities were not disclosed in Plaintiffs' Rule 26(a) disclosure or in any supplemental disclosure. Plaintiffs respond by noting that the identities of these declarants were in fact disclosed several times during discovery. (*See* Baldwin Decl. [Doc. No. 191] Exs. 1, 2; Kelley Decl. [Doc. No. 185] Ex. 2.) Moreover, Plaintiffs note that Defendants received notice of the incidents described in these declarations and the exhibits attached to the declarations in discovery.

member on trust lands, found drugs and drug paraphernalia on the member, and planned to send that evidence to the Band Solicitor General's office, but the Sheriff's deputy demanded that she turn over the evidence, and she complied. (*Id.*) Moreover, on August 9, 2016, Burton responded to a call involving a domestic dispute on trust lands. (*Id.* ¶¶ 8-11.) After Burton arrived on the scene, a Sheriff's deputy arrived, informed Burton that she was a civilian, and requested a statement from her so that he could arrest the suspect. (*Id.*) Burton declined to give the deputy a statement, and the deputy allowed the suspect to leave. (*Id.*)

A current Band officer, Dusty Burton, stated in his declaration that, on September 2, 2016, he was assisting Crow Wing County deputies with a vehicle pursuit that ended on trust lands. (D. Burton Decl. [Doc. No. 155] ¶¶ 8-10.) While at the scene, he began to interview a passenger in the suspect vehicle, who was providing information about the location of another person with a felony warrant. (*Id.*) In the middle of the interview, a Sheriff's deputy arrived and directed the passenger away from Burton, leaving him unable to complete the investigation. (*Id.*) On November 20, 2016, after Burton responded to a call involving a recent death at a home on Band-owned fee land, a Sheriff's deputy arrived on the scene and told Burton not to search anything and to leave the scene until Sheriff's Office investigators arrived. (*Id.* ¶¶ 15-20.)

---

The Court denies Defendants' Motion to Strike. On a number of occasions, not only were the identities of these declarants disclosed to Defendants in discovery, evidence of these incidents was also disclosed.

A former Band officer, Scott Heidt, described a further incident on September 8, 2016, when he and another Band officer were investigating a stabbing on trust lands. (Heidt Decl. [Doc. No. 159] ¶¶ 8-11.) During their investigation, they took a taped statement from a witness, but a Sheriff's deputy asked the other Band officer to "hold off on taking the statement." (*Id.*) Heidt allowed the other Band officer to finish taking his statement, and then the Sheriff's deputy took his own taped statement. (*Id.*)

Plaintiff Sergeant Naumann testified about an incident that occurred during the revocation period[2] when he and other Band officers initiated a traffic stop, located a Department of Corrections fugitive, removed noncompliant passengers from the vehicle, and found a firearm within the vehicle. (Baldwin Decl. [Doc. No. 150] Ex. Z, Naumann Dep. at 82.) While Band officers were searching the vehicle, a Sheriff's deputy arrived and "was yelling at us telling us to stop searching the vehicle and basically getting in the way of my investigation, preventing me from conducting a thorough investigation." (*Id.*) In a subsequent email on October 24, 2017 to then-Sheriff Lindgren, the Sheriff's deputy involved stated that he "took control of the scene." (*Id.*, Ex. AA.)

Bradley Gadbois, a current Band investigator who worked as a Band officer in 2017, described an incident on September 29, 2017, when he investigated a car and suspect on the Reservation. (Gadbois Decl. [Doc. No. 158] ¶¶ 10-18.) After Gadbois searched the car and interviewed the driver, a Sheriff's deputy arrived on the scene and conducted his own

---

[2] The Court uses the term "revocation period" to refer to the period of time from the County's termination of the 2008 Agreement until the time the Band, County, and Sheriff entered into the 2018 Agreement, discussed *infra*.

search and interview. (*Id.*) On another occasion, on November 3, 2017, Gadbois was investigating a parked vehicle containing a driver and a passenger, who was showing signs of an opioid overdose. (*Id.* ¶¶ 20-25.) After Gadbois administered Narcan to the passenger, which revived him, two Sheriff's deputies arrived on the scene, and a methamphetamine pipe was found in the vehicle. (*Id.*) Gadbois wanted to conduct a drug investigation of the vehicle, but was prevented from doing so under the Protocol without the cooperation of the Sheriff's deputies. (*Id.*) The deputies neither arrested the driver nor took custody of the vehicle. (*Id.*)

James West, the Band's Deputy Police Chief, testified that "there was an interruption in [Band] officers' investigations" and that "[w]hen [Band officers] show up on a scene, domestic or whatever it might be, they start talking to a victim or holding a suspect, and a sheriff's deputy arrives and butt right in and take over the interview, or take possession of somebody that's technically not under arrest." (Baldwin Decl. [Doc. No. 150] Ex. BB, West Dep. at 47-48.) Moreover, Band Sergeant Naumann testified that Band officers "had to just stand by and let [Sheriff's deputies] take over our scene." (*Id.*, Ex. Z, Naumann Dep. at 94.)

At the Band's Rule 30(b)(6) deposition, Michael Dieter, a Sergeant in the Band's Police Department, testified that "[o]ften times county deputies would try to take statements from officers as witnesses rather than just relying on our reports. They would often take multiple statements. If we took a statement from a witness, they might take a second statement from the same witness." (*Id.*, Ex. CC, Rule 30(b)(6) Band Dep. at 182-83.) Former Assistant County Attorney Gardner testified that Band police "were treated as

witnesses and not as law enforcement officers" and that Sheriff's "deputies were instructed to take statements from" Band officers. (*Id.*, Ex. L, Gardner Dep. at 42, 61-62.)

### D.  The Band's Compliance with the Opinion and Protocol

Todd Matha, as the Band's Solicitor General, supervised the Band's police department. (Baldwin Decl. [Doc. No. 150] Ex. DD, Matha Dep. at 205-09.) Matha disagreed with Walsh's mandates, as set forth in the Opinion and Protocol, but Matha nonetheless directed Band officers to follow them, out of fear that Band officers would face criminal and civil penalties if they disobeyed them. (Baldwin Decl. [Doc. No. 150] Ex. DD, Matha Dep. at 205.) Matha also wanted to avoid disputes between the Band and the County that might serve to undermine law enforcement in the area. (*Id.* at 205-09.) Similarly, Band Chief of Police Rosati directed Band officers to follow the Opinion and Protocol in light of the potential imposition of criminal and civil penalties on them and to avoid endangering the prosecutions of any suspects that Band officers investigated. (*Id.*, Ex. EE, Rosati Dep. at 92-93, 102, 116-17, 211.)

After Rice became the Band's Police Chief, she continued to ensure that Band officers followed the Protocol because she did not want to jeopardize the career of any Band officer and feared that Band officers would "go to jail." (*Id.*, Ex. GG, Rice Dep. at 150-51.) Rice was especially concerned about the restrictions that the Protocol imposed on Band officers' ability to use force: "What if we were to have to arrest somebody or something happened, or use of force issue, or even deadly force? That was my concern. So I just didn't—we just made sure we abided by [the Protocol]." (*Id.* at 151.) Band Sergeant Craig Nguyen testified to a similar concern: "There are circumstances when it comes to

officers' personal safety when officers need to use a fire[arm], not to discharge it but to gain control of certain subjects involving crimes that are high violence in nature involving weapons, drugs, gangs, so on and so forth. [The Protocol] restrict[s] us not being able to do that." (*Id.*, Ex. HH, Nguyen Dep. at 46.)

Rice testified that, although County Sheriff Lindgren told her informally that Band officers would not be arrested or prosecuted, she did not trust his assurances because he was committed to following the mandates of the Protocol. (*Id.*, Ex. GG, Rice Dep. at 157, 204-05.) Rice acknowledged that no one had yet been arrested but she believed that was so "[b]ecause we followed the [P]rotocol." (*Id.* at 205.) Assistant County Attorney Gardner testified that County "officers were advised that they could arrest tribal police officers if they" violated the Protocol. (*Id.*, Ex. L, Gardner Dep. at 60.) The Band's Deputy Police Chief West testified that "[t]here was a lot of fear within the officers regarding getting arrested for impersonating officers" under the Protocol. (*Id.*, Ex. BB, West Dep. at 37-38.) West confirmed that "[o]fficers followed the [P]rotocol." (*Id.* at 42.)

According to Band Sergeant Naumann, "[the Protocol] caused [Band officers] to not be able to effectively do [their] jobs because guys were afraid to proactively patrol and initiate traffic stops." (*Id.*, Ex. Z, Naumann Dep. at 92.) Naumann elaborated that "your career is potentially in jeopardy if someone decides to prosecute you for doing your job that you've done for years, and we weren't able to do our jobs." (*Id.*) Accordingly, Naumann concluded that "[b]ased on the Northern Protocol trying to restrict our ability to do our job … the only thing that we felt safe without being charged with a crime or prosecuted for doing our jobs was arrest people on warrants." (*Id.* at 84-86.)

In a December 2016 letter to the United States Attorney's Office in Minnesota and the Department of Justice in D.C., Walsh wrote that "the Mille Lacs County Sheriff's Office has taken on all state law enforcement services provided in the entirety of Mille Lacs County" and that a "tenuous status quo has been followed by the Mille Lacs County Sheriff's Office and the Mille Lacs Band Police Department based on my Opinion and Protocol." (*Id.*, Ex. JJ; *see id.*, Ex. KK, Walsh Dep. at 378.) In his deposition, Walsh conceded that the letter was not in fact entirely accurate, notably failing to advise federal officials that the County Sheriff's Office had taken on the role of investigating all violations of state law on trust lands and had assumed responsibility for responding to all calls and investigating all violations of state law on non-trust lands. (Baldwin Decl. [Doc. No. 150] Ex. KK, Walsh Dep. at 377-78.)

### E.  The Decline in Morale in the Mille Lacs Band Police Department and the Resignations of Several Band Officers

Band Solicitor General Matha testified that "[Band officers] took offense at … being relegated to essentially witnesses at a scene that had no more authority in relation to a criminal action than would often times just a bystander," and that this contributed to "a decrease in morale and just this lack of understanding as to how it was that they were to perform their job." (Baldwin Decl. [Doc. No. 150] Ex. DD, Matha Dep. at 201-02.)

According to Naumann, the Opinion "in not so many words [said Walsh] was going to threaten to arrest and prosecute our officers for doing our jobs. It was insulting, demeaning, threatening …. [and] terrible." (*Id.*, Ex. Z, Naumann Dep. at 20.) He testified that Band officers "were deterred from protecting our community," "[could]n't do

anything," and were "[n]othing more than glorified security guards." (*Id.* at 92, 98.) Moreover, he testified that during the revocation period "[w]e lost officers because of not having a cooperative agreement. We had officers leaving. Morale went down. It was pretty terrible for the most part. It was the worst two and a half years of law enforcement in my career." (*Id.* at 101.) Rice testified that she was injured "[p]rofessionally because of the Northern Protocol" and that the Protocol "deterred [her] from doing [her] job completely." (*Id.*, Ex. GG, Rice Dep. at 11-12, 187.)

Former Band Officer Dusty Burton stated that the Sheriff's deputies' interference with his investigations "undermined [his] credibility as a police officer within the community and negatively affected my morale and that of my fellow Tribal Police officers." (D. Burton Decl. [Doc. No. 155] ¶ 21.) Similarly, Band Officer Gadbois noted that the Sheriff's Office's practice of repeating investigations completed by Band officers in front of criminal suspects "undermined the credibility, authority and morale" of Band officers. (Gadbois Decl. [Doc. No. 158] ¶ 19.)

Several Band officers consequently resigned from their jobs. Heidt explained that "[o]ne of the reasons why I left the Tribal Police Department was because of the restrictions that the County Attorney's Protocol placed on me as a licensed peace officer." (Heidt Decl. [Doc. No. 159] ¶ 13.) Similarly, Ashley Burton stated she "left the Tribal Police Department because of the restrictions that the County Attorney's Northern Protocol placed on me as a licensed peace officer. I wanted to exercise my full authority as a Tribal Police Officer and serve the Mille Lacs Reservation communities to the fullest." (A. Burton Decl. [Doc. No. 154] ¶ 25.) Gardner testified that "[s]everal [Band] officers left their department.

I know of at least a handful that went to completely different agencies because they were not allowed to be police officers, and that's what they wanted their career to be." (Baldwin Decl. [Doc. No. 150] Ex. L, Gardner Dep. at 46-47.)

### F. Lack of County Law Enforcement Response to Criminal Activity on the Reservation

Band Chief of Police Rosati testified that, after Walsh issued the Opinion and Protocol, "life as a patrol cop ceased to exist. We didn't feel we had the authority to go out and do our jobs, like make arrests. Like if we rolled up on a DWI, we wouldn't be able to make that arrest. Our protocol was to have the county come deal with it." (Baldwin Decl. [Doc. No. 150] Ex. EE, Rosati Dep. at 101.) Rosati explained that "[o]nce … the criminal element on the reservation found out that we no longer had authority, they knew it. And they would blatantly say it to our officers, 'You can't even arrest me.'" (*Id.* at 103; *see* Gadbois Decl. [Doc. No. 158] ¶¶ 26-29 (describing encounter on March 21, 2018, where suspect refused to comply with Band officer's instruction because, according to suspect, Band officer was "not a cop").)

Rosati further testified that the termination of the 2008 Agreement made it more difficult for Band officers to address drug crimes and overdoses: "[t]he people know when you're not making arrests or doing what we normally did, that word traveled pretty quick, so it made it pretty difficult for my officers to continue our normal course of action, as far as combatting those overdoses." (Baldwin Decl. [Doc. No. 150] Ex. EE, Rosati Dep. at 197.) He testified that Band officers "[m]ade every effort to attempt or tried to follow the

[P]rotocol," which "limit[ed] their ability to investigate crime on non-trust land" and "limit[ed] their ability to investigate crime on trust lands." (*Id.* at 211.)

> Band Chief of Police Rice testified that:

> A majority [of Band police reports] are overdoses and drug involvement where officers are actually making traffic stops on the reservation, deputy shows up, blatant paraphernalia, blatant drugs right in front of everybody, they are not arresting them because they are on the phone with the county attorney's office and they are saying don't do anything, if [Band officers] started that investigation, let it go. So they would long form that complaint, let people walk away who had significant amounts of drugs on them. … [I]t was all up to whether it was this deputy, that deputy. Some would get along with us, and some wouldn't.

(*Id.*, Ex. GG, Rice Dep. at 176.)

Band Sergeant Nguyen testified that Band officers "driving around and being present" was no longer a deterrent to criminal activity because people "knew we didn't have law enforcement authority when they saw a tribal cop." (*Id.*, Ex. HH, Nguyen Dep. at 76.) And that, in Ngyuen's view, "increased the drug availability, and people from out of town, people who we did not know came and with them they brought drugs, and the gang activity also increased." (*Id.*)

Similarly, former Assistant County Attorney Gardner testified that Band officers' "credibility amongst the community deteriorated very quickly, because the community members knew that they, [Band] officers, were not allowed to do anything." (*Id.*, Ex. L, Gardner Dep. at 46.)

According to Rosati, after the County terminated the 2008 Agreement, he did not believe the Sheriff's deputies stationed "within [the Band] community knew the people

like [Band officers] knew our people." (*Id.*, Ex. EE, Rosati Dep. at 123.) He noted that Band officers "actually understand the family trees within the community." (*Id.* at 213.) Naumann testified that "statements [were] being taken from victims twice and from people that aren't familiar with the community that don't know the community, the community members, and the family structure." (*Id.*, Ex. Z, Naumann Dep. at 100.)

In the view of former Assistant County Attorney Gardner, Band officers' knowledge of and connections in the Band community were "absolutely important and priceless" from a law enforcement perspective. (*Id.*, Ex. L, Gardner Dep. at 23-24; *cf id.* at 27 (explaining that some Sheriff's deputies had some knowledge of the Band community, but they had less knowledge than Band officers).) According to Band member Colin Cash, Band officers "know the Band community and they care about the community. They also know who belongs in the community and who is an outsider. … When Sheriff's deputies took over for Band police, they did not know the people or the area. It became free [rein] for people using drugs and committing crimes. … The Sheriff's deputies didn't know the drug houses or the dealers. It was an open market for drugs." (Cash Decl. [Doc. No. 156] ¶¶ 8-9, 11.)

Several witnesses noted a decline in police work after the revocation of the 2008 Agreement. Rosati testified that Band officers engaged in very proactive policing before the 2008 Agreement was revoked, but he did not observe Sheriff's deputies engaging in proactive policing after the revocation. (Baldwin Decl. [Doc. No. 150] Ex. EE, Rosati Dep. at 213.) Gardner testified that "deputies, when they were on the north end during the revocation, did not proactively patrol the reservation. Instead, they waited at the north end sheriff's station for a call to come in." (*Id.*, Ex. L, Gardner Dep. at 69.) According to

Naumann, the Protocol "caused us to not be able to effectively do our jobs because guys were afraid to proactively patrol and initiate traffic stops," and Sheriff's deputies "weren't conducting proactive patrols." (*Id.*, Ex. Z, Naumann Dep. at 92, 101.) During the Band's Rule 30(b)(6) deposition, Band Sergeant Dieter testified that the Protocol deterred patrol officers "from wanting to go out and be proactive under the idea if they were proactive and violated the Northern Protocol that they could be arrested for it." (*Id.*, Ex. CC, Rule 30(b)(6) Band Dep. at 210-11.)

After the termination of the 2008 Agreement, the Sheriff's Office hired additional deputies. (Flaherty Decl. [Doc. No. 178] Ex. 15, Mott Dep. at 16-17; Lindgren Decl. [Doc. No. 180] ¶ 10.) Rice testified that, although the Sheriff's Office hired more deputies during the revocation period, "there was nothing being done" because "tribal police were proactive" while Sheriff's deputies were "all reactive." (Baldwin Decl. [Doc. No. 150] Ex. GG, Rice Dep. at 180-81.) Rice elaborated that the Reservation became a "police free zone" when "people saw the traffic stops and nothing happened. There [weren't] any search warrants being executed on the reservation. There was police presence, but they knew we were limited. You had deputies running around telling them we're not cops." (*Id.* at 182.)

### G. Impact on Public Safety

Wade Lennox, a State Corrections Officer who works with felony offenders on the Reservation, testified regarding the impact of the Opinion and Protocol on public safety. (*See* Baldwin Decl. [Doc. No. 150] Ex. SS, Lennox Dep.) Lennox testified that he saw Band officers "out interacting with the community members. It was clear that part of their

mission work was to be available, regardless of the need." (*Id.* at 17.) However, Lennox

observed several changes that he noted in an April 4, 2017, email to Rice:

> I can share with you things have gotten significantly worse here. When I
> started working here many of the drug deals had been driven behind closed
> doors. Chemical use, although abundant, was not visible in the public eye. I
> am here every week, many times twice weekly. In the last several months I
> have witnessed numerous drug deals and use right out in the open. Needles
> on the road side is not an uncommon observation. In the past, it would be a
> very rare occasion I would not see Tribal Officers out and about monitoring
> these obscure areas, I would see them on foot working together, checking out
> the various parts of the reservation likely only known to locals. I do not see
> the same type of law enforcement taking place anymore and it has resulted
> in a much less safe area.

(Baldwin Decl. [Doc. No. 150] Ex. TT.) Former Assistant County Attorney Gardner

testified that Lennox's observations in this email were accurate. (*Id.*, Ex. L, Gardner Dep.

at 67-68.)

In an October 10, 2017, email to Walsh, Lennox wrote that "there simply is not the

law enforcement presence on the Reservation there had been and that has dramatically

impacted our probationary work" and that he "see[s] County [Sheriff's deputies] patrolling,

but not even remotely close to what was being done." (*Id.*, Ex. UU.) According to Lennox,

after the termination of the 2008 Agreement, "[t]he general perception from the offenders

we were working with at the time was [kind of] free rein." (*Id.*, Ex. SS, Lennox Dep. at

15.) "[T]here was a general sense that [the Reservation] became almost a safe haven [for

drug trafficking]." (*Id.* at 27-28.)

In November 2017, then United States Secretary of the Interior, Ryan Zinke,

traveled to the Reservation. (Dieter Decl. [Doc No. 157] ¶ 7.) Because of the high levels

of drug trafficking, use, and overdoses on the Reservation, the Office of Justice Services in the Bureau of Indian Affairs ("BIA") "temporarily assigned BIA Special Agents to conduct saturation patrols and work with Band police officers to help address these problems." (*Id.*) The BIA Special Agents and Band officers carried out joint drug investigations in 2018. (*Id.* ¶ 9.) Band officers notified Sheriff's deputies of these investigations before they occurred. (*Id.* ¶ 10.)

### H. Special Law Enforcement Commissions ("SLECs")

On January 8, 2016, under the Tribal Law and Order Act of 2010 ("TLOA"), Pub. L. No. 111-211, 124 Stat. 2258, the United States agreed to assume concurrent federal criminal jurisdiction over the Band's Indian country, effective January 1, 2017. (Baldwin Decl. [Doc. No. 150] Ex. LL.) On December 20, 2016, the BIA and the Band entered into a Deputation Agreement, allowing the BIA to issue SLECs to qualified Band officers. (*Id.*, Ex. MM.) The Deputation Agreement allowed Band officers who held SLECs, such as Naumann, to enforce federal law within the Band's Indian country. (*Id.*; *see id.*, Ex. NN (Band officers' SLEC cards), Ex. Z, Naumann Dep. at 38.)

Walsh acknowledged that his view was that Band officers holding SLECs could not exercise SLEC authority on non-trust lands within the 1855 Treaty boundaries. (Baldwin Decl. [Doc. No. 150] Ex. KK, Walsh Dep. at 384-85.) In an email to a Band officer, Walsh explained that, although the Protocol predated the issuance of the SLECs, the Protocol remained in force and should be followed to avoid any challenges to jurisdiction. (*Id.*, Ex. OO at 2-3.)

### I. The 2018 Agreement

In September 2018, the Band, County, and then County Sheriff Lindgren entered into a "Mutual Aid/Cooperative Agreement." (Baldwin Decl. [Doc. No. 150] Ex. AAA.) Under this Agreement, on a temporary basis, the parties agreed that the Band has concurrent jurisdiction with the Sheriff under Minn. Stat. § 626.90: (1) over all persons on trust lands; (2) over all Band members within the boundaries of the 1855 Treaty; and (3) over any person committing or attempting to commit a crime in the presence of a Band officer within the boundaries of the 1855 Treaty. (*Id.* ¶ 4(a).) However, the Agreement provides that:

> This Agreement shall automatically terminate ninety (90) days after the final resolution, including the exhaustion of all appeals and any proceedings on remand, of the [present lawsuit]. The County and the Sheriff are entering into this Agreement in reliance on the Court's determination of the issues raised in the lawsuit, including the existence and extent of Indian country in Mille Lacs County, and have not insisted upon the inclusion of provisions in this Agreement that would be essential to them in the absence of the lawsuit.

(*Id.* ¶ 25(c).)

## II.   PROCEDURAL HISTORY

On November 17, 2017, the Band, Rice, and Naumann sued the County, Walsh, and Lindgren, seeking declaratory and injunctive relief, as well as costs and attorneys' fees. (Compl. [Doc. No. 1] at 7-8.) First, Plaintiffs seek a declaration that, under federal law, the Band has:

> inherent sovereign authority to establish a police department and to authorize Band police officers to investigate violations of federal, state and tribal law within the Mille Lacs Indian Reservation as established in [the 1855 Treaty], and, in exercising such authority, to apprehend suspects (including Band and

non-Band members) and turn them over to jurisdictions with prosecutorial
authority.

(*Id.* at 7.)

Second, Plaintiffs seek a declaration that:

Pursuant to 18 U.S.C. § 1162(d), 25 U.S.C. §§ 2801 and 2804, the
Deputation Agreement between the Band and the [BIA], and the SLECs
issued to Band police officers by the [BIA], Band police officers have federal
authority to investigate violations of federal law within the Mille Lacs Indian
Reservation as established in [the 1855 Treaty], and, in exercising such
authority, to arrest suspects (including Band and non-Band members) for
violations of federal law.

(*Id.*)

Finally, Plaintiffs seek to enjoin Defendants from taking any actions that interfere
with Band officers' authority, as determined by this Court. (*Id.* at 8.)

On April 27, 2020, Magistrate Judge Brisbois entered the Third Amended Pretrial
Scheduling Order, which, *inter alia*, granted the parties leave to file early dispositive
motions "only so far as are outlined in their Joint Motion for Leave to File Early Dispositive
Motions." (Third Am. Pretrial Scheduling Order [Doc. No. 138] at 6.) In their Joint Motion,
the parties only sought leave to file the following dispositive motions: "(1) Plaintiffs'
motion for summary judgment that they have standing and that their claims are ripe and
not moot; (2) the Defendant County Attorney and County Sheriff's motion for summary
judgment on their immunity defenses; and (3) the Defendant County Attorney's motion for
summary judgment that the Court lacks subject matter jurisdiction." (Jt. Mot. [Doc. No.
132] at 1-2.)

### III.   DISCUSSION

#### A.  Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material'" if it may affect the outcome of the lawsuit. *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). Likewise, an issue of material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The moving party bears the burden of establishing a lack of any genuine issue of material fact in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986), and the Court must view the evidence and any reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

Walsh and Lorge move for summary judgment alleging that this Court lacks subject matter jurisdiction over this matter or, alternatively, that they are nevertheless immune from suit. Plaintiffs move for summary judgment on three threshold issues of justiciability: standing, ripeness, and mootness.

The Court first considers Walsh's and Lorge's challenge to subject matter jurisdiction.

#### B.  Subject Matter Jurisdiction

Defendants Walsh and Lorge contend that there is no basis under federal law for the Court to exercise federal question subject matter jurisdiction over any of Plaintiffs' claims of interference with the Band's sovereign law enforcement authority. (Walsh and Lorge Mem. in Supp. of Mot. for Summ. J. ("Ind. Defs.' Mem. Summ. J.") [Doc. No. 164] at 14-31.) Defendants further argue that Congress's enactment of the TLOA precludes the Court from applying federal common law to the issues raised in this case.[3] (*Id.* at 21-22.) In response, Plaintiffs contend that the Court may exercise federal question subject matter jurisdiction over each of its claims under federal common law, 28 U.S.C. § 1331 and § 1362, 25 U.S.C. § 2804, and under certain treaties. (Pls.' Mem. in Opp'n to Mot. for Summ. J. ("Pls.' Opp'n Summ. J.") [Doc. No. 173] at 12-24.)

Federal courts are "courts of limited jurisdiction" and only possess those powers authorized by the Constitution and by statute. *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (internal quotations and citation omitted). Under 28 U.S.C. § 1331, federal district courts "shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." To determine whether a claim "arises under" federal law, federal courts apply the "well-pleaded complaint" rule. *Great Lakes Gas Transmission Ltd. P'ship v. Essar Steel Minn. LLC*, 843 F.3d 325, 329 (8th Cir. 2016). This rule "provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Id.* (quoting *Caterpillar Inc. v. Williams*, 482 U.S.

---

[3] The parties debate whether the TLOA provides a private right of action. However, since the Plaintiffs have not plead any cause of action under the TLOA, the Court declines to address this issue.

386, 392 (1987)). "Federal question jurisdiction exists if the well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Id.* (quoting *Williams v. Ragnone*, 147 F.3d 700, 702 (8th Cir. 1998)).

It is well established that questions of federal common law can serve as a basis for the exercise of federal question subject matter jurisdiction under § 1331. *Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972); *see Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 850 (1985). Indeed, in the context of federal Indian law, federal courts apply federal common law "as a necessary expedient when Congress has not spoken to a *particular* issue." *United States v. Lara*, 541 U.S. 193, 207 (2004) (discussing *County of Oneida v. Oneida Indian Nation of N.Y.*, 470 U.S. 226, 233-37 (1985)) (internal quotations and citations omitted) (emphasis in original).

Federal courts have often treated the scope of a tribe's inherent sovereign authority as a matter of federal common law. *See Lara*, 541 U.S. at 205-07; *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 206, 212 (1978); *United States v. Terry*, 400 F.3d 575, 579-80 (8th Cir. 2005) (citing *Strate v. A-1 Contrs.*, 520 U.S. 438, 456 n.11 (1997); *Duro v. Reina*, 495 U.S. 676, 696-97 (1990)); *see also Snow v. Quinault Indian Nation*, 709 F.2d 1319, 1321 (9th Cir. 1983) ("Increasingly, the legal boundaries of tribal sovereignty are being defined by case law."); 1 Cohen's Handbook of Federal Indian Law § 7.04 (2019) ("Federal question jurisdiction … extends to claims based on federal common law, including cases involving … challenges to the exercise of state authority in Indian country."); *id.* § 7.04 n.9 (collecting cases).

Consistent with the above authority, the Ninth Circuit has specifically held that the scope of a tribe's inherent sovereign law enforcement authority is a matter of federal common law. *See Bishop Paiute Tribe v. Inyo Cnty.*, 863 F.3d 1144, 1151-52 (9th Cir. 2017). In that case, the Bishop Paiute Tribe brought a declaratory judgment action against a county, a sheriff, and a district attorney, seeking, *inter alia*, a declaration that the Tribe had "the authority on its Reservation to stop, restrain, investigate violations of tribal, state and federal law, detain, and transport or deliver a non-Indian violator to the proper authorities." *Id.* at 1150. The Ninth Circuit held that it had subject matter jurisdiction under § 1331 because the Tribe "allege[d] that federal common law grants the Tribe the authority to 'investigate violations of tribal, state, and federal law, detain, and transport or deliver a non-Indian violator to the proper authorities'" and that the "[t]he Defendants' arrest and charging of [a tribal officer]" allegedly violated such federal common law. *Id.* at 1152.

Here, Plaintiffs similarly allege that the scope of the Band's sovereign law enforcement authority is defined by federal common law, hence raising a federal question sufficient to confer subject matter jurisdiction on this Court. Specifically, Plaintiffs allege that, "[a]s a matter of federal common law, the Band possesses inherent sovereign authority to establish a police force and to authorize Band police officers to investigate violations of federal, state and tribal law within the Reservation." (Compl. [Doc. No. 1] ¶ H.) Plaintiffs further allege that, "[a]lso as a matter of federal common law, the Band possesses inherent sovereign authority to authorize its police officers to apprehend suspects and turn them over to jurisdictions with criminal prosecutorial authority." (*Id.*) In support of their allegations that Defendants have interfered with their sovereign law enforcement authority,

Plaintiffs cite to the County Attorney's threats of prosecution and arrest against Band officers as well as the County's instructions to the Sheriff's deputies not to arrest suspects apprehended by Band police officers. (*See id.* ¶¶ M-Q.) Accordingly, Plaintiffs have raised issues of federal common law on the face of their well-pleaded Complaint. As a result, they have adequately pleaded a federal question over which this Court has subject matter jurisdiction under § 1331.

Defendants rely primarily on the decision of the Eighth Circuit in *Longie v. Spirit Lake Tribe*, 400 F.3d 586 (8th Cir. 2005), to support their claim that the issues raised in this case are matters of tribal and/or state law, not federal law. (Ind. Defs.' Mem. Summ. J. at 19.) However, *Longie* is inapposite. It involved a disputed land transfer between a tribe and a member of that tribe. *Longie*, 400 F.3d at 590-91. The resolution of that dispute turned on whether there was a contract or other legal basis to force the tribe to effectuate the transfer under tribal law. *Id.* Unlike the disputed land transfer in *Longie* between the tribe and its member that raises issues under tribal law, the instant case raises issues of sovereign authority as between the Band and the County under federal common law. In fact, the Eighth Circuit made that very distinction in *Longie* when it described the United States Supreme Court's decision in *Nat'l Farmers Union Ins. Cos.* as "finding jurisdiction under section 1331 because federal common law establishes the limits of tribal sovereignty." *Id.* at 590 (citing *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 851 (1985)).

Moreover, Walsh and Lorge's argument that Congress has already acted in the area of tribal law enforcement authority by enacting the TLOA, thus precluding the Court from

applying federal common law, is unavailing. While congressional legislation can displace federal common law under certain circumstances, "[t]he test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute 'speak[s] directly to [the] question' at issue." *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 423-24 (2011). Importantly, the TLOA does not speak to the scope of the Band's sovereign law enforcement authority. Rather, it creates a federal program through which certain tribal officers may assist federal authorities in the enforcement of federal criminal law in Indian country. *See* 25 U.S.C. § 2804. Accordingly, Congress has not displaced federal common law that serves to define the scope of a tribe's sovereign law enforcement authority.

Plaintiffs have raised issues of federal common law on the face of their well-pleaded Complaint, sufficient to confer federal question subject matter jurisdiction on this Court as to each of Plaintiffs' claims.

### C. Justiciability

Next, the Court considers Plaintiffs' motion for summary judgment on three threshold justiciability doctrines: standing, ripeness, and mootness. According to Plaintiffs, the record evidence establishes that they have standing and that their claims are ripe and not moot. The Court considers each of these issues in turn.

### 1. Standing

Article III of the Constitution limits the jurisdiction of federal courts to certain "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue."

*Clapper v. Amnesty Int'l U.S.A.*, 568 U.S. 398, 408 (2013). To establish Article III standing, a plaintiff must show—as an "irreducible constitutional minimum"—the existence of three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, there must be an "injury in fact." *Id.* Second, "there must be a causal connection between the injury and the conduct complained of," such that the injury is "fairly trace[able] to the challenged action of the defendant." *Id.* Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (quotations and citation omitted). Standing "in no way depends on the merits of the plaintiffs' contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

First, the Court considers whether Plaintiffs have suffered an injury in fact. Plaintiffs allege that they have suffered several related injuries in fact that establish standing: (1) interference with and infringement of the Band's sovereign law enforcement authority; (2) resulting injuries to Plaintiffs Rice and Naumann's abilities to practice their chosen professions; (3) harm to morale causing several officers to resign; and (4) a resulting decline in effective law enforcement and public safety. (Pls.' Mem. in Supp. of Mot. for Partial Summ. J. ("Pls.' Mem. Summ. J.") [Doc. No. 148] at 27-32.) Walsh and Lorge argue, to the contrary, that none of these injuries are sufficient to confer standing. (Walsh and Lorge Mem. in Opp'n to Mot. for Partial Summ. J. ("Ind. Defs.' Opp'n Summ. J.") [Doc. No. 176] at 29-45.)

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)

(quoting *Lujan*, 504 U.S. at 560). Importantly, courts have long recognized that tribes have legally protected rights in their sovereignty and, accordingly, that infringement of those rights confers standing. *See Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 468 n.7 (1976) (a tribe's "discrete claim of injury" to "tribal self-government" can "confer standing" in a case involving a state's imposition of taxes); *Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 463 (2d Cir. 2013) ("actual infringements on a tribe's sovereignty constitute a concrete injury sufficient to confer standing"); *Quapaw Tribe of Okla. v. Blue Tee Corp.*, 653 F. Supp. 2d 1166, 1179 (N.D. Okla. 2009) ("Indian tribes, like states and other governmental entities, have standing to sue to protect sovereign or quasi-sovereign interests."). Indeed, a tribe has a legally protected interest in exercising its inherent sovereign law enforcement authority. *Bishop Paiute Tribe v. Inyo County*, 863 F.3d 1144, 1153 (9th Cir. 2017); *see also Confederated Tribes & Bands of the Yakama Nation v. Yakima Cnty.*, 963 F.3d 982, 989 (9th Cir. 2020). In *Bishop Paiute Tribe*, for example, the Ninth Circuit found that a tribe has a legally protected interest in its "inherent sovereign authority to restrain, detain, and deliver to local authorities a non-Indian on tribal lands that is in violation of both tribal and state law." 863 F.3d at 1153. Consistent with this authority, the Court finds that the Band has a legally protected interest in exercising its inherent sovereign law enforcement authority.

As discussed earlier, the evidence in the record reveals numerous actual, concrete, and particularized incidents in which the Band's police officers have been restricted from carrying out their law enforcement duties pursuant to the Opinion and Protocol. The County concedes as much but argues that it is justified in doing so and challenges the extent

and scope of the Band's sovereign law enforcement authority. The resolution of this issue is for another day. For purposes of Article III standing, however, those injuries in fact are actual, concrete, and particularized and therefore confer standing on the Band to challenge the County's conduct.

Second, the Court considers whether Plaintiffs' injuries are fairly traceable to the challenged actions of Defendants in issuing and enforcing the Opinion and Protocol. "When government action or inaction is challenged by a party who is a target or object of that action, as in this case, 'there is ordinarily little question that the action or inaction has caused him injury.'" *Minn. Citizens Concerned for Life v. FEC*, 113 F.3d 129, 131 (8th Cir. 1997) (quoting *Lujan*, 504 U.S. at 561-62).

Plaintiffs argue that their injuries are fairly traceable to Defendants' conduct for three reasons. First, they argue that the evidence of record is clear that compliance with the Opinion and Protocol, despite being titled as such, was mandatory. (Pls.' Mem. Summ. J. at 32.) Second, Plaintiffs argue that Walsh clearly communicated to the Band police department that violations of the Opinion and Protocol could result in criminal and/or civil liability. (*Id.*) Finally, Plaintiffs note that Lindgren and his deputies repeatedly enforced the Opinion and Protocol. (*Id.*)

Walsh and Lorge contend that Plaintiffs' injuries are not fairly traceable to Defendants' actions for several reasons. First, they argue that the Opinion and Protocol did not actually restrict the Band's law enforcement authority because the Band "chose to cooperate with" the Opinion and Protocol on the advice of its Solicitor General, Matha. (Ind. Defs.' Opp'n Summ. J. at 33-34.) Second, they argue that Walsh never actually

threatened a Band officer with prosecution and Lindgren never actually threatened a Band officer with arrest. (*Id.* at 34-35.)

The Court finds that Plaintiffs' injuries are fairly traceable to Defendants' challenged conduct. The record is replete with evidence that County law enforcement and Band officials alike understood that compliance with the Opinion and Protocol was mandatory. Walsh made clear that violations of the Opinion and Protocol could result in criminal and/or civil enforcement. (*See, e.g.*, Baldwin Decl. [Doc. No. 150] Ex. N at 2.) And, as discussed earlier, Lindgren and his deputies enforced the Opinion and Protocol by actively interfering in the Band's criminal investigations, even on trust lands.

The Court finds unavailing the Defendants' argument that the Band's decision to follow the Opinion and Protocol, on the advice of its Solicitor General, to avoid potential criminal and civil liability, is the actual and intervening cause of these injuries. That argument "wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). Indeed, "[a] plaintiff is not deprived of standing merely because he or she alleges a defendant's actions were a contributing cause instead of the lone cause of the plaintiff's injury." *City of Wyo. v. P&G*, 210 F. Supp. 3d 1137, 1151-52 (D. Minn. 2016) (collecting cases).

Defendants' arguments that they never actually threatened prosecution or arrest also miss the mark. First, Walsh made it clear that the Opinion and Protocol was to be enforced. Second, this lawsuit does not seek tort damages for prosecution or arrest under the Opinion and Protocol. Rather, it seeks a declaratory judgment that the Band's sovereign authority

has been infringed. The particularized injury that confers standing in this case is that very

interference with the Band's sovereign law enforcement authority. Accordingly, the Court

finds that Plaintiffs' injuries are "fairly traceable" to Defendants' alleged unlawful conduct.

Finally, in order to confer standing, the Court must find that it will be likely that the

injury will be redressed by a favorable decision. In this case, the declaratory and injunctive

relief sought is specifically designed to do just that—to recognize and restore the Band's

sovereign law enforcement authority.

Accordingly, the Court finds that Plaintiffs have met their burden of establishing

standing to pursue these claims.

## 2.    Ripeness

Next, Plaintiffs seek summary judgment on the issue of ripeness. Whether a claim

is ripe depends on "the fitness of the issues for judicial decision and the hardship to the

parties of withholding court consideration." *Public Water Supply Dist. No. 10 v. City of

Peculiar*, 345 F.3d 570, 572-73 (8th Cir. 2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S.

136, 149 (1967)). A plaintiff must satisfy both elements "at least to a minimal degree." *Id.*

(citing *Nebraska Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1039 (8th

Cir. 2000)). Under the "fitness for judicial decision" prong of the analysis, whether a case

is fit "depends on whether it would benefit from further factual development." *Id.* at 573.

A case "is more likely to be ripe if it poses a purely legal question and is not contingent on

future possibilities." *Id.* Under the hardship prong, the plaintiff must have "sustained or is

immediately in danger of sustaining some direct injury as the result of the challenged"

conduct. *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).

Plaintiffs contend that their claims are ripe because the mandates of the Opinion and Protocol, as enforced by the County and the Sheriff, have repeatedly infringed on their sovereign law enforcement authority. (Pls.' Mem. Summ. J. at 35.) In response, Defendants argue that the Band has not in fact suffered a cognizable injury. (Ind. Defs.' Opp'n Summ. J. at 46-51.)

Plaintiffs satisfy both prongs of the ripeness analysis. This case is clearly fit for judicial decision. And under the "hardship prong," Plaintiffs have presented a record with sufficient evidence that they have sustained a direct injury to their sovereign law enforcement authority as a result of the challenged conduct.

### 3.      Mootness

Finally, Plaintiffs move for summary judgment on the issue of mootness, contending that the 2018 Agreement, which temporarily granted the Band the same law enforcement powers that it possessed before the County revoked the 2008 Agreement, does not moot this case. A case can become moot by a party's voluntary cessation of the challenged conduct if it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Wright v. RL Liquor*, 887 F.3d 361, 363 (8th Cir. 2018) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). The party asserting that a case is moot bears a "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Friends of the Earth*, 528 U.S. at 189 (internal quotations and citation omitted).

Defendants fail to meet this burden. If this case is dismissed, on mootness grounds, the 2018 Agreement will, by its very terms, terminate, and it is highly probable that the

parties will continue to dispute the extent of the boundaries of the Reservation and the extent of the Band's sovereign law enforcement authority. It is certainly not "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189 (citation omitted).

### D. Walsh and Lorge's Defenses of Immunity

Next, the Court considers Defendants Walsh's and Lorge's defenses of immunity from suit. Specifically, they argue: (1) that the Tenth Amendment bars this action because Plaintiffs unlawfully seek to control Walsh's prosecutorial discretion; (2) that *Younger* abstention is appropriate and principles of federalism and comity preclude the Court from awarding injunctive relief; (3) that the Eleventh Amendment immunizes Walsh and Lorge from this suit; and (4) that absolute prosecutorial immunity insulates Walsh and Lorge from this suit. (*See* Ind. Defs.' Mem. Summ. J. at 31-46.) The Court considers each of these arguments in turn.

### 1. Tenth Amendment and Prosecutorial Discretion

The gravamen of Defendants' claims of immunity under the Tenth Amendment rest on their prosecutorial discretion. Walsh and Lorge argue that Plaintiffs seek to interfere with that discretion and that Plaintiffs improperly ask this Court to review their charging decisions. (Ind. Defs.' Mem. Summ. J. at 31-36.) Plaintiffs respond that Defendants fundamentally misunderstand their claims. Plaintiffs argue that they do not seek to interfere with any charging decision. (Pls.' Opp'n Summ. J. at 25.) Rather, they seek clarity as to their sovereign law enforcement authority and they ask for an order preventing Walsh and Lorge from interfering with that authority. (*Id.*)

The Court is not aware of any authority, nor do Defendants cite any authority, for the proposition that a judicial declaration of the scope of a tribe's sovereign law enforcement authority or a judicial order prohibiting interference with that authority runs afoul of the Tenth Amendment.

It is well established that the Tenth Amendment does not foreclose federal courts from preventing state (or local) officials from infringing upon rights secured by federal law. *See Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828-29 (10th Cir. 2007); *Mille Lacs Band of Chippewa Indians v. Minnesota*, 124 F.3d 904, 928 n.44 (8th Cir. 1997), *aff'd*, 526 U.S. 172 (1999). For instance, when the Mille Lacs Band sought to prevent Minnesota officials from interfering with the Band's treaty-based rights to hunt, fish, and gather, the Eighth Circuit rejected a Tenth Amendment defense because the "case [was] about state law infringing on rights guaranteed by federal law, and there is no question that federal courts have the power to order state officials to comply with federal law." *Mille Lacs Band*, 124 F.3d at 928 n.44 (citations omitted). Accordingly, Walsh and Lorge's defense of immunity based on their prosecutorial discretion under the Tenth Amendment fails.

## 2. *Younger* Abstention and Principles of Federalism and Comity

Walsh and Lorge urge the Court to dismiss them from this case under the *Younger* abstention doctrine, and they contend that the Court cannot issue an injunction under the principles of federalism articulated in *Rizzo v. Goode*, 423 U.S. 362 (1976), and *O'Shea v. Littleton*, 414 U.S. 488 (1974).

The *Younger* abstention doctrine arose out of principles of comity articulated by the United States Supreme Court in *Younger v. Harris*, 401 U.S. 37 (1971). Under that doctrine, federal courts must "abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings." *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002) (citing *Younger*, 401 U.S. at 43-44). Specifically, the Court is required to abstain when: "(1) there is an ongoing state proceeding, (2) that implicates important state interests, and (3) that provides an adequate opportunity to raise any relevant federal questions." *Tony Alamo Christian Ministries v. Selig*, 664 F.3d 1245, 1249 (8th Cir. 2012) (citing *Plouffe v. Ligon*, 606 F.3d 890, 894-95 (8th Cir. 2010)). If these three conditions are satisfied, "principles of comity and federalism preclude federal actions seeking injunctive or declaratory relief." *Id.*

"Circumstances fitting within the *Younger* doctrine ... are 'exceptional'; they include … 'state criminal prosecutions,' 'civil enforcement proceedings,' and 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Sprint Communs., Inc. v. Jacobs*, 571 U.S. 69, 73 (2013) (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 367-68 (1989)). Unless the case is deemed to be "exceptional," however, the general rule applies—"the pendency of an action in [a] state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (quoting *McClellan v. Carland*, 217 U.S. 268, 282 (1910)).

Defendants Walsh and Lorge argue that this Court must abstain from hearing this case under the *Younger* abstention doctrine. Specifically, they argue that the effect of injunctive relief in this case would be to improperly enjoin pending or threatened criminal prosecutions. (Ind. Defs.' Mem. Summ. J. at 36-38.) Plaintiffs respond that there is no pending state court proceeding in which the Band's sovereign law enforcement authority will be adjudicated, let alone one that qualifies as "exceptional" under Supreme Court precedent. They note that this Court has previously held that *Younger* abstention would be inappropriate in a case seeking a determination of the extent of the Band's treaty rights relating to hunting, fishing, and gathering, even in the presence of pending criminal prosecutions. (Pls.' Opp'n Summ. J. at 30 (citing *Mille Lacs Band of Chippewa Indians v. Minn. Dep't of Nat. Res.*, 853 F. Supp. 1118, 1132 (D. Minn. 1994))).

The Court agrees with the Plaintiffs. *Younger* abstention is simply not applicable in the absence of both a state and federal proceeding considering the same federal constitutional claims. Therefore, Defendants' motion for summary judgment based on the *Younger* abstention doctrine is denied.

Next, Walsh and Lorge contend that federalism and comity principles under *Rizzo v. Goode*, 423 U.S. 362 (1976), and *O'Shea v. Littleton*, 414 U.S. 488 (1974), preclude the Court from granting injunctive relief in this case.

In *Rizzo*, the Supreme Court struck down an injunction revising the internal procedures of the Philadelphia police department based, in part, on principles of federalism. 423 U.S. at 377-81. The Court explained that "[w]here … the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the special delicacy of

the adjustment to be preserved between federal equitable power and State administration of its own law." *Id.* at 378 (internal quotations and citations omitted). Further, the Court noted that such federalism concerns "have applicability where injunctive relief is sought … against those in charge of an executive branch of an agency of state or local governments." *Id.* at 380. In *O'Shea*, the Court struck down an injunction that sought to control and prevent specific events that might occur during state prosecutions, which, according to the Court, constituted "an ongoing federal audit of state criminal proceedings." 414 U.S. at 491, 500.

Walsh and Lorge contend that an injunction in this case would run afoul of the principles of federalism and comity under *Rizzo* and *O'Shea*. They warn that the Court "could be forced to referee jurisdictional disputes between the Sheriff and tribal police" and "the injunction would require continuous supervision by the federal courts over the administration of state executive functions." (Ind. Defs.' Mem. Summ. J. at 36-38.) In response, Plaintiffs argue that this case does not raise federalism concerns under *Rizzo* and *O'Shea* because here, Plaintiffs seek only a declaration as to the scope of their sovereign law enforcement authority. (Pls.' Opp'n Summ. J. at 31-35.) Nothing, they contend, in *Rizzo* or *O'Shea* bars such relief. (*Id.*)

The Court agrees that federalism principles under *Rizzo* and *O'Shea* do not preclude injunctive relief in this case. The Eighth Circuit has recognized that the federalism concerns in *Rizzo* only apply in "quite narrow circumstances." *Chambers v. Marsh*, 675 F.2d 228, 232 (8th Cir. 1982), *rev'd on other grounds*, *Marsh v. Chambers*, 463 U.S. 783 (1983). Unlike the injunction in *Rizzo*, Plaintiffs do not request an order "revising the internal

procedures" of the County Attorney's Office or Sheriff's Office. Rather, Plaintiffs seek to enjoin interference with their sovereign law enforcement authority, a matter of federal law. Accordingly, although federal courts must be cognizant of federalism concerns under *Rizzo*, "they must, and do, retain power to enforce compliance with" federal law. *Youakim v. Miller*, 562 F.2d 483, 491 (7th Cir. 1977).

Likewise, the federalism concerns articulated in *O'Shea* do not exist here. Unlike the plaintiffs in *O'Shea*, Plaintiffs do not seek an "ongoing federal audit" of any state proceedings. *See* 414 U.S. at 500. Rather, they ask this Court to define the extent of their sovereign law enforcement authority and enjoin any interference with that authority. *O'Shea* has no applicability to this case.

Accordingly, to the extent that Defendants move for summary judgment based on principles of federalism and comity articulated in *Rizzo* and *O'Shea*, the motion is denied.

### 3.      Eleventh Amendment Immunity

Next, Walsh and Lorge argue that the Eleventh Amendment renders them immune from Plaintiffs' "official capacity" claims. Under the Eleventh Amendment, however, "only States and arms of the State possess immunity from suits authorized by federal law." *N. Ins. Co. v. Chatham Cnty.*, 547 U.S. 189, 193 (2006). The Supreme Court has consistently declined to extend Eleventh Amendment immunity to counties, even when "such entities exercise a 'slice of state power.'" *Id.* at 193-94 (quoting *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401 (1979)); *see Greenwood v. Ross*, 778 F.2d 448, 453 (8th Cir. 1985) ("It is settled that a suit against a county, a municipality, or other lesser governmental unit is not regarded as a suit against a

state within the meaning of the Eleventh Amendment." (quoting *Gilliam v. City of Omaha*, 524 F.2d 1013, 1015 (8th Cir. 1975))).

Whether an agency qualifies as an "arm of the state" under the Eleventh Amendment is a question of federal law that requires an analysis of the "provisions of state law that define the agency's character." *Thomas v. St. Louis Bd. of Police Comm'rs*, 447 F.3d 1082, 1084 (8th Cir. 2006) (quoting *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 n.5 (1997)). Specifically, courts must analyze "the agency's degree of autonomy and control over its own affairs and, more importantly, whether a money judgment against the agency will be paid with state funds." *Id.*

Applying the analytical framework in *Thomas*, the Court finds that Eleventh Amendment immunity does not shield Walsh and Lorge from liability here, because they are not "arms of the state." First, under Minnesota law, the County Attorney and Sheriff have wide autonomy and control over their affairs, wholly apart from the state. *See Thomas*, 447 F.3d at 1084. For example, the County Attorney and the Sheriff are not subject to state control in the execution of their statutory duties. Minn. Stat. § 388.051 (establishing County Attorney's duties); *id.* § 387.03 (establishing Sheriff's powers and duties). Moreover, the County Attorney and Sheriff are both elected positions. *Id.* § 382.01. And as elected county officials, the County Attorney and Sheriff can be removed through a petition containing the signatures of at least 25 percent of the number of people who voted in the last election for the county office that is the subject of the petition. *Id.* §§ 351.15-23; *see id.* § 351.14, subd. 5. Also, the County Board, not the state, sets and pays the salary of the County Attorney. *Id.* § 388.18, subd. 2, 5; *id.* § 388.22 subd. 1, 2. Likewise, the County

Board sets the Sheriff's salary. *Id.* § 387.20, subd. 2(a). Accordingly, the County Attorney and the Sheriff have significant autonomy and control over their affairs apart from the state.

Second, and "more importantly," *Thomas*, 447 F.3d at 1084, Minnesota law provides that a money judgment against Walsh and Lorge would be paid with county, not state, funds. Specifically, Minnesota law provides that "[w]hen a judgment is recovered against … a county officer, in an action … against the officer officially … the judgment shall be paid from funds in the [county] treasury," and if such funds are unavailable in the county treasury, "the unpaid amount of the judgment shall be levied and collected as other county charges." Minn. Stat. § 373.12. Thus, although Plaintiffs do not seek a money judgment in this case, a money judgment against Walsh and Lorge would be paid by the county.

Walsh and Lorge note that several of their duties and powers arise from Minnesota state statutes, such as Walsh's duty to enforce state water laws and Lorge's power to pursue and apprehend persons suspected of criminal activity. (*See* Ind. Defs.' Mem. Summ. J. at 41.) However, this demonstrates that Walsh and Lorge exercise, at most, "slices of state power" but does not establish that they are acting as "arms of the state" under the Eighth Circuit's framework in *Thomas*.

Accordingly, the Eleventh Amendment does not bar Plaintiffs' "official capacity" claims against Walsh and Lorge.

### 4.  Absolute Prosecutorial Immunity

Next, Walsh and Lorge seek dismissal from this case on the ground of absolute prosecutorial immunity. Absolute prosecutorial immunity protects prosecutors from suits

for damages "arising out of their official duties in initiating and pursuing criminal prosecutions." *Saterdalen v. Spencer*, 725 F.3d 838, 842 (8th Cir. 2013) (quoting *Williams v. Hartje*, 827 F.2d 1203, 1208 (8th Cir. 1987)). However, absolute prosecutorial immunity does not extend to "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings." *Stockley v. Joyce*, 963 F.3d 809, 817 (8th Cir. 2020) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)). Specifically, "prosecutors are not entitled to absolute immunity for their actions in giving legal advice to the police," because providing advice to the police is "not a function 'closely associated with the judicial process.'" *Buckley v. Fitzsimmons*, 509 U.S. 259, 271 (1993) (quoting *Burns v. Reed*, 500 U.S. 478, 495 (1991)).

According to Walsh, the conduct at issue in this case—his "alleged, threatened prosecution of" Plaintiffs—relates to his prosecutorial function, and thus he should be immune from suit. (Ind. Defs.' Mem. Summ. J. at 43-44.) If Walsh is entitled to prosecutorial immunity, Defendants argue that Lorge is likewise entitled to immunity for following Walsh's "legal advice." (*Id.* at 46.) In response, Plaintiffs contend that Walsh's and Lorge's conduct at issue in this case does not fall within the scope of prosecutorial immunity and that, in any event, prosecutorial immunity cannot shield Walsh and Lorge because Plaintiffs do not seek money damages. (Pls.' Opp'n Summ. J. at 44-47.)

As a threshold matter, although prosecutors enjoy absolute prosecutorial immunity from damages liability in certain circumstances, absolute prosecutorial immunity does not extend to actions for declaratory and injunctive relief. *See Supreme Court v. Consumers*

*Union of United States*, 446 U.S. 719, 736 (1980) ("Prosecutors enjoy absolute immunity from damages liability, but they are natural targets for § 1983 injunctive suits" (citation omitted)); *Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 531 (8th Cir. 2005) (citing and quoting *Consumers Union* for the proposition that "prosecutors, as state enforcement officers, are 'natural targets for § 1983 injunctive suits'"); *Bishop Paiute Tribe v. Inyo Cnty.*, No. 1:15-cv-00367-DAD-JLT, 2018 U.S. Dist. LEXIS 4643, at *21 (E.D. Cal. Jan. 10, 2018) (holding that absolute prosecutorial immunity defense was unavailable in suit arising under federal common law and seeking only injunctive and declaratory relief).

District Courts within the Eighth Circuit have also held that absolute prosecutorial immunity does not apply in an action for declaratory and injunctive relief. *See, e.g.*, *Richter v. Smith*, No. C16-4098-LTS, 2018 U.S. Dist. LEXIS 215431, at *21 (N.D. Iowa Dec. 21, 2018) ("absolute immunity bars recovery of money damages only"); *Kurtenbach v. S.D. AG*, 2018 U.S. Dist. LEXIS 53208, at *7 (D.S.D. Mar. 29, 2018) ("Immunities, i.e., absolute, prosecutorial or qualified immunity are not a bar to plaintiffs action for injunctive and declaratory relief under Section 1983." (internal quotations and citations omitted)); *Oglala Sioux Tribe v. Hunnik*, 993 F. Supp. 2d 1017, 1033 (D.S.D. 2014) (holding that State's Attorney was "not entitled to prosecutorial immunity for prospective injunctive or declaratory relief" where plaintiff did not seek money damages); *Hayden v. Nev. Cnty.*, No. 08-4050, 2009 U.S. Dist. LEXIS 22004, at *11 (W.D. Ark. Mar. 6, 2009) ("absolute immunity does not protect a prosecutor from claims for injunctive relief"). Here, Plaintiffs do not seek money damages—they seek only declaratory and injunctive relief.

Accordingly, Walsh and Lorge are not entitled to dismissal from this suit on the ground of absolute prosecutorial immunity.

### 5.   Walsh and Lorge's Remaining Arguments

Walsh and Lorge raise several other arguments. First, they seek dismissal of the "official capacity" claims asserted against them on the ground that such claims are redundant. Second, they seek dismissal of the "individual capacity" claims asserted against them on the grounds that (1) equitable relief cannot be obtained against government officials in their individual capacities and (2) Plaintiffs have failed to state "individual capacity" claims against Walsh and Lorge because their allegations all involve official conduct. Third, they request a ruling that qualified immunity bars Plaintiffs from seeking costs and attorney's fees from Walsh and Lorge in their individual capacities and that there is no statutory basis to award Plaintiffs costs and attorney's fees against Walsh and Lorge in their individual capacities. (*See* Ind. Defs.' Mem. Summ. J. at 46-55.)

The Court declines to consider these arguments at this time. The Third Amended Scheduling Order did not authorize Walsh and Lorge to seek summary judgment on these issues through an early dispositive motion. (Third Am. Pretrial Scheduling Order [Doc. No. 138] at 6; *see* Jt. Mot. [Doc. No. 132] at 1-2.) Walsh and Lorge may raise these arguments again, if and when it is appropriate to do so.

## IV.   CONCLUSION

Based on the foregoing, and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion for Summary Judgment on Standing, Ripeness, and Mootness [Doc. No. 146] is **GRANTED**;

2. Defendants Walsh and Lorge's Motion for Summary Judgment [Doc. No. 162] is **DENIED**;

3. Defendants County of Mille Lacs, Walsh, and Lorge's Motion to Strike and for Sanctions [Doc. No. 182] is **DENIED**.

**IT IS SO ORDERED.**


Dated: December 21, 2020                                s/Susan Richard Nelson
                                                        SUSAN RICHARD NELSON
                                                        United States District Judge