## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Mille Lacs Band of Ojibwe, a federally recognized Indian Tribe; Sara Rice, in her official capacity as the Mille Lacs Band Chief of Police; and Derrick Naumann, in his official capacity as Sergeant of the Mille Lacs Police Department, | Case No. 17-cv-05155 (SRN/LIB) |
| **Plaintiffs,** | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| County of Mille Lacs, Minnesota; Joseph Walsh, individually and in his official capacity as County Attorney for Mille Lacs County; and Donald J. Lorge, individually and in his official capacity as Sheriff of Mille Lacs County, | |
| **Defendants.** | |

Anna Brady, Beth Ann Baldwin, Marc D. Slonim, and Wyatt Golding, Ziontz Chestnut, 2101 Fourth Avenue, Suite 1230, Seattle, WA 98121; and Arielle Wagner, Charles N. Nauen, and David J. Zoll, Lockridge Grindal Nauen P.L.L.P., 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401, for Plaintiffs.

Brett D. Kelley, Kelley, Wolter & Scott, P.A., 431 South Seventh Street, Suite 2530, Minneapolis, MN 55415; Courtney E. Carter and Randy V. Thompson, Nolan Thompson Leighton & Tataryn PLC, 1011 First Street South, Suite 410, Hopkins, MN 55343; and Scott M. Flaherty and Scott G. Knudson, Taft Stettinius & Hollister LLP, 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402, for Defendant County of Mille Lacs, Minnesota.

Scott M. Flaherty and Scott G. Knudson, Taft Stettinius & Hollister LLP, 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402, for Defendant Joseph Walsh.

Brett D. Kelley, Douglas A. Kelley, Stacy Lynn Bettison, and Steven E. Wolter, Kelley, Wolter & Scott, P.A., 431 South Seventh Street, Suite 2530, Minneapolis, MN

55415; and Scott M. Flaherty and Scott G. Knudson, Taft Stettinius & Hollister LLP, 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402, for Defendant Donald J. Lorge.

## Table of Contents

I.   Background ........................................................................................................... 3
     A.   The 1855 Treaty Establishing the Mille Lacs Reservation ................................. 4
     B.   The 1863 and 1864 Treaties .......................................................................... 4
     C.   The 1867 Treaty ........................................................................................... 12
     D.   Treatment of the Reservation Between 1867 and the Nelson Act ..................... 13
     E.   The Nelson Act ............................................................................................. 26
          1.   Legislative History ................................................................................. 26
          2.   Statutory Provisions ............................................................................... 27
          3.   The Nelson Act Agreement ..................................................................... 29
     F.   The Mille Lacs Reservation After the Nelson Act ............................................ 31
          1.   Interior Secretary Noble's Decisions ....................................................... 31
          2.   1893 Resolution ..................................................................................... 33
          3.   1898 Resolution ..................................................................................... 33
          4.   1902 Act ................................................................................................ 35
          5.   Continuing Presence at Mille Lacs .......................................................... 40
          6.   Prior Litigation Concerning the Reservation ............................................. 41
II.  Discussion .......................................................................................................... 48
     A.   Standard of Review ....................................................................................... 48
     B.   Affirmative Defenses ..................................................................................... 49
          1.   Claim Preclusion .................................................................................... 50
          2.   Issue Preclusion ..................................................................................... 53
          3.   Judicial Estoppel .................................................................................... 56
          4.   Laches ................................................................................................... 58
          5.   The Indian Claims Commission Act ......................................................... 61
     C.   Disestablishment of the Mille Lacs Reservation ............................................. 63
          1.   The Law of Reservation Disestablishment ................................................ 63
          2.   The Treaties of 1863 and 1864 ............................................................... 66
          3.   The Treaty of 1867 ................................................................................. 74
          4.   The Nelson Act ...................................................................................... 74
          5.   Post-Nelson Act Congressional Resolutions ............................................. 87
          6.   Summary ................................................................................................ 92
III. Conclusion ........................................................................................................... 93

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Cross-Motions for Partial Summary Judgment [Doc. Nos. 223 & 239] filed by the parties. Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court **GRANTS** Plaintiffs' motion and **DENIES** Defendants' motion.

## I.    BACKGROUND

Plaintiffs are the Mille Lacs Band of Ojibwe, Mille Lacs Band Chief of Police Sara Rice, and Mille Lacs Band Sergeant Derrick Naumann (collectively, "the Band"). The Band brought suit against the County of Mille Lacs, Mille Lacs County Attorney Joseph Walsh, and Mille Lacs County Sheriff Donald Lorge (collectively, "the County") seeking declaratory and injunctive relief regarding the Band's law enforcement authority within the Mille Lacs Reservation. (*See generally* Compl. [Doc. No. 1].)

An integral part of the parties' dispute, and the issue now presented to the Court on the parties' Cross-Motions for Summary Judgment, is whether the Mille Lacs Reservation has been disestablished or diminished by Congress. In order to resolve this important issue, the Court must interpret a series of treaties and Acts of Congress dating back to the nineteenth century. The following recitation of the record, which is largely undisputed, begins with the 1855 treaty establishing the Mille Lacs Reservation. The Court then examines the 1863, 1864, and 1867 treaties, which the County contends resulted in the disestablishment of the reservation. Next, the Court explores the treatment of the Mille Lacs Reservation between the Treaty of 1867 and the Nelson Act of 1889, the provisions and history of the Nelson Act, and the Band's written agreement to the Nelson Act (the

"Nelson Act Agreement"). The Court concludes by examining the reservation's history following the Nelson Act, including its treatment by Congress, federal officials, and the courts.

### A.      The 1855 Treaty Establishing the Mille Lacs Reservation

The Mille Lacs Reservation was established by the 1855 Treaty with the Chippewa, as one of six tracts of land "reserved and set apart . . . for the permanent homes" of the Mille Lacs and other Mississippi Chippewa bands party to the treaty. Treaty with the Chippewa art. 2, Feb. 22, 1855, 10 Stat. 1165 (hereinafter "Treaty of 1855"). The Treaty of 1855 set aside more than 61,000 acres along Lake Mille Lacs for the Mille Lacs Band. *See id.* The treaty also established additional reservations for the Mississippi Chippewa at Gull Lake, Pokegama Lake, Rabbit Lake, Rice Lake, and Sandy Lake. *Id.* In addition, the treaty established reservations for the Pillager and Lake Winnibigoshish bands at Cass Lake, Leech Lake, and Lake Winnibigoshish. *Id.* Under the Treaty of 1855, the Mille Lacs Band and other Indian signatories gave up their aboriginal territory and agreed to "cede, sell, and convey to the United States all their right, title, and interest in, and to, the lands now owned and claimed by them, in the Territory of Minnesota." Treaty of 1855 art. 1.

### B.      The 1863 and 1864 Treaties

Following increased tension between Minnesota's Indian tribes and white settlers, Minnesota's Dakota Sioux began an uprising in 1862, leading to the deaths of several hundred settlers over the course of six weeks. (Decl. of Courtney Carter ("Carter Decl.")

[Doc. No. 242], Ex. 5 ("Rife Rep."), at 18[1].) During the Dakota uprising, Chief Hole-in-the-Day (the Younger) of the Gull Lake Band of Chippewa—a signatory of the 1855 Treaty—gathered warriors to launch his own campaign against white settlers. (*Id.* at 19.) When the Mille Lacs Band learned that Chief Hole-in-the-Day planned to attack the garrison, refugees, and government officials at Fort Ripley, the Band's chiefs refused to participate in Hole-in-the-Day's uprising and sent their own warriors to protect the fort and nearby settlements. (*Id.* at 21-22; Decl. of James McClurken ("McClurken Decl.") [Doc. No. 235], Ex. A ("McClurken Rep."), at 42.) Hole-in-the-Day's attack was averted, and Commissioner of Indian Affairs William P. Dole—who had been at Fort Ripley—praised the Mille Lacs Band's actions as going "far in enabling us to finally effect a settlement of the Chippewa difficulties without resort to arms." (Rife Rep. at 22.)

Following Hole-in-the-Day's brief uprising and the conclusion of the far bloodier Dakota uprising, the United States sought to remove the Mississippi bands to a reservation near Leech Lake. Through negotiations at Crow Wing in the winter of 1862–1863, representatives of the United States sought to convince the Mille Lacs Band to cede the reservation established under the Treaty of 1855. (McClurken Rep. at 44-48.) Despite the danger to the Band posed by nearby settlers, who were unhappy with the Lincoln Administration's resolution of the Dakota uprising, Mille Lacs Chief Shaboshkung—a signatory of the 1855 Treaty—"scuttled any discussion about the potential cession of the

---

[1] Pin-cites to the record reference page numbers assigned by the Court's ECF system, where available. Where the ECF system has not assigned page numbers, pin-cites reference the document's internal page numbers.

1855 Mille Lacs Reservation and the Band's removal to Leech Lake," and the Mississippi bands sought instead to negotiate directly with the Secretary of the Interior and the Commissioner of Indian Affairs in Washington, D.C. (*Id.* at 46-48; Rife Rep. at 26-27.) The Band's opposition to removal from their reservation was fueled by their belief that Commissioner Dole had promised them that, due to their aid during Hole-in-the-Day's uprising, they would not be forced to leave the Mille Lacs Reservation.[2] Prior to departing for Washington, D.C., the Ojibwe delegates met in St. Paul to strategize. In order to preserve the Mille Lacs Reservation, the delegates proposed ceding several bands' reservations on the condition that the ceding bands would be permitted to relocate to Mille Lacs. (McClurken Rep. at 48-49.)

Negotiations commenced in Washington, D.C. in February 1863. Representatives from all six Ojibwe bands were present, with Shaboshkung leading the Mille Lacs

---

[2] McClurken Rep. at 47-48, quoting Bishop Henry Whipple's January 22, 1863 letter to Commissioner Dole, which stated:

> The Mille Lac Indians and Bad Boy say that they held a council with you [Dole] at Fort Ripley and proved satisfactorily to you that they had resisted the outbreak and when their lives were in danger proved themselves the white mans friend. They say that you [Dole] promised them that they should be protected and rewarded, and that Hole-in-the-Day & his followers should be punished, that after Mr. White returned to Washington, he wrote to Mr. Johnson in the name of the Sec of the Interior & promised the same thing, that when Judge Usher came he promised that all their wrongs should be redressed and that Hole in the Day should be punished. They [the Mille Lacs Ojibwe] say that now they who have proved themselves true men are to lose their lands and be sent with bad Indians to a new home where these men will give them trouble.

delegation. (Rife Rep. at 28.) Secretary of the Interior John P. Usher and Commissioner Dole represented the United States. (*Id.*)

During the negotiations, Secretary Usher attempted to persuade the Mille Lacs to leave their reservation, arguing that removing to Leech Lake would offer a reprieve from flooding caused by lumbermen damming the Rum River and from interference by settlers. (McClurken Rep. at 51-52.) Usher also expressed the concern that Minnesotans had settled at Lake Mille Lacs, and that concentrating the bands there—as the delegates had discussed in St. Paul—would result in conflict. (*Id.*) Shaboshkung and the representative of the Leech Lake Band countered that the proposed reservation near Leech Lake lacked sufficient arable land for all the bands; and Shaboshkung disputed Usher's claim of white settlement at Mille Lacs. (*Id.* at 53-54.) Consistent with the delegates' discussion in St. Paul, Shaboshkung proposed enlarging the Mille Lacs Reservation and removing the Gull Lake, Rabbit Lake, Sandy Lake, Pokegama, and Rice Lake Bands to Mille Lacs. (*Id.* at 53.)

But Commissioner Dole expressed the concern that concentrating the bands at Mille Lacs would provoke nearby settlers. (*Id.* at 54.) Dole also stated that land along Lake Mille Lacs had been surveyed and sold, and that he therefore might not be able to add that land to the Mille Lacs Reservation. (*Id.*) And Dole, recognizing that he had made promises to the Mille Lacs following the 1862 uprisings, resisted the proposition that he had promised that the Band would be able to remain at Mille Lacs indefinitely:

> I have not forgotten the councils that I held with the chiefs here from Millacs. I have not forgotten all my promises to them, but they remember that the question of removal was not thought of at that time; and therefore I made no promises to them on that subject. . . . I cannot promise but what it may be necessary that the government should use its power for their removal, and

> the only question now is where can they go for a home where they can make
> a living. It may be barely possible that the people of Minnesota will consent
> to the Indians now living at Millac, to remain there . . . for the present. They
> may consent in the future for them to remain there forever if they will become
> good citizens. But I am sure that it will not give satisfaction to the people of
> Minnesota; however much it may be desired by the Indians if we remove
> them all to Millac my view of it is that at least the Gull Lake Indians will
> have to remove further north.

(*Id.* at 54-55.) By this speech, Dole indicated his belief that the Mille Lacs Band could

safely remain at Mille Lacs for the present, that their good conduct may make it possible

for them to remain indefinitely, but that settlers would not tolerate the concentration of all

the Ojibwe bands at Mille Lacs. Dole also resisted the claim that he had promised the Mille

Lacs they could remain on their reservation as a reward for their assistance during Hole-

in-the-Day's uprising, asserting instead that he had not discussed the prospect of removal

at Fort Ripley and that circumstances may require their removal from the reservation. (*Id.*

at 54-55, 57; Rife Rep. at 29; Decl. of Bruce M. White [Doc. No. 237], Ex. A ("White

Rep."), at 95-96.) Dole did, however, acknowledge during the negotiations that the Mille

Lacs "have earned this from the Government that they might . . . be allowed to remain

where they are at least for the present." (McClurken Rep. at 56.)

As negotiations continued into March 1863, the Mille Lacs delegates were adamant

that they be permitted to remain permanently on their reservation, and they rejected Dole's

proposal to require their removal after one or two years. (*Id.* at 55-57.) Henry Rice, a United

States Senator for Minnesota, joined the negotiations on March 6. Senator Rice, who had

experience negotiating with the Ojibwe, met with the Ojibwe delegates in unrecorded

private sessions. (*Id.* at 57; White Rep. at 97; Rife Rep. at 32.) Following these meetings,

8

Senator Rice drafted a treaty and obtained signatures from the Ojibwe delegates by March 11. (White Rep. at 98.) There is no record of the negotiations following Rice's private meetings with the delegates. (*Id.* at 97; McClurken Rep. at 57.) In a March 18 letter to Bishop Henry Whipple, an advocate for Minnesota's Ojibwe, Rice wrote: "Every word in [the treaty] (save amendments made by the Senate) emanated from my pen. I consulted no one—Whites or Indians—and would not allow any changes." (White Rep. at 98.)

Article 1 of the treaty provided that "[t]he reservations known as Gull Lake, Mille Lac, Sandy Lake, Rabbit Lake, Pokagomin Lake, and Rice Lake, as described in the [Treaty of 1855], are hereby ceded to the United States, excepting one-half section of land, including the mission-buildings at Gull Lake, which is hereby granted in fee simple to the Reverend John Johnson, missionary." Treaty with the Chippewa of the Mississippi and the Pillager and Lake Winnibigoshish Bands art. 1, Mar. 11, 1863, 12 Stat. 1249 (hereinafter "Treaty of 1863"). The treaty established a new reservation near Leech Lake, provided for various payments to the bands, and obligated the United States to make certain improvements to the new reservation. *Id.* arts. 2–6. Article 12 made removal from the ceded reservations contingent on the United States fulfilling its obligations under the treaty, and provided for special treatment for the Mille Lacs Band:

> It shall not be obligatory upon the Indians, parties to this treaty, to remove from their present reservations until the United States shall have first complied with the stipulations of Articles 4 and 6 of this treaty, when the United States shall furnish them with all necessary transportation and subsistence to their new homes, and subsistence for six months thereafter: Provided, That owing to the heretofore good conduct of the Mille Lac Indians, they shall not be compelled to remove so long as they shall not in any way interfere with or in any manner molest the persons or property of the whites.

*Id.* art. 12.

Shortly after signing the treaty, the Ojibwe delegates met with President Lincoln in a closed-door meeting. (White Rep. at 100-04.) Although no record of the meeting was preserved, Mille Lacs leaders repeated Lincoln's message consistently in the following decades. On December 2, 1867, Shaboshkung said:

> [W]e have remembered the words of our great father that he said to us six years ago when we went down to Washington if we would behave ourselves as we have done before that we should be let alone on the land we had before occupied [sic] for a hundred years or a thousand years or as long as we do not commit any depredations to it . . . .

(McClurken Rep. at 49.) Again, on February 23, 1875, Shaboshkung described the meeting with Lincoln:

> While in this room many years ago, we spoke to the Commissioner and he spoke good words. The President took hold of our hands and promised us faithfully and encouraged us, and he said we could live on our reservation for ten years, and if you are faithful to the whites and behave yourselves friendly to the whites you shall increase the number of years to 100; and you may increase it to a thousand years if you are good Indians, and through our good behaviour [sic] at the time of the war, (we were good and never raised hands against the whites) the Secretary of the Interior and the President said that we should be considered good Indians and remain at Mill Lac so long as we want to.

(*Id.* at 50.) And during negotiations with federal officials in 1886, Band leaders said:

> We saw the President and Commissioner of Indian Affairs sitting in a similar manner [in council]. This man saw them to [pointing to Mon-zo-mahinay] [sic]. They said to us, "Sit quiet where you are; the Mille Lacs will be only a little less splendid than Washington." Why we were told this was because we had always been quiet and peaceable. They told us we might stay here a thousand years if we wished to. For ten thousand years we will sit quiet here. Then for one hundred years, and for one thousand years, and if there be one Mille Lacs living, then he will stay quietly by Mille Lacs.

(*Id.* (alterations in original).)

Although Senator Rice won signatures from the Ojibwe delegates and represented to Bishop Whipple that "the Indians all left [Washington] satisfied with the treaty," McClurken Rep. at 60, the Ojibwe had grave concerns about the treaty. Consistent with Shaboshkung's arguments during the negotiations, chiefs who had not attended the negotiations in Washington, D.C.—including Hole-in-the-Day—complained that the land set aside for the new reservation near Leech Lake was not suitable for all the bands required to relocate there. (Rife Rep. at 36-37; McClurken Rep. at 60-61.) And the Mille Lacs chiefs protested Senate amendments that had reduced appropriations for the implementation of the treaty. (Rife Rep. at 36-37.) Further, after rumors that the Mille Lacs negotiators had ceded their reservation reached Mille Lacs, their constituents made "strong and credible threats against the negotiators' lives." (McClurken Rep. at 61.) Even Senator Rice was dissatisfied with the location of the new reservation near Leech Lake, writing to Bishop Whipple: "I did not like the location—but it was the best that could be done." (White Rep. at 98.)

Seizing the opportunity provided by the bands' discontentment, Hole-in-the-Day traveled to Washington, D.C. with Misquadace, of Sandy Lake, to renegotiate the treaty. No record of the negotiations exists, and it is unclear why the other Ojibwe chiefs present during the 1863 negotiations did not attend. (Rife Rep. at 39.) The resulting treaty, signed May 7, 1864, superseded the Treaty of 1863 but was largely identical to it. (*Id.*; McClurken Rep. at 62.) Article 1 still provided that the bands "ceded" their reservations to the United States, but set apart a section of land at Gull Lake, Sandy Lake, and Lake Mille Lacs for Chiefs Hole-in-the-Day, Misquadace, and Shaboshkung, respectively. Treaty with the

11

Chippewa, Mississippi, and Pillager and Lake Winnibigoshish Bands art. 1, May 7, 1864, 13 Stat. 693 (hereinafter "Treaty of 1864"). Article 12 retained its proviso that the Mille Lacs Band would not be required to remove, conditioned on their good behavior, and added a second proviso that "those of the tribe residing on the Sandy Lake reservation shall not be removed until the President shall so direct." *Id.* art. 2. Article 2 was modified to slightly expand the Leech Lake Reservation, and a provision was added to Article 3 to pay Hole-in-the-Day $5,000 for damage to his house following the 1862 uprisings. (Rife Rep. at 39.) Finally, the payments provided in Articles 5 and 6 were increased. (*Id.* at 39-40.)

### C.     The 1867 Treaty

Three years later, concerns regarding encroachment on the new Leech Lake Reservation by lumber and railroad interests prompted another round of negotiations in Washington, D.C. (*Id.* at 41.) Shaboshkung and Hole-in-the-Day, along with eight other chiefs, represented the Mississippi bands. (*Id.*) Special Commissioners Lewis V. Bogy and William H. Watson and Indian Agent Joel B. Bassett represented the United States. (*Id.*) By the resulting treaty, the bands ceded much—though not all—of the Leech Lake Reservation established by the Treaties of 1863 and 1864, and a new reservation was established at White Earth. Treaty with the Chippewa of the Mississippi art. 1, Mar. 19, 1867, 16 Stat. 719 (hereinafter "Treaty of 1867"). The new reservation, located far from the nearest white settlement and containing good farming land, spanned 1,300 square miles and included the White Earth and Rice Lakes. (Rife Rep. at 42.) The Treaty of 1867 did not mention the Mille Lacs Reservation or the Article 12 proviso in the 1863 and 1864 treaties. And federal officials did not record the negotiations leading to the treaty, so it is

unclear whether the status of the Mille Lacs Reservation was discussed. (*See* McClurken Rep. at 74-75.) Regardless, in November 1868, Indian Agent Joel Bassett wrote to Commissioner of Indian Affairs Nathaniel G. Taylor that the Mille Lacs Band did not intend to remove to White Earth; rather, "[t]he Mille Lac bands of Mississippi Indians manifest a strong desire to remain on their old reservation at Millie Lac [sic]." (Rife Rep. at 43.)

### D.      Treatment of the Reservation Between 1867 and the Nelson Act

Shortly after the Treaties of 1863 and 1864 were signed, local settlers and government officials sought to oust the Mille Lacs Indians from their reservation. To this end, settlers and mercantile interests endeavored to manufacture evidence of the Mille Lacs Band's bad conduct, so as to invoke the removal provisions of the Article 12 proviso. (*See* McClurken Rep. at 67; Rife Rep. at 43-44; White Rep. at 118, 124, 126-29.) The Indian Office never substantiated such claims. Indeed, in 1882, Commissioner of Indian Affairs Hiram Price wrote that the Mille Lacs Band "have never violated the conditions upon which their continued occupancy of the lands in question solely depends." (Decl. of Marc Slonim ("Slonim Decl.") [Doc. No. 226], Ex. 44, at 7.) And in May 1880, the Indian Office received a petition signed by citizens of Morrison County, neighboring the Mille Lacs Reservation, "commending the Mille Lac Indians in the highest terms for their uniform good conduct." (*Id.*)

While some attempted to oust the Band by invoking the Article 12 proviso, others made claims on the reservation timberland, with varying support from federal officials. Beginning in 1871, Indian Agent Edward Smith wrote to Indian Affairs Commissioner Ely

Parker regarding illegal entries on the reservation. Smith reported that "a man, by the name of O. E. Garretson, has sent in men and cut from two to three million feet of pine logs, which are being taken to market." (McClurken Rep. at 99.) Smith requested authorization to collect payment for the lumber, writing:

> The Mill Lac reservation, though ceded by the Indians to the Government, should not yet be subject to entry; for the Indians not having been ordered or notified to leave, are, according to their treaty, yet entitled to all their rights upon it.

(*Id.*) And Smith noted the Band's insistence "that their lands be not thrown open to entry, of any kind, so long as they remain, and that they be permitted to receive, as compensation for the timber cut unlawfully upon their reservation, whatever stumpage may be awarded by the Surveyor." (*Id.* at 100.)

Two months after learning that lumber had been taken from the reservation, Smith discovered that lumbermen had also claimed title to land within the reservation's boundaries. (*Id.*) In 1870, the Surveyor General of Minnesota had authorized a survey of the Mille Lacs Reservation and sent the bill to the Department of the Interior. (*Id.*) When the Department paid the bill and the plat of the survey was filed in the Taylor Falls Land Office, the Register and Receiver at Taylor Falls had interpreted the payment and plat filing as authorization to open the reservation to public entry. (*Id.*) Smith again wrote to Commissioner Parker:

> In this way, without permission of any sort from the Department, settlers and lumber men are taking possession of this Indian Reserve. The consequence is a double wrong. (1) The Indians are dispossessed without being removed, and (2) an injustice is done the public in not being allowed an equal opportunity to enter these lands, the very few men who in some way had

knowledge of the time when entries would be received having been ready to take the lands.

About one fourth of these lands are taken by scrip . . . which will be shown to be largely fraudulent. The other entries are under preemptive claims for lumbering purposes and preparations are making for extensive lumbering next winter.

(*Id.* at 101.) Smith requested, "in the name of these Indians," that all the entries "be canceled as without authority of law, and that I may be authorized to protect this reservation [Mille Lacs] from any encroachments until the Indians are removed." (*Id.* (alteration in original).)

Commissioner Parker then wrote to the Commissioner of the General Land Office, stating that "no part of said reservation should be considered as subject to entry or sale as public lands." (*Id.*) The General Land Office instructed officials at Taylor Falls:

You are now informed that these lands are still occupied by the Indians and are not subject to disposal, and you are requested to give public notice by advertisement in a newspaper of general circulation in that neighborhood of the above fact and also that all settlements and entries thereon are illegal and will not be recognized by this office . . . you will allow no Entries on these lands until so ordered by this office.

(*Id.*) And in September 1871, the United States Attorney General ordered the United States District Attorney for Minnesota to prosecute trespassers on the reservation. (*Id.* at 103.)

Throughout the controversy in 1871, federal officials conveyed their understanding that the Band retained exclusive rights to the Mille Lacs Reservation. Agent Smith wrote to the Governor of Minnesota: "their Reservation at Mill Lac, their right to which has never been relinquished or in any way extinguished, has been seized by white men and covered

with fraudulent scrip and preemption claims equally fraudulent . . . ." (*Id.* at 104.) Secretary

of the Interior Columbus Delano, in a September 4, 1871 letter to Agent Smith, wrote:

> This Department has no information leading to the belief that [the Article 12] proviso has ever been violated and is therefore of the opinion that the Mille Lac Indians are entitled to remain at present unmolested on their reservation and that their occupancy cannot be disturbed until they shall interfere with or in some manner molest the persons or property of the whites.

(*Id.* at 105.)

Although the Mille Lacs Reservation remained closed to entries for the next twenty

years, timber trespasses continued. As Agent Smith aptly predicted at the end of 1871:

> Unfortunately for these Indians, their reservation is rich in pine lands, which makes them the prey of lumber-dealers, and a strong pressure is kept up on all sides to secure their early removal. . . .
>
> There is little doubt that, owing to the presence of this valuable pine, the efforts on the part of the whites to get possession will not be relaxed, and it cannot be long before a sufficient pretext will be found to enforce their removal.

(Slonim Decl., Ex. 22, at 1005–06.) Smith therefore opined that "the best interest of the

Indians will be promoted by their early removal to the White Earth reservation," and that

appropriations should be made to develop the White Earth Reservation for the Band. (*Id.*

at 1006.) To fund the development efforts, Smith suggested—"as the easiest way out of the

difficulties in which this reservation is involved"—that the Mille Lacs Reservation's pine

be sold, "leaving the fee in the Government and the right of occupying in the Indians until

their removal to White Earth." (*Id.*) According to Smith, "[t]he Indians would readily

consent to the immediate sale of the pine for the benefit of their Great Father, and when

the reservation is once laid bare of its tempting wealth it will be no longer in demand for

pretended settlement . . . ." (*Id.*) As an alternative to removal to White Earth, Smith suggested giving the Band "in severalty so much of the reservation as they can occupy," and using the proceeds from the sale of the reservation's pine to fund agricultural development and schools. (*Id.*)

In 1872, Congress appropriated funds to finance the Mississippi Chippewas' removal to White Earth. Act of May 29, 1872, 17 Stat. 165, 189 ("That the Secretary of the Interior be, and he hereby is, authorized to expend, for the removal of the Chippewa Indians to *to* [sic] the White Earth Lake reservation, in Minnesota, for their subsistence for six months after their removal, and for improvements on the said reservation, the unexpended balance of appropriations heretofore made . . . ."). Approximately twenty-five Mille Lacs Ojibwe moved to White Earth following this appropriation. (McClurken Rep. at 110.)

After Smith was appointed as the Commissioner of Indian Affairs in 1873, he reiterated his suggestion that either title to reservation land be returned to the Band, or the Mille Lacs relocate to White Earth. In his 1873 report, Smith wrote:

> The Mille Lac band of Chippewas in Minnesota remains in its anomalous position. They have sold their reservation, retaining a right to occupy it during good behavior. With this title to the soil it is not deemed expedient to attempt permanent improvements at Mille Lac, unless a title to the reservation can be returned to them on condition that they surrender to Government [sic] all moneys acquired in consideration of their cession of the Mille Lac reservation. If this cannot be done, their Indians should be notified that they belong at White Earth, and be required to remove. In their present location, on its present tenure, nothing can be done looking toward their civilization.

(Slonim Decl., Ex. 24, at 12.) In 1875, a Mille Lacs delegation led by Shaboshkung met with Smith in Washington, D.C. to discuss the state of the Mille Lacs Reservation.

Shaboshkung requested assistance in developing the reservation and providing for its residents. (*Id.*, Ex. 27, at 1.) Smith argued that the Band ought to move to White Earth, explaining:

> The difficulty about your staying at Mille Lac is that you have no ownership in the land. A white man never puts up a house on land that does not belong to him. . . . You have sold your ownership in that country, and something ought to be done, and you ought to go where you can have land that is your own forever.

(*Id.* at 2.) Shaboshkung reiterated the Band's understanding of the promises made by Dole and Lincoln years before, stating:

> While in this room many years ago, we spoke to the Commissioner and he spoke good words. The President took hold of our hands and promised us faithfully and encouraged us, and he said we could live on our reservation for ten years, and if you are faithful to the whites and behave yourselves friendly to the whites you shall increase the number of years to 100; and you may increase it to a thousand years if you are good Indians, and through our good behaviour [sic] at the time of the war, (we were good and never raised hands against the whites) the Secretary of the Interior and the President said that we should be considered good Indians and remain at Mill Lac so long as we want to.

(*Id.*) Regarding the Treaty of 1863, Shaboshkung stated that "[w]e signed the paper because we were asked to sign with the other Indians," but protested that the document did not reflect their understanding of the agreement: "[W]e do not understand. It is very strange to us that whenever anything is done before us we think it is allright [sic], but instead after getting out of the Office, something more was added of which we knew nothing." (*Id.*, Ex. 28, at 2-3.)

Smith responded that the promises made to the Band were not recorded in the Treaties of 1863 and 1864, and that only the written text considered by Congress mattered. (*Id.*, Ex. 27, at 3; *id.*, Ex. 28, at 1-2.) According to Smith:

> The Mille Lac[s] gave up [their reservation] and took the right in White Earth where there was to be land broken for them and houses built, but they were not to be obliged to go so long as they did not interfere with or trouble the persons or property of white people. Now that is exactly the state of things. This is the way you lost you[r] right at Mille Lac. You have not lost it so long as you behave yourself and nobody can find any fault with you. But you see what the danger is, and it is growing more and more every year.

(*Id.*, Ex. 28, at 2.) That "danger," according to Smith, was that despite the Band's good behavior overall, individual members' misbehavior rendered the Band "liable . . . at any time to have a bad name gotten up against you; and then no one knows what will come as to your staying there." (*Id.*, Ex. 27, at 3-4.) Smith concluded that unless Congress ordained to shore up the Band's title to reservation land, the best course was for the Mille Lacs to relocate to White Earth. (*Id.*; *id.*, Ex. 28.) The Mille Lacs left Washington, D.C. unconvinced, but with promises of aid from Smith. (*Id.*, Ex. 28.)

In 1876, the lumbermen's scheming to obtain the reservation's timber continued. Amherst Wilder and future Senator Dwight Sabin arranged to hire settlers to make a preemption entry on reservation land and, after receiving a rejection from the local land office, appeal the decision to Washington. While their attorneys assisted in Washington, William Folsom, a Minnesota legislator, would push for the Band's removal. (White Rep. at 160-63.) Pursuant to the Sabin-Wilder scheme, Folsom's son made such an entry, which was rejected by the local land office and the General Land Office on the ground that the reservation was not open to entry. (*Id.* at 165-66.)

19

Secretary of the Interior Zachariah Chandler overturned the agencies' decisions. Construing the Treaties of 1863 and 1864, Chandler concluded: "All of the conditions of said treaties having been complied with by the United States, the title to said lands now rests absolutely in the United States." (Slonim Decl., Ex. 32, at 2.) Regarding the Article 12 proviso, Chandler reasoned that "[u]nder this proviso it is true that, so long as said Indians do not interfere with the persons or property of the whites, they cannot be compelled to remove; but it by no means gives them an exclusive right to the lands, nor does it, in my judgment, exclude said lands from sale and disposal by the United States." (*Id.* at 3.) Chandler further explained that "[i]t was anticipated evidently that these lands would be settled upon by white persons, that they would take with them their property and effects, and it was provided that so long as the Indians did not interfere with such white persons or their property, they might remain, not because they had any right to the lands, but simply as a matter of favor." (*Id.* at 3-4.) Accordingly, Chandler ordered that the reservation lands be opened to entry. (*Id.* at 4.) But, because the Mille Lacs Band still occupied the land and no appropriation was available to immediately remove them to White Earth, Chandler suspended execution of his decision until the close of the next session of Congress. (*Id.*) The Chandler decision did not purport to reverse the cancellation of previous entries pursuant to Secretary Delano's intervention in 1871.

Congress did not act on Chandler's decision. (White Rep. at 176.) But, before the Congressional session closed, Carl Schurz succeeded Chandler as the Secretary of the Interior. (*Id.*) The day before Congress was to adjourn, and Chandler's decision would thereby become effective, Schurz sent a telegram to the Taylor Falls Land Office

instructing it not to permit any entries on the Mille Lacs Reservation pursuant to Chandler's decision until Schurz issued further guidance. (*Id.* at 177.) Several days later, Schurz sent additional orders forbidding further entries until "the result of the action of Congress in relation to the right of the Indians in question to occupy the tract of country known as the Mille Lac Reservation . . . shall have been determined." (*Id.*) Despite this directive, in March 1879, the Taylor Falls Land Office permitted 285 entries, covering 24,376.77 acres—more than a third of the Mille Lacs Reservation's land. (*Id.* at 177-78.) This land—obtained using powers of attorney executed by soldiers, most of whom lived outside of Minnesota—was ultimately transferred to Senator Sabin and Amherst Wilder. (*Id.* at 180.) Two months later, Secretary Schurz wrote to the Taylor Falls Land Office cancelling all 285 entries as "having been allowed in contravention of the specific order of the Department, given with a view to afford opportunity for the adjustment of the rights of the Indians in the reservation." (Slonim Decl., Ex. 44, at 14.)

In July 1880, Acting Indian Affairs Commissioner E.J. Brooks responded to a petition seeking assistance against the lumbermen's persistent efforts to claim reservation pine land:

> I have to say, that there is no law authorizing the sale or entry of any of the lands embraced within the Mille Lacs reservation, and in the absence of such law no such sale or entry can be made.

> It will be seen, therefore, that the apprehensions of the Indians, and of the people as well, regarding the disposition of the lands referred herein, are not well grounded.

(*Id.*, Ex. 39; *see also id.*, Exs. 36-37 (describing the petition).) Similarly, in a May 1882 report, Indian Affairs Commissioner Hiram Price analyzed the Treaties of 1863 and 1864,

and concluded that the Article 12 proviso's right of occupancy was exclusive: "The Indians were there, and until they were removed either by their own consent or by reason of the forfeiture of their right of occupancy the whites manifestly must keep out." (*Id.*, Ex. 44, at 4.)

Despite Price's 1882 report, the Department of the Interior again changed course. Secretary Henry M. Teller restored Chandler's view of the Article 12 proviso. (*Id.*, at 10-12.) Teller reasoned that the proviso "gave to this band of Indians the right to remain on the reservation until they should voluntarily remove therefrom," but "[w]hatever title they had passed by this treaty to the United States, nothing remained in the Indians." (*Id.* at 11.) Teller noted that the parties to the treaty contemplated the band's voluntary removal to the reservation first established near Leech Lake, and later relocated to White Earth; but the Mille Lacs "have refused to do so and still refuse." (*Id.*) In Teller's view, the "interests of the Indians undoubtedly require their removal" but, under the Article 12 proviso, the United States could not compel removal absent the "clearest proof" that the Band had violated the proviso. (*Id.*) Because such proof did not exist, "it must be presumed that the Indians are rightfully on the reservation and entitled to the protection of the Government in all that was given them by the proviso in article 12." (*Id.*) Yet Teller concluded that the right of occupancy did not extend to the entire reservation:

> The question is whether they may occupy the whole reservation or only the part that is necessary to make good the promise of the proviso of section 12. It is not claimed that they originally occupied the entire reservation, or that it is now necessary to exclude white settlers therefrom to keep in good faith the treaty with them. I conclude that whatever they actually occupied in 1863 they are entitled now to occupy; if they have increased the area of their

occupation they are entitled to that, if such occupation was prior to the occupancy by white people.

The reservation was public land open to homestead and pre-emption claims, subject only to the rights of the Indians to reside thereon and not to remove therefrom until they wish so to do. Good faith required the Government to reserve for them as much land as they needed. This could not be more fairly determined than by conceding to them all they had previously occupied.

(*Id.*) Teller accordingly directed Commissioner Price to ascertain the amount of land occupied by the Band, so that the remainder could be occupied by settlers who had, in good faith, attempted settlement. (*Id.* at 11-12.) Following this decision, Teller reinstated Sabin and Wilder's 1879 entries—but not those canceled in 1871. (*Id.* at 16.)

In 1884, the House of Representatives requested a report on the Mille Lacs Reservation. After receiving Price's 1882 report and Teller's decision, Congress declared "[t]hat the lands acquired from the . . . Mille Lac band[] of Chippewa Indians on the White Earth reservation [sic[3]], in Minnesota, by the [Treaty of 1864] shall not be patented or disposed of in any manner until further legislation by Congress." Act of July 4, 1884, 23 Stat. 76, 89. The General Land Office again closed the Mille Lacs Reservation to entry. (*See* Slonim Decl., Ex. 53, at 541.)

---

[3] Although the Act of July 4, 1884 referred to the "White Earth reservation," Congress clearly intended to address the Mille Lacs Reservation, given that the White Earth Reservation was in fact established by the Treaty of 1867. (*See* Slonim Decl., Ex. 53, at 541 (1887 letter from Acting Interior Secretary Henry Muldrow, noting that "[t]he words 'on the White Earth reservation' in said act are repugnant to its otherwise clearly expressed intent and meaning and must yield thereto in construction" and concluding that the Act barred further entries on the Mille Lacs Reservation).)

Then, in May 1886, Congress authorized the Secretary of the Interior to "negotiate with the several tribes and bands of Chippewa Indians in the State of Minnesota for such modification of existing treaties with said Indians and such change of their reservation as may be deemed desirable by said Indians and the Secretary of the Interior." Act of May 15, 1886, 24 Stat. 29, 44. The Secretary appointed the Northwest Indian Commission to conduct these negotiations. The Commission reached agreements with the Chippewa of the White Earth, Leech Lake, Cass Lake, Lake Winnebagoshish, and White Oak Point Reservations, and the Gull Lake and Gull River Bands, providing for the consolidation of these bands at White Earth, the allotment of land at White Earth, and the sale of their prior reservations. (Slonim Decl., Ex. 52, at 1.) A second agreement with the Chippewa at the Red Lake Reservation provided for the sale of some of that reservation's land, and authorized the band to take allotments on the remaining land in the future. (*Id.* at 2.)

The Commission similarly held a council with the Mille Lacs Band, where "[e]very possible argument was used to influence their minds in favor of the movement [to White Earth]." (*Id.* at 17.) The Commission reported: "Their refusal was absolute and unqualified." (*Id.* at 18.) Shaboshkung again repeated the Mille Lacs account of the 1863 negotiations, stating that President Lincoln and Commissioner Dole

> said to us, "Sit quiet where you are; the Mille Lacs will only be a little less splendid than Washington." Why we were told this was because we had always been quiet and peaceable. They told us we might stay here a thousand years if we wished to. For ten years we will sit quiet here. Then for one hundred years, and for one thousand years, and if there be one Mille Lacs living, then he will stay quietly by Mille Lacs.

24

(*Id.* at 30.) Chief Mozomany echoed Shaboshkung's arguments: "Our young men have kept their part of the contract—to live in peace with the whites. . . . Is the one thousand years up that the Great Father has sent you here?" (*Id.*) Following the Band's refusal to remove to White Earth, Secretary of the Interior Lucius Lamar directed the Commission to try again. (*Id.*) But the Band persisted in its refusal to remove—except for a dozen representatives, who agreed on behalf of fifty Band members to remove to White Earth. (*Id.* at 19, 33-37.)

In 1888, foreshadowing the passage of the Nelson Act and echoing the Band's requests in years past, the Band petitioned Washington to permit the Band to take allotments at Mille Lacs. (*Id.*, Ex. 54, at 6-9.) The petition recalled the Band's resistance against Hole-in-the-Day's uprising in 1862, and explained the Band's desire to remain at Mille Lacs. (*Id.* at 6-7.) The Band wrote:

> [W]e are firm in our determination to remain at Mille Lac, and shall ask our Great Father to . . . sell the timber that we have no use for at Mille Lacs, or in some other way assist us to make ourselves more comfortable homes where we are. . . .
>
> We are told that we ceded our reservation at Mille Lac to the United States in 1863 and that we now only have the right to occupy it during good behavior. We never intentionally ceded all our lands at Mille Lac to the United States; we never intended to go away from our home at Mille Lac but if our Great Father shall decide that we have ceded them away and that we still have only the right of possession left and as it will make but little difference to him where they are, and a great deal of difference to us, we would respectfully ask you to let us remain at Mille Lac and give to us in severalty, the lands on this reservation, not disposed of . . . .

(*Id.* at 7.) One of the County's experts, Dr. Paul Driben, points to this petition as the first indication that the Band desired to give up its reservation, having concluded that

relinquishing the reservation in exchange for allotments was the only way to prevent settlers' and lumbermen's persistent encroachment. (*See* Decl. of Paul Driben ("Driben Decl.") [Doc. No. 259], at ¶ 5; *id.*, Ex. A ("Driben Rep."), at 57; Slonim Decl., Ex. 162 ("Driben Dep."), at 62, 128; *but see* Decl. of Randolph Valentine [Doc. No. 236], Ex. B ("Valentine Rebuttal"), at 16-17 (opining that the 1888 petition "implies a desire to retain their reservation, not to rid themselves of it").)

### E.      The Nelson Act

#### 1.      Legislative History

In March 1888, the U.S. House of Representatives' Committee on Indian Affairs issued a report regarding the agreements obtained by the Northwest Indian Commission and a proposed bill (which later became the Nelson Act). *See* H.R. Rep. No. 50-789 (1888) [Doc. No. 229-3]. The report summarized all the "reservations and unceded lands" in Minnesota that would be affected by the bill, and included the Mille Lacs Reservation in its summary. *Id.* at 2. But the Committee also stated that "[t]he Mille Lac Reservation has long since been ceded by the Indians, in fee, to the United States, with a right reserved to the Indians to occupy the same as long as they are well behaved." *Id.*

The Committee recommended that "[a]ll the Indians on the small outlying and scattered reservations" be removed to the White Earth Reservation and receive allotments there. *Id.* at 6. To carry out this objective, among others, the Committee proposed a bill providing for the sale of reservation land and the establishment of a "permanent interest-bearing fund for all the Chippewa Indians in common," as well as the concentration of Minnesota's Chippewa at White Earth. *Id.*

On the House floor, however, the proposed bill was amended to allow Minnesota's Chippewa to take allotments on their existing reservations, rather than at White Earth. 19 Cong. Rec. 1887-88 (1888) [Doc. No. 229-5]. Moreover, when Senator Sabin brought the bill to the Senate floor, a new provision was added, which barred the sale or disposal of "any tract upon which there is a subsisting valid preemption or homestead entry" and permitted such entries to proceed to patent. 19 Cong. Rec. 9129-32 (1888) [Doc. No. 229-6]. Although this provision was not in earlier versions of the bill, Senator Sabin apparently sought to include this language in order to protect his and Wilder's personal entries on the Mille Lacs Reservation. (McClurken Rep. at 181-82; White Rep. at 248-49.)

## 2.   Statutory Provisions

In 1889, Congress approved the Nelson Act. The Nelson Act established a commission to negotiate with Minnesota's Chippewa "for the complete cession and relinquishment in writing of all their title and interest in and to all the reservations of said Indians in the State of Minnesota, except the White Earth and Red Lake Reservations . . . , for the purposes and upon the terms hereinafter stated." Act of Jan. 14, 1889 ("Nelson Act") § 1, 25 Stat. 642. The cession was contingent on the written assent of two-thirds of the male adults of each band and the President's approval. *Id.* Further, the President's approval would "be deemed full and ample proof of the assent of the Indians, and shall operate as a complete extinguishment of the Indian title . . . for the purposes and upon the terms in this act provided." *Id.*

Section 3 of the Act provided that, after the cessions had been obtained, approved, and ratified, all Minnesota Chippewa, except those on the Red Lake Reservation, would be

removed to White Earth and then receive allotments there. *Id.* § 3. However, in line with

the House's revisions, the Act permitted the Chippewa to remain on their reservations:

> *Provided further*, That any of the Indians residing on any of said reservations may, in his discretion, take his allotment in severalty under this act on the reservation where he lives at the time of the removal herein provided for is effected, instead of being removed to and taking such allotment on [the] White Earth Reservation.

*Id.*

Under Sections 4 and 5, the ceded lands were to be surveyed and categorized as

"pine lands" or "agricultural lands," and the "pine lands" were to be sold for at least their

appraised values. *Id.* §§ 4–5. Section 6 provided for the disposal of unallotted "agricultural

lands" under the homestead laws, subject to Senator Sabin's proviso forbidding the

disposal of land with "subsisting, valid, pre-emption or homestead entr[ies]." *Id.* § 6. The

Act created an interest-bearing "permanent fund" within the Treasury Department, into

which "all money accruing from the disposal of said lands"—after deducting "all the

expenses of making the census, of obtaining the cession and relinquishment, of making the

removal and allotments, and of completing the surveys and appraisals"—would be

deposited. *Id.* § 7. Some of the interest accruing on that fund would be distributed to the

Chippewa, and some would be "devoted exclusively to the establishment and maintenance

of a system of free schools among said Indians." *Id.* The Act also permitted Congress to

appropriate the fund's principal "for the purpose of promoting civilization and self-support

among the said Indians." *Id.*

### 3.      The Nelson Act Agreement

After the passage of the Nelson Act, President Harrison appointed Senator Henry Rice, Martin Marty, and Joseph Whiting to the commission described in the Act (the "Chippewa Commission"). H.R. Exec. Doc. No. 51-247, at 1 (1890) [Doc. Nos. 230 & 230-1]. On October 2, 1889, the Chippewa Commission began negotiations with the Mille Lacs Band at their reservation. *Id.* at 163. After Whiting read the Nelson Act to everyone present, Rice "took charge" of the negotiations. (McClurken Rep. at 155.) Rice turned to the Treaty of 1863 and confirmed that the Band's understanding of that treaty was correct: "the understanding of the chiefs as to the treaty was right. Here is the acknowledgment of the Government that you were right, that 'you have not forfeited your right to occupy the reservation.'" H.R. Exec. Doc. No. 51-247, at 164. Later, Rice explained that the Band's "acceptance of this act will not affect these old matters at all, or weaken your chances of obtaining hereafter your dues, but, on the contrary, leaves you in a stronger position than before." *Id.* at 165. Rice then delivered an "elaborate explanation" of the Nelson Act, and Mozomany reported that "this understanding is perfect." *Id.* at 165–66.

Later in the negotiations, when discussing allotments, Maheengaunce stated that he understood all that Rice had said and that the Band would take allotments on the Mille Lacs Reservation: "as you have uttered the words of the law, stating that an Indian can take his allotment on the reservation where he resides, we make known to you that we wish to take

our allotments on this reservation, and not be removed to White Earth." *Id.* at 168.[4] Toward the end of the negotiations, Rice confirmed that if the Band agreed to the Act, they would receive allotments at Mille Lacs. *Id.* at 171. In urging Band members to assent to the agreement, Maheengaunce explained that it was "a settlement of all our past difficulties. . . . They tell us we are going to stay here forever, and that they are going to make allotments here to us." *Id.* Similarly, Kegewdosay told Rice that "we have heard from your own mouth, from the Commission . . . that we are going to have our allotments on our old reservation where we have resided." *Id.* at 174.

The Mille Lacs Band then signed the Nelson Act Agreement proffered by the Commission. *Id.* That Agreement provided that the Indians "occupying and belonging to the Mille Lac Reservation under and by virtue of a clause in the twelfth article of the [Treaty of 1864]" accept and consent to the Nelson Act "and each and all of the provisions thereof." *Id.* at 45. The Band agreed to "grant, cede, relinquish, and convey to the United States all of our right, title, and interest in and to" lands at White Earth and Red Lake not required to make the allotments provided for by the Act. *Id.* at 45–46. And the Band further agreed to "hereby forever relinquish to the United States the right of occupancy on the Mille Lac Reservation, reserved to us by the twelfth article of the [Treaty of 1864]." *Id.* at 46.

---

[4] Throughout the negotiations, Band members repeatedly referred to the land as their "reservation." *See generally id.* at 166–70.

One week after the Band signed the Nelson Act Agreement, Rice sent a letter to T.J. Morgan, the Commissioner of Indian Affairs, advising him that the Band "assented to the propositions offered them" and "signified their intention to remain where they are, and will take allotments upon that reservation." (Slonim Decl., Ex. 64, at 2.) In a December 1889 report to Morgan, the Chippewa Commission stated that the 1863 and 1864 treaties "confirmed the belief that [the Mille Lacs] were not only permanently located, but had the sole occupancy of the reservation." H.R. Exec. Doc. No. 51-247, at 22.

On March 4, 1890, President Harrison approved the Nelson Act Agreement, noting that the Nelson Act "authorized any Indian to take his allotment upon the reservation where he now resides," and observing that the Chippewa Commission reported that "quite a general desire was expressed by the Indians to avail themselves of this option." *Id.* at 1–2.[5]

## F.    The Mille Lacs Reservation After the Nelson Act

### 1.    Interior Secretary Noble's Decisions

After the passage of the Nelson Act, settlers continued to enter the Mille Lacs Reservation. The first in a trio of decisions from Interior Secretary John Noble accelerated

---

[5] The Court also notes that, shortly after the President approved the Nelson Act Agreement, Congress passed two laws apparently acknowledging the continued existence of the Mille Lacs Reservation. First, the Act of July 22, 1890, provided a right-of-way for "construction of a railroad through the Mille Lacs Indian Reservation," and the right to take 320 acres of land "in said reservation" for railroad purposes "upon paying to the United States for the use of said Indians such sum" as the Secretary of the Interior may direct. 26 Stat. 290. Second, a reservoir-damage appropriation was enacted on August 19, 1890, which provided for payment to the "Mississippi band, now residing or entitled to reside on the White Earth, White Oak Point, and Mille Lac Reservations . . . ." 26 Stat. 336, 357.

these entries, frustrating attempts to allot Mille Lacs Reservation lands to Band members for nearly three decades. (McClurken Rep. at 194.) In January 1891, Secretary Noble concluded that, following the Nelson Act Agreement, homestead entries suspended by the 1884 Act could proceed to patent. *Amanda J. Walters*, 12 Pub. Lands Dec. 52 (1891) [Doc. No. 231-3]. In so holding, Noble stated that the Mille Lacs Reservation was not a "reservation" on which the Indians could take allotments because, in his view, the Band ceded the reservation in 1863 and Mille Lacs was "the very land referred to and intended to be covered by" Sabin's § 6 proviso preserving entries made prior to the Nelson Act. *Id.* at 55–56. Noble did not, however, address lands within the Mille Lacs Reservation that were not subject to preexisting claims under the § 6 proviso. (*See* McClurken Rep. at 194.)

Then, in September 1891, Secretary Noble decided *Northern Pacific Railroad Co.*, a case involving railroads seeking to claim lands on the Mille Lacs Reservation. 13 Pub. Lands Dec. 230 (1891) [Doc. No. 231-4]. In that case, Noble recognized that the Article 12 proviso's right of occupancy was "a real and substantial interest or right in the enjoyment of which the Indians were entitled to protection," and was therefore an "appropriation as excepted [the lands] from [the railroad withdrawal] orders." *Id.* at 234. Accordingly, he held that reservation lands that did not have pre-existing claims, and were therefore not covered by the § 6 proviso, could only be disposed of under the Nelson Act. *Id.*

Finally, in April 1892, Noble considered the tension between *Northern Pacific Railroad Co.* and a departmental letter providing that reservation lands should be disposed of under the general land laws. Noble held that *Northern Pacific Railroad Co.* was

controlling, and required that reservation lands be disposed of according to the provisions of the Nelson Act. *Mille Lac Lands*, 14 Pub. Lands Dec. 497, 497–98 (1892) [Doc. No. 231-9]. Subsequently, the General Land Office determined that all homestead and preemption entries made after the Nelson Act's passage in 1889 "must be disallowed and cancelled." *See* H.R. Rep. No. 52-2321, at 2 (1893). Between the *Walters* and *Mille Lac Lands* decisions, entries were made covering 31,659 of the reservation's approximately 61,000 acres. H.R. Rep. No. 53-149, at 1 (1893).

### 2.    1893 Resolution

In the wake of the *Mille Lac Lands* decision, Congress determined that "prompt action" was needed to protect the preemption and homestead entries that settlers had made on the Mille Lacs Reservation as a result of the *Walters* decision. H.R. Rep. No. 52-2321, at 1-2. The House and Senate therefore approved a resolution to legitimize the entries that occurred between the *Walters* and *Mille Lac Lands* decisions. (*See* McClurken Rep. at 206-07; White Rep. at 319.) The 1893 Resolution confirmed "all bona fide pre-emption or homestead filings or entries allowed for lands within the Mille Lac Indian Reservation" between the dates of the *Walters* and *Mille Lac Lands* decisions, and permitted such entries to proceed to patent. J. Res. 5, 53rd Cong., 28 Stat. 576 (1893).

### 3.    1898 Resolution

Throughout the 1890s, the U.S. government made repeated attempts to induce Band members to leave the Mille Lacs Reservation, such as by withholding annuity payments from those who refused to remove to White Earth. (*See* McClurken Rep. at 210-13.) Nevertheless, most remained at the Mille Lacs Reservation, and they continued to seek

allotments there. (*Id.* at 219, 224-25.) They also continued to express their desire to remain on the Reservation. For example, in an October 1894 letter addressed to "Our Great Father in Washington," Band leaders—who wrote as the Great Father's "Children who reside on the Mille Lac Reservation"—stated that they "never consented to give up our lands" and proposed "to [retain] possession of them until a court of competent jurisdiction shall decide that we have no legal right to [retain] possession of our reservation." (Slonim Decl., Ex. 96.) Further, in June 1897, the Band requested that federal officials allot "unpatented lands of the Mille Lacs reservation, amounting to several thousand acres," to Band members. (*See* McClurken Rep. at 223-25.) Throughout this time period, however, settlers continued to claim reservation lands. (*Id.* at 216-17.)

In 1897 and 1898, Congress considered whether settlers could make entries and obtain patents on the reservation's lands. (*See id.* at 227-30.) In 1898, Binger Hermann, the Commissioner of the General Land Office, wrote that the last clause of the Nelson Act Agreement, which relinquished the Band's right of occupancy under the Treaty of 1864, was "not necessary" to extinguish title to the lands—"the words occurring before in the agreement being sufficient for that purpose." S. Rep. No. 55-1007, at 3 (1898). Consequently, Hermann asserted that the Band "elected . . . not to take the allotments on what was their own particular reservation," and therefore they could "only properly take" allotments on the White Earth Reservation. *Id.* He added that the remaining land at Mille Lacs "is insufficient in quantity and unfit in quality for the purpose of allotment." *Id.*

Thereafter, Congress approved a Joint Resolution providing that "all public lands formerly within the Mille Lac Indian Reservation . . . are hereby, declared to be subject to

entry by any bona fide qualified settler under the public land laws." J. Res. 40, 55th Cong.,

30 Stat. 745 (1898). The 1898 Resolution further provided that certain preemption filings

and all homestead entries or applications "shall be received and treated in all respects as if

made upon any of the public lands of the United States subject to preemption or homestead

entry." *Id.* In a proviso, Congress "perpetually reserved" a few lots "as a burial place for

the Mille Lac Indians, with the right to remove and reinter thereon the bodies of those

buried on other portions of said former reservation." *Id.*

### 4. 1902 Act

Although the Nelson Act offered the Band the right to individual allotments on the

Mille Lacs Reservation, the record indicates that only one Band member successfully

obtained an allotment at Mille Lacs prior to 1925. (White Rep. at 324.) Reflecting their

frustration with their inability to obtain allotments, Band members wrote a letter in March

1900 to the Secretary of the Interior, and stated that the "reservation was given to our band

as a reward for its loyalty to the Government, and its services in suppressing the Indian

uprising in Minnesota in 1862," but "through the influence of pine syndicates it was opened

to settlement in violation to [sic] treaty stipulations." (Slonim Decl., Ex. 126, at 3.) The

Band explained its view of the Nelson Act and Agreement: "In 1889, an act was passed by

Congress under which we ceded our rights to the reservation to occupy it as a band, but

reserved the right to take allotments in severalty thereon." (*Id.*) But "[b]efore we had

allotments given to us our reservation was again opened to settlement, and not only the

vacant lands were entered but those upon which our houses were built and our gardens

located. Since then we have been driven out of our houses by the settlers who claim the

lands upon which they are located." (*Id.*) Despite the deprivation of their lands and the Government's failure to grant allotments pursuant to the Nelson Act, the Band reported that its "young men have stubbornly refused to leave the reservation and insist upon the fulfillment of the agreement of 1889, in relation to allotting lands to them at Mille Lac." (*Id.* at 3-4.)

In early 1900, the Senate Committee on Indian Affairs considered a bill to compensate Band members for improvements to the Mille Lacs Reservation and permit them to take allotments at White Earth. (Slonim Decl., Ex. 127, at 2.) Indian Affairs Commissioner William Jones, who supported the bill, wrote that the Band "relinquished their right of occupancy on said reservation under" the Nelson Act, but that the white settler entries permitted prior to the Nelson Act and pursuant to the 1898 Resolution "had the effect of practically exhausting every acre of land on the reservation available for allotment to the Indians." (*Id.*) Consequently, "the Indians must . . . of necessity either remove from the reservation or secure no lands." (*Id.*) But a minority of the committee emphasized that "[o]ut of the tangle of verbiage of which treaties, laws, and rulings are composed[,] the Indians of the Mille Lac Reservation are able only to realize that somewhere in their dealings with the white race bad faith has been extended to them." (*Id.* at 5-6.) Consequently, the minority suggested instead that the Government purchase reservation lands occupied by settlers, and allot those lands to Band members. (*Id.*)

Although the bill did not pass, it was reintroduced in 1902, with an increased appropriation and a proviso permitting Band members who acquired lands within the reservation to remain at Mille Lacs. The House Committee Report regarding the

reintroduced bill echoed the previous Senate minority's view that the Band had been treated poorly, but supported the bill so that the Band, "from whom the land has been taken, perhaps with their consent but without their knowledge, may receive satisfactory compensation, in order that they may the more willingly vacate the reservation which has been taken from them by various treaties." (*Id.*, Ex. 135, at 7.) The Committee offered its support despite its conclusion that the appropriation for the bill, split among the 1,200 Band members then residing on the reservation, amounted to "a sum of slight consequence." (*Id.*) As enacted, the Act provided:

> For payment to the Indians occupying the Mille Lac Indian Reservation . . . the sum of forty thousand dollars, or so much thereof as may be necessary, to pay said Indians for improvements made by them, or any of them, upon lands occupied by them on said Mille Lac Indian Reservation . . . upon condition of said Indians removing from said Mille Lac Reservation: *Provided*, That any Indian who has leased or purchased any Government subdivision of land within said Mille Lac Reservation . . . shall not be required to move from said reservation . . . . *And provided further*, That this appropriation shall be paid only after said Indians shall, by proper council proceedings, have accepted the provisions hereof . . . and said Indians upon removing from said Mille Lac Reservation shall be permitted to take up their residence and obtain allotments in severalty either on the White Earth Reservation or on any of the ceded Indian reservations in the State of Minnesota on which allotments are made to Indians.

Act of May 27, 1902, 32 Stat. 245, 268.

Indian Inspector James McLaughlin and Indian Agent Simon Michelet met with Band members in August 1902 to procure their assent to the 1902 Act. McLaughlin asked the Band members whether they were "willing to accept a fair appraisement for improvements that you have made upon certain locations here, and remove from the former Mille Lac Reservation." (Slonim Decl., Ex. 134, at 32.) He told them to "[b]ear in mind

that you have lost all rights to lands here, you have no rights to lands here now, and you can acquire none here, but you can acquire rights elsewhere under the present legislation." (*Id.*) Chief Wahweyaycumig contested McLaughlin's portrayal of the Band's rights. He explained that when Senator Rice came to negotiate the Nelson Act Agreement, "[h]e pointed to the different directions defining our reservation and said that it would come to pass that this land would be allotted to us, and if there is not sufficient land on this reservation to allot us there was plenty of vacant Government land upon which we might locate." (*Id.* at 56.) The Chief argued that Senator Rice explained that the agreement would provide for payment to the Band for its pine, and promised "that we would commence to notice the movement of the whitemen [sic] from our territory immediately upon the acceptance of the treaty." (*Id.* at 57.) To McLaughlin's characterization of the Nelson Act, Chief Wahweyaycumig responded: "I have not realized any of the promises that were made to me, neither do I recognize this act that you have read to me today as the one that was presented and ratified at the time Mr. Rice was here to treat with us."[6] (*Id.*) McLaughlin and Michelet assured the Band that the 1902 Act contemplated only their removal from the reservation and the payment for their improvements to it; it would not result in the forfeiture of the Band's "back claims," and they would lose "no rights by moving." (*Id.* at 67-71.)

---

[6] *See also id.* at 72 (stating "I am pretty well along in age now and I have never heard my people at any time consent to the cession of this territory we claim as our own").

Ultimately, the Band consented to the 1902 Act. Ayndosogeshig explained: "These men that you see here before you wish to have the money that you speak of, as being appropriated to pay for the damages of these Indians for their improvements, to be placed in their hands while they remain here." (*Id.* at 73.) Ayndosogeshig apparently believed that the payments were to compensate them for property damage caused by settlers' efforts to displace Band members. (*Id.*) Notably, Ayndosogeshig also expressed the Band's desire to remain on the reservation: "I wish to purchase five different tracts of land upon which the Indians made settlements. The understanding that we had, when we were in Washington, was, that if any of the Indians wished to take an allotment on any of the other reservations and return to live upon this land there was not to be any objection to it." (*Id.*) Agent Michelet explained that the band, or individual members, could choose to purchase land on the reservation if they became dissatisfied with White Earth, but the payments afforded by the Act were conditioned on their initial removal. (*Id.* at 77-78.)

The 1902 Agreement proffered by McLaughlin and Michelet and signed by the Band provided:

> NOW THEREFORE, IN CONSIDERATION of the covenants and agreements of the party of the first part [the United States] herein contained, the said Mille Lac Indians occupying the former Mille Lac Indian Reservation, parties of the second part, hereby accept the appraisement made by James McLaughlin, U.S. Indian Inspector, and Simon Michelet, U.S. Indian Agent, of even date herewith, aggregating Forty thousand dollars, ($40,000), as full compensation for improvements made by them, or any of them, upon lands occupied by them, on said Mille Lac Reservation, and also accept the terms and conditions of said Act of Congress and agree to remove from said Mille Lac Indian Reservation, (except the excepted classes provided for in said Act of Congress), upon payment to them of the said appraised sum of Forty thousand dollars ($40,000), . . . as soon thereafter as notified by the proper authorities that the necessary arrangements have been

made for them upon the White Earth Reservation or any of the ceded Indian Reservations in the state of Minnesota on which allotments are made to Indians . . . .

It is understood that nothing in this agreement shall be construed to deprive the said Mille Lacs Indians of any benefits to which they may be entitled under existing treaties or agreements not inconsistent with the provisions of this agreement, or the [Act of 1902].

(Carter Decl., Ex. 61, at 25.)

## 5.    Continuing Presence at Mille Lacs

After assenting to the 1902 Act, many Band members left the Mille Lacs Reservation. However, many Band members remained, and some that initially left later returned. The parties do not dispute that at least two or three hundred Band members always remained at Mille Lacs. (*See* McClurken Decl., Ex. C ("McClurken Rebuttal"), at 5-6.) But due to inaccurate counting and apparent fraud by White Earth lumbermen, the number of Mille Lacs Band members who actually removed to White Earth is unclear. (*See* McClurken Rebuttal at 6-12.) Federal investigations in the 1910s found that fewer than 51 Mille Lacs Ojibwe lived at White Earth. (*Id.* at 13.) Further, by 1910, only 120 allotments had been issued to Band members living at White Earth. (*Id.* at 12.) And by 1912, all land available for allotment at White Earth had been allotted, and federal officials ceased efforts to remove the Mille Lacs Ojibwe to White Earth. (*Id.* at 13.)

In 1914, 1923, and under the Indian Reorganization Act of 1934, Congress purchased and allotted lands on the Mille Lacs Reservation for Band members.[7] By 2010,

---

[7] Act of Aug. 1, 1914, 38 Stat. 582, 590–91; Act of Jan. 24, 1923, 42 Stat. 1174, 1191; *see* Slonim Decl., Ex. 160.

1,598 of the 4,907 persons living on the reservation identified as Indian. Mem. from Solicitor to Sec'y of the Dep't of the Interior ("2015 Interior M-Opinion"), M-37032, at 20 (Nov. 20, 2015) [Doc. No. 150-4]. Today, the United States owns approximately 3,600 of the reservation's 61,000 acres in trust for the Band, and the Band and its members own another 6,100 acres in fee, comprising about 16% of the Mille Lacs Reservation. (Decl. of Bridgett Quist ("Quist Decl."), at ¶¶ 3-6.) The Band's government center is located on the reservation, and the Band operates schools, clinics, community centers, utility infrastructure, and a gaming complex on its trust and fee lands within the reservation. (*Id.* ¶¶ 7-10.)

### 6.     Prior Litigation Concerning the Reservation

In 1909, Congress conferred jurisdiction on the U.S. Court of Claims "to hear and determine a suit or suits to be brought by and on behalf of the Mille Lac band of Chippewa Indians in the State of Minnesota against the United States on account of losses sustained by them or the Chippewas of Minnesota by reason of the opening of the Mille Lac Reservation in the State of Minnesota . . . to public settlement under the general land laws of the United States." Act of Feb. 15, 1909, 35 Stat. 619. In 1911, the Band brought such a suit against the United States. The Band alleged that the Mille Lacs Reservation survived the Treaties of 1863 and 1864, and that when the Band assented to the Nelson Act, the United States—rather than allotting reservation land to Band members—instead opened the reservation to entry under the general land laws. (Second Slonim Decl. [Doc. No. 254], Ex. 4 ("1911 Compl."), at 5-8.) The Band argued that by opening the reservation to settlement, without paying the Band the value of the land sold as required by the Nelson

Act, the United States deprived the Band, "without their consent and against their will," of "all pine lands in the said Mille Lac Reservation, and all of the land comprising such Mille Lac Reservation, and all of their right, title and interest in and to such reservation." (Carter Decl., Ex. 65 ("1911 Brief"), at 505.) For the uncompensated sale of reservation land, the Band sought three million dollars in damages. (*Id.* at 427.) The United States argued that the reservation had been ceded under the Treaty of 1864, and therefore the reservation did not fall within the scope of the Nelson Act. (*Id.*, Ex. 66, at 101 ("As the former Mille Lac Reservation was not *ceded* under the act of 1889, it could not be surveyed, divided up, or classified as pine or agricultural lands, and it was therefore not intended to come within the provisions of the act.").)

The Court of Claims, interpreting the Article 12 proviso, found that the Treaties of 1863 and 1864 did not grant the Band "a mere license or favor," but instead "reserved to the [Band] the Mille Lac Reservation." *Mille Lac Band of Chippewas v. United States*, 47 Ct. Cl. 415, 438, 457 (1912), *rev'd on other grounds sub nom. United States v. Mille Lac Band of Chippewa Indians*, 229 U.S. 498 (1913). The Mille Lacs Band

> remained as a band in open, notorious possession of the same, a lawful notice to the world of a claim of title, until the resolutions of the Congress opened their domain to public settlement and divested them of title to their lands. They fulfilled all the conditions of the tenure, remained at peace with the whites, and were fully entitled to the benefits of the act of January 14, 1889, which were denied them.

*Id.* at 458. The court did not address, nor did the parties raise, the issue of whether the Nelson Act or subsequent legislation disestablished the reservation. Instead, having found that the United States sold reservation land in derogation of the Nelson Act's promises, the

court awarded damages to the Band—payable to the Chippewa fund established by the Nelson Act, rather than to the Band itself—representing the value of the land sold in violation of the Nelson Act. *Id.* at 461–62.

The United States appealed to the Supreme Court. Recognizing that "there was a real controversy between the Mille Lacs and the government in respect of the rights of the former under article 12 of the treaty of 1864," the Court reasoned that "this controversy was intended to be and was . . . adjusted and composed" by the Nelson Act. *United States v. Mille Lac Band of Chippewa Indians*, 229 U.S. 498, 506 (1913). The Court read the Nelson Act as presenting a compromise between the Mille Lacs Band and the Government: "while the government . . . waived its earlier position respecting the status of the reservation, and consented to recognize the contention of the Indians, this was done upon the express condition, stated in the proviso to § 6, 'that nothing in this act shall be held to authorize the sale or other disposal under its provision of any tract upon which there is a subsisting, valid pre-emption or homestead entry, but any such entry shall be proceeded with under the regulations and decisions in force at the time of its allowance, and if found regular and valid, patents shall issue thereon.'" *Id.* at 507. Because that compromise legitimized valid entries made prior to the Nelson Act, the Court held that the Court of Claims erred in including such land in its calculation of damages. *Id.* But the United States' disposal of "the lands not within the proviso . . . not for the benefit of the Indians, but in disregard of their rights," was "clearly in violation of the trust" created by the Nelson Act. *Id.* at 509. The Court reached its conclusion notwithstanding Congress's 1893 and 1898 Resolutions approving the disposal of land under the general land laws:

43

> That the wrongful disposal was in obedience to directions given in two resolutions of Congress does not make it any the less a violation of the trust. The resolutions . . . were not adopted in the exercise of the administrative power of Congress over the property and affairs of dependent Indian wards, but were intended to assert, and did assert, an unqualified power of disposal over the lands as the absolute property of the government. Doubtless this was because there was a misapprehension of the true relation of the government to the lands, but that does not alter the result.

*Id.* at 509–10. On remand, the Court of Claims adjusted its damages award to exclude lands subject to the Nelson Act's § 6 proviso, limiting the award to lands disposed of after the Nelson Act's passage. *Mille Lac Band of Chippewa Indians in State of Minn. v. United States*, 51 Ct. Cl. 400 (1916).

The Supreme Court referenced its 1913 *Mille Lac Band* decision in *United States v. Minnesota*, 270 U.S. 181 (1926). In *Minnesota*, the United States brought suit to recover swamplands patented to Minnesota, including about 700 acres of swampland on the Mille Lacs Reservation patented in 1871. *Id.* at 198–99. The United States argued that Indian lands were not disposable under the Swamp Lands Acts, and sought to either cancel patents granted on reservation swampland or recover the value of such land. *Id.* at 192–93. The Court reiterated its conclusion in *Mille Lac Band* that the Nelson Act "adjusted and composed" the controversy over the Band's interest in reservation lands under the Article 12 proviso. *Id.* at 198. Consistent with its holding in *Mille Lac Band* that the Nelson Act's compromise validated legitimate entries prior to 1889, the Court held that the United States could not recover the Mille Lacs swamplands patented in 1871. *Id.* at 199 ("[T]he United States is without right to any recovery here in respect of the lands as to which it was adjudged [in *Mille Lac Band*] to be free from any obligation or responsibility to the

Indians."). The Court did not examine whether the Treaties of 1863 and 1864 or the Nelson Act disestablished the reservation.

In 1946, Congress created the Indian Claims Commission ("ICC") to hear claims against the United States by Indian tribes, including claims for equitable revisions of treaties and claims "based upon fair and honorable dealings that are not recognized by any existing rule of law or equity." Indian Claims Commission Act ("ICCA") § 2, 60 Stat. 1049 (Aug. 18, 1946). Congress waived defenses based on laches and statutes of limitations, and provided that any accrued claims not brought within five years would be barred. *Id.* But the Act provided that "[n]o claim accruing after the date of the approval of this Act shall be considered by the Commission," and that any claim existing before the statute's enactment yet not presented within five years could not "thereafter be submitted to any court or administrative agency for consideration, nor will such claim thereafter be entertained by Congress." *Id.* §§ 2, 12.

The Minnesota Chippewa Tribe and its constituent bands, including the Mille Lacs, filed several claims under the Act. *See Minn. Chippewa Tribe v. United States*, 11 Cl. Ct. 221, 232–33 (1986); *Minn. Chippewa Tribe v. United States*, 230 Ct. Cl. 761 (1982); *Minn. Chippewa Tribe v. United States*, 15 Ind. Cl. Comm. 466 (1965) [Doc. No. 242-15, at 58]; *Minn. Chippewa Tribe v. United States*, 14 Ind. Cl. Comm. 226 (1964) [Doc. No. 242-15, at 19]. Relying on the unique causes of action created by the ICCA, the Band sought damages for the disposal of its land both before and after the Nelson Act.[8] The Court of

---

[8] *See, e.g.*, *Minn. Chippewa Tribe*, 11 Ct. Cl. at 234–35 ("Based on the treaties of 1863 and 1864, plaintiffs contend that the Mille Lac band was promised a reservation in

Claims—to which the Band's claims were transferred after the ICC concluded its operations—reasoned that the Band remained in possession of its 1855 reservation prior to the Nelson Act:

> [B]y treaties made in 1855, 1863, and 1864, reservations were set aside for the Mille Lac band in return for cessions of land. In article XII of both the 1863 and 1864 treaties, the band was promised the right to remain in possession of its reservation "so long as they shall not in any way interfere with or in any manner molest the persons or property of the whites." It is undisputed that the band never violated that condition.

*Id.* at 236. The court noted the Supreme Court's 1913 opinion in *Mille Lac Band*, which denied the Band compensation for the 29,335.5 acres entered prior to the Nelson Act on the basis of the Act's § 6 proviso. *Id.* But under the unique causes of action created by the ICCA, the Court of Claims granted summary judgment in favor of the Band with respect to the pre-Nelson Act entries. *Id.* at 237. The court reasoned that, "as the Court of Claims and the Supreme Court found, the purpose of the 1863 and 1864 treaties was to assure that the band could keep its reservation because of its 'good conduct.'" *Id.* at 239. Although the Band "never broke its promise not to interfere with the white people or their property," due to the United States' subsequent disposal of the reservation's land, "the United States received the proceeds from [the] sale of these lands under the land laws, [while] the band received no compensation at all for nearly half of its reservation . . . and the timber growing

---

return for their good conduct, but that through a series of conveyances confirmed as a result of the Nelson Act, that reservation was taken from them. Under clauses 3 and 5 of 25 U.S.C. § 70a . . . they seek, for the band, the fair market value of the land which the Supreme Court in 1913 held had not been ceded under the Nelson Act, and for the tribe, the fair market value of the acreage which was then ceded.").

on it." *Id.* at 239. The court therefore found that the United States' disposal of lands entered prior to the Nelson Act violated the standard of fair and honorable dealings and equated to unconscionable consideration, satisfying the elements of two of the ICCA's causes of action.[9] *Id.* at 240.

But the court declined to grant summary judgment on the plaintiffs' claim for the fair market value of the nearly 32,000 acres disposed of under the Nelson Act, for which the Supreme Court had ordered payment in *Mille Lac Band*. The court reasoned:

> Plaintiffs' claim seems to be that once having promised (in article 12 of the treaties of 1863 and 1864) that the Mille Lac band "shall not be compelled to remove" during the course of their good conduct, it was unfair to present the Nelson Act to them for assent. . . . [I]n contrast to the situation as to the land which was not subject to the Nelson Act, there is no question that band members *were* aware that they were ceding some of the land previously promised to them in return for the benefits of the act. As the Supreme Court held, those benefits were considerable, in that they thereby secured a share in the proceeds of the sale of all other Chippewa land, to which they otherwise had no claim.
>
> In short, the court cannot find solely on the basis of the earlier promises made to the band, that it was per se dishonorable for the government to offer them a treaty on different terms. They knew that they would be ceding parts of their reservation by assenting to the Nelson Act and they received compensation for their assent.

*Id.* at 240–41 (citations and footnotes omitted). Like the Court of Claims and Supreme Court in the *Mille Lac Band* proceedings, the court did not address whether the Nelson Act or subsequent legislation disestablished the reservation.

---

[9] Unlike the damages awarded in *Mille Lac Band*, which were made part of the Chippewa trust established by the Nelson Act, the court reasoned that the ICCA claim "belongs to the band alone since it was then the sole possessor of the Indian Title to the reservation." *Id.* at 240.

Ultimately, in 1999 the court granted the parties' Joint Motion and Stipulation for Entry of Final Judgment. (*See* Decl. of James M. Schoessler [Doc. No. 256-1].) The stipulation "dispose[d] of all claims, rights, and demands under Section 2 of the ICCA . . . which plaintiff has asserted or could have asserted." (*Id.*, Ex. A, at ¶ 2.) The Band withdrew "[a]ll claims, rights, and demands under Section 2 of the ICCA . . . regarding those lands in the Mille Lacs Reservation that were disposed of by the United States prior to [the Nelson Act]" with prejudice. (*Id.* ¶ 8.) The parties "specifically agree[d] that the plaintiff is receiving no compensation for any such claim under the final judgment entered pursuant to this Stipulation, and no such Claim is being adjudicated by such judgment." (*Id.*) But the parties also agreed that "[n]othing in this Stipulation shall be construed to limit, foreclose, or otherwise adversely affect . . . any tribal treaty right, on any lands or waters within any of the reservations of plaintiff's six constituent bands." (*Id.* ¶ 11.)

## II.   DISCUSSION

### A.   Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). A factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, the Court must view the evidence and any

reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the moving party bears the burden of establishing the lack of a genuine issue of fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Where, as here, the record is largely undisputed and "the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Aucutt v. Six Flags Over Mid-Am., Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996) (citing *Crain v. Board of Police Comm'rs*, 920 F.2d 1402, 1405–06 (8th Cir. 1990)).

### B.    Affirmative Defenses

Before turning to the merits of the parties' cross-motions, the Court must resolve several affirmative defenses raised by the County. Namely, the County asserts that the Band's claims are barred by claim and issue preclusion, judicial estoppel, laches, and the Indian Claims Commission Act. For the reasons that follow, the Court finds that these doctrines do not bar the claims brought in this litigation.

### 1.      Claim Preclusion

The Court first considers the County's argument that claim preclusion bars this action. Where a party brings successive lawsuits, claim preclusion operates as a bar to claims asserted in the later-filed suit when: "(1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits involve the same parties (or those in privity with them); and (4) both suits are based upon the same claims or causes of action." *Elbert v. Carter*, 903 F.3d 779, 782 (8th Cir. 2018) (quoting *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 673 (8th Cir. 1998)). In general, "claim preclusion does not apply to claims that did not arise until *after* the first suit was filed." *United States v. Bala*, 948 F.3d 948, 951 (8th Cir. 2020) (emphasis in original) (quoting *Baker Grp. v. Burlington N. & Santa Fe Ry.*, 228 F.3d 883, 886 (8th Cir. 2000)). However, a subsequent claim may be barred where it "arises out of the same nucleus of operative facts as the prior claim." *Id.* (quoting *Lane v. Peterson*, 899 F.2d 737, 742 (8th Cir. 1990)).

According to the County, claim preclusion applies in this case because the Band already litigated its "claim of reservation cession" in the *Mille Lac Band* proceedings in 1912 and 1913, in *Minnesota* in 1926, and in the *Minnesota Chippewa Tribe* proceedings under the ICCA. (Mem. in Supp. of Defs.' Mot. for Summ. J. [Doc. No. 241], at 75-83.) In response, the Band argues that claim preclusion does not apply because (1) the claims in this case are different from any of those brought in prior cases, and (2) this case does not involve the same parties as the prior cases. (Mem. in Opp'n to Defs.' Mot. for Summ. J. [Doc. No. 253], at 73-76.)

The Court agrees with the Band. In this case, the Band asserts claims for declaratory and injunctive relief concerning the scope of its inherent and federally delegated law enforcement authority. (*See* Compl. at 7.) These claims arise from the County's alleged interference with that authority beginning in 2016. (*See id.*) As the County concedes, "the Band has never before brought a claim seeking a declaration of its investigatory and jurisdictional authority over the 1855 Treaty area." (Mem. in Supp. of Defs.' Mot. for Summ. J. at 75.) The County asserts that claim preclusion nonetheless applies because the Band and the Minnesota Chippewa Tribe "have previously litigated the claim of reservation cession." (*Id.*) But that argument conflates claim preclusion with the closely related doctrine of issue preclusion. Whether or not the disestablishment *issue* may have been previously litigated does not mean that the Band's law enforcement authority *claims* are precluded. None of the Band's prior litigation involved such claims. *See generally supra* Section I.F.6. The *Mille Lac Band* proceedings in 1912 and 1913 involved the Band's claims for compensation based on the Government's opening of the reservation to settlement in derogation of the Nelson Act. In *Minnesota*, the United States sought to cancel patents granted to Minnesota on reservation swampland or to recover the value of such land. And the *Minnesota Chippewa Tribe* cases involved the unique claims created by the ICCA.

Moreover, the Band could not have brought its present claims before the County allegedly interfered with the Band's law enforcement authority in 2016. Claim preclusion generally does not apply to claims that did not arise until after the first suit was filed, unless the subsequent claim "arises out of the same nucleus of operative facts as the prior claim."

*Bala*, 948 F.3d at 951 (quotation omitted). To be sure, the Band's claims concerning its law enforcement authority raise the issue of whether its reservation was disestablished, and the core facts driving the disestablishment inquiry today are largely identical to the facts considered by the Court of Claims, Supreme Court, and the ICC decades ago. But the *claims* asserted here arise out of the County's alleged interference with the Band's law enforcement activities in 2016—a markedly different "nucleus of operative facts." Because the prior cases were not "based upon the same claims or causes of action" as this case, claim preclusion does not apply. *Elbert*, 903 F.3d at 782.

Finally, claim preclusion is inapplicable here for another reason: this case does not involve the same parties as the prior cases. The County urges the Court to apply the exception to claim preclusion's mutuality requirement recognized in *Nevada v. United States*, 463 U.S. 110 (1983). There, the United States sued to adjudicate certain water rights that were resolved in a prior action. *Id.* at 116–21. The prior action was an equitable action to quiet title, and all parties involved in that action "contemplated a comprehensive adjudication of water rights intended to settle once and for all" how the rights associated with a certain river should be divided among the litigants. *Id.* at 143. The Court explained that "even though quiet title actions are *in personam* actions, water adjudications are more in the nature of *in rem* proceedings," and nonparties "have relied just as much on" the decree in the prior action "as have the parties of that case." *Id.* at 143–44. Therefore, the Court concluded that "under these circumstances it would be manifestly unjust . . . not to permit subsequent appropriators to hold" one of the litigants to the claims it made in the

prior action, and that any "other conclusion would make it impossible ever finally to quantify a reserved water right." *Id.* at 144 (quotation omitted).

The Court declines to extend *Nevada's* "narrow exception to the mutuality rule" to the Band's claims in this case. *Mille Lacs Band of Chippewa Indians v. Minnesota*, 124 F.3d 904, 932 (8th Cir. 1997), *aff'd*, 526 U.S. 172 (1999). As the Eighth Circuit has explained, "[t]he proceedings in *Nevada* were unique; they involved [a] comprehensive water rights adjudication, in which many non-party water appropriators had relied on a prior decree as much as the parties to the action, making res judicata appropriate because of the special need to finally quantify reserved water rights." *Id.* at 932–33. Those concerns are not present in this case, and the Court sees no need to extend *Nevada's* "narrow exception."

Accordingly, the Court finds that claim preclusion does not bar the Band's claims.

### 2.   Issue Preclusion

Next, the County argues that the Band is precluded from arguing that its reservation has never been disestablished. Issue preclusion bars a party from relitigating an issue where the following elements are satisfied:

> (1) the party sought to be precluded in the second suit must have been a party, or in privity with a party, to the original lawsuit; (2) the issue sought to be precluded must be the same as the issue involved in the prior action; (3) the issue sought to be precluded must have been actually litigated in the prior action; (4) the issue sought to be precluded must have been determined by a valid and final judgment; and (5) the determination in the prior action must have been essential to the prior judgment.

*Sandy Lake Band of Miss. Chippewa v. United States*, 714 F.3d 1098, 1102–03 (8th Cir. 2013) (quotation omitted).

The County points to the Court of Claims' 1912 and 1986 decisions, the Supreme Court's 1913 and 1926 decisions, and the ICC's 1964 and 1982 decisions. The County asserts that "[w]hether the lands encompassed by the 1855 Treaty and the Nelson Act remained Indian country, or were ceded to the United States through the 1863, 1864, and 1867 Treaties and the Nelson Act, were essential to the courts' determinations in the earlier litigation. It was at the core of their analyses of the disposition of lands and the compensation to which the Band was entitled." (Mem. in Supp. of Def.'s Mot. for Summ. J. at 96-97.)

The County is partially correct: the issue of whether the reservation survived the Treaties of 1863 and 1864 was previously litigated and decided. But that issue was resolved in the Band's favor. In 1913, the Court of Claims held that the Article 12 proviso "reserved to the [Band] the Mille Lac Reservation." *Mille Lac Band of Chippewas v. United States*, 47 Ct. Cl. 415, 438, 457 (1912), *rev'd on other grounds sub nom. United States v. Mille Lac Band of Chippewa Indians*, 229 U.S. 498 (1913). Consequently, the court concluded that by disposing of reservation land under the general land laws rather than the Nelson Act, the United States violated the Nelson Act. *Id.* at 461–62. The Supreme Court did not reach the merits of the controversy surrounding the Article 12 proviso, holding instead that it was "adjusted and composed" in the Nelson Act, whereby "the government . . . waived its earlier position respecting the status of the reservation, and consented to recognize the contention of the Indians," on the condition that otherwise valid entries prior to the Nelson Act would be carried to patent pursuant to the Act's § 6 proviso. 229 U.S. at 507. Similarly, the Court of Claims in 1986 found that "the purpose of the 1863 and 1864 treaties was to

assure that the band could keep its reservation because of its 'good conduct.'" *Minn. Chippewa Tribe v. United States*, 11 Cl. Ct. 221, 239 (1986).[10]

But none of the courts considered whether the Nelson Act disestablished the Mille Lacs Reservation. Each court considered whether the United States violated the Nelson Act by its subsequent disposition of reservation lands. *See, e.g.*, *Mille Lac Band of Chippewa Indians*, 229 U.S. at 509 (holding that the sale of "lands not within the [Nelson Act's § 6] proviso . . . not for the benefit of the Indians, but in disregard of their rights," was "clearly in violation of the trust" created by the Nelson Act). The Band's damages claims for the wrongful disposition of its land did not require the courts to reach, nor did they reach, the question of whether the Nelson Act or subsequent legislation altered the reservation's boundaries.

Because the disestablishment question, insofar as it concerns the pre-Nelson Act treaties, was resolved in the Band's favor; and because the disestablishment question, insofar as it concerns the Nelson Act, was neither determined, litigated, nor essential to the judgments in the Band's prior litigation, the Court finds that the Band is not precluded from litigating the disestablishment issue in this case.

---

[10] The County also cites decisions from the ICC as holding that the Band had "ceded" its reservation under the Treaties of 1863 and 1864. But "cession" and "disestablishment" are not necessarily equivalent terms. *See infra* Sections II.C.2, 4. A close review of the ICC's decisions confirms that the Commission did not opine on Congress's intent to disestablish the reservation through the Treaties of 1863 or 1864. *See Minn. Chippewa Tribe v. United States*, 14 Ind. Cl. Comm. 226 (1964); *Minn. Chippewa Tribe v. United States*, 15 Ind. Cl. Comm. 466 (1965). And, to the contrary, when the Band's ICC claims were transferred to the Court of Claims, that court found that the treaties preserved the reservation. *Minn. Chippewa Tribe v. United States*, 11 Cl. Ct. at 239 (1986).

### 3.    Judicial Estoppel

The County also insists that the Band is estopped from asserting that the Mille Lacs Reservation has never been disestablished. "The doctrine of judicial estoppel prevents a party who assumes a certain position in a legal proceeding, and succeeds in maintaining that position, from later assuming a contrary position." *Scudder v. Dolgencorp, LLC*, 900 F.3d 1000, 1006 (8th Cir. 2018) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)) (cleaned up). In determining whether judicial estoppel applies, courts consider three factors: "(1) whether a party's later position is clearly inconsistent with its earlier position, (2) whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled, and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* (quoting *New Hampshire*, 532 U.S. at 750–51) (cleaned up). At bottom, judicial estoppel is a discretionary equitable doctrine intended to prevent abuses of the judicial process by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 749–50 (quotation omitted).

In support of this defense, as with the County's preclusion defenses, the County points to the Band's litigation before the Court of Claims and the ICC. The County asserts that, throughout the Band's litigation history, the Band claimed its reservation had been disestablished; that the Band prevailed on its position, and received compensation for the

disestablishment of its reservation; and that the Band should therefore be estopped from asserting before this Court that the reservation was never disestablished.

But the County's review of the Band's litigation history improperly conflates the "cession" of reservation land with disestablishment.[11] Throughout the 1900s, first under a 1909 jurisdictional statute and later under the ICCA, the Band sought damages for the uncompensated disposition of its land under the general land laws. The Band argued that its reservation still existed at the time of the Nelson Act, and that the Nelson Act entitled the Band to compensation for unallotted land opened for sale and settlement. But it did not argue that the reservation was *disestablished* by the Nelson Act. Like the County, the Court views as representative the Band's claims leading to the Court of Claims' 1986 decision:

> The claimants' position is that the 1863 and 1864 treaties <u>reserved the Mille Lac Reservation to the Mille Lac Band</u> for so long as the Band complied with the condition of Article 12; that the Band did comply with the condition; that the United States, in violation of standards of fair and honorable dealings (a) opened the reservation lands to disposal under the public land laws in violation of the treaties; . . . (d) <u>disposed of the Band's reservation land under the public land laws both before and after the 1889 Act although the law was crystal clear that Interior was entirely without authority to issue valid patents to Indian lands</u>; and (e) failed to pay the fair market value of the land and timber so disposed of. But for the Government's unfair and dishonorable dealings, but for the use of the legalistic Section 6 proviso as a pretext for taking the Band's property, all of the reservation land would have been disposed of initially under the Nelson Act. The claimants would have

---

[11] In support of its argument, the County identifies various statements in the Band's past complaints and briefs such as "the reservation ceased to exist" or the reservation was "relinquished" or "disposed of." Read in context, these statements reflect the Band's position that, despite its legal rights in its reservation, the reservation's land had come to rest almost entirely in non-Band members. In other words, the Band argued that the reservation had ceased to exist de facto, not de jure. And insofar as the Band referred to the "disposal" and "relinquishment" of its land under the Nelson Act, those terms are not equivalent to disestablishment. *See infra* Section II.C.4.

> received the benefit of 1889 Act compensation plus the right under the Indian
> Claims Commission Act, to recover the fair market value of those lands, less
> payments on the claim.

(Carter Decl., Ex. 117, at 16-17 (footnote omitted) (emphasis added).) The Band's claim, as before the Court of Claims in 1911, was that the Treaties of 1863 and 1864 did not disestablish the Mille Lacs Reservation; that the Nelson Act promised payment for the disposal of reservation lands under that Act; and that the United States disposed of reservation land under the general land laws, rather than the Nelson Act, without compensating the Band. The Band did not argue that the Nelson Act disestablished the reservation; instead, the Band simply sought compensation for the United States' disposal of reservation lands without payment to the Band, in contravention of the Act.[12]

The Court finds that the Band's prior litigation positions are fully consistent with its position before this Court, and that the Band is therefore not estopped from asserting that its reservation has never been disestablished or diminished.

### 4.    Laches

Next, the County argues that the Band's claims are barred by laches. The County relies principally on *City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005), and *Wolfchild v. Redwood County*, 91 F. Supp. 3d 1093, 1105 (D. Minn. 2015), *aff'd*, 824 F.3d 761 (8th Cir. 2016). In *Sherrill*, the Supreme Court observed that "[t]he

---

[12] *See Minn. Chippewa Tribe v. United States*, 11 Cl. Ct. 221, 236–37 (1986) ("Plaintiffs . . . contend . . . that by treaty the United States promised the band that it would not be compelled to leave its reservation . . . ; and that despite its continuing good conduct the band was ejected without benefit of payment for nearly half of the land."); *see generally supra* Section I.F.6.

principle that the passage of time can preclude relief has deep roots in our law, and this Court has recognized this prescription in various guises. It is well established that laches, a doctrine focused on one side's inaction and the other's legitimate reliance, may bar long-dormant claims for equitable relief." *Id.* at 217. Applying laches, the Court held that the Oneida Indian Nation was barred from asserting a claim to sovereignty (in particular, immunity from local taxation) to land last occupied by the tribe two centuries ago, which had recently been purchased by band members in fee. *Id.* at 214–15 ("We . . . hold that standards of federal Indian law and federal equity practice preclude the Tribe from rekindling embers of sovereignty that long ago grew cold." (internal quotation marks omitted)).

And in *Wolfchild*, descendants of the Mdewakanton Sioux alleged that a twelve-square-mile reservation sold to private landowners between 1865 and 1895 had never been disestablished, and sought to dispossess the defendant landowners. *Wolfchild*, 91 F. Supp. 3d at 1102. Applying *Sherrill*, this Court held that the plaintiffs' claims were barred by laches. The Court reasoned that "[t]he *Sherrill* doctrine has been applied to dismiss centuries old Indian land claims that would have a disruptive effect and would upset the justified expectations of the Defendants in a number of cases." *Id.* at 1104 (collecting such cases). The Court found that the plaintiffs' claims to the land would have a significantly disruptive effect, and given the tribe's inaction, the Court concluded that the claims were barred under *Sherrill*:

> The landowner Defendants assert that public records establish that their title to the properties at issue originated with land patents and grants issued in the 1800's. Since that time, the Defendants and their predecessors in title have

used and occupied the properties, improving and developing the land for agriculture, businesses and residences. Throughout this time, the land has also been governed and taxed by the State of Minnesota and the Municipal Defendants. The public record further demonstrates that ditches, watershed districts, roads and other rights of way were openly established and used. Plaintiffs do not dispute that by 1891, all land patents for the disputed area had been issued. Plaintiffs thus had notice, for well over one hundred years, that others were in wrongful possession of land to which Plaintiffs now claim title.

*Id.*

The Court finds that laches does not bar the Band's claims. Unlike in *Wolfchild*, the Band does not seek to oust any landowners within the Mille Lacs Reservation. Nor does it seek damages for the disposition of reservation land. Rather, it seeks only declaratory and injunctive relief concerning its law enforcement authority within the 1855 treaty area. And unlike in *Sherrill*, the Band's claim to law enforcement authority within the reservation would not upset any reliance interests. The Band has remained in continuous possession of parts of the reservation since it was established in 1855, and has asserted rights to the reservation throughout that time. Importantly, as reflected by the filings of the United States and State of Minnesota, appearing as amici curiae, a decision recognizing the reservation's continued existence would not upset any settled expectations. (*See* Amicus Curiae Brief of the United States [Doc. No. 265-1]; Amicus Curiae Brief of the State of Minnesota [Doc. No. 250].) Indeed, both the United States and Minnesota have recognized the reservation's continued existence within the 1855 treaty area.[13]

_____

[13] *See* 2015 Interior M-Opinion at 2 ("The 1863 and 1864 Treaties, as well as the 1889 Nelson Act, fail to evince a clear Congressional intent to disestablish the Reservation and, in fact, guaranteed the Band continuing rights to its Reservation."); Amicus Curiae Brief of the State of Minnesota at 11 ("[T]he Mille Lacs Band and various state agencies

Because the Band has occupied and actively defended its rights in the Mille Lacs Reservation since its inception and timely filed this lawsuit seeking declaratory and injunctive relief concerning its law enforcement authority, and further recognizing the Band's claims would not upset longstanding reliance interests, the Court finds that the laches doctrine does not bar the Band's claims.

### 5.    The Indian Claims Commission Act

Finally, the County argues that the Indian Claims Commission Act bars the Band's claims. It is true that the ICCA barred claims that could have been brought under it, yet were not brought within five years. ICCA § 2, 60 Stat. 1049 (Aug. 18, 1946). But the Act also provided that "[n]o claim accruing after the date of the approval of this Act shall be considered by the Commission." *Id.* Again, the County incorrectly equates the Band's claims in this litigation (claims for declaratory and injunctive relief regarding the Band's law enforcement authority on the reservation) with an issue raised by those claims (whether the Mille Lacs Reservation has ever been disestablished). The Band's *claims*, which accrued in 2016, could not have been brought under the ICCA, and are therefore not subject to the statute's time-bar.

The County argues that the Band's law enforcement authority claims are an effort to re-litigate the "ancient" issue of its treaty rights by artful pleading. It relies principally on *Oglala Sioux Tribe of Pine Ridge Indian Reservation v. U.S. Army Corps of Engineers*,

---

have intergovernmental cooperative agreements already in place to clarify and guide regulatory responsibilities in the 1855 treaty area. Ongoing intergovernmental cooperation can be relied upon to ensure continuity and efficient governance.").

where the court reasoned: "A tribe cannot avoid the Indian Claims Commission Act through 'artful pleading.' It cannot obtain review of a historical land claim otherwise barred by the Act by challenging present-day actions involving the land." 570 F.3d 327, 332 (D.C. Cir. 2009) (citations omitted). But there, the tribe's claims would have "require[d] the court to decide whether to rescind the Sioux Tribe's agreements with the United States approving the 1889 Act's diminishment of the Great Sioux Reservation, to declare that Act null and void, and to treat the area as if the 1868 Treaty had not been modified"—claims that could have been brought under the ICCA. *Id.*

By contrast, the Band's claims here do not require this Court to set aside any treaty, statute, or agreement—it merely must interpret them to determine the scope of the Band's present law enforcement authority on the Mille Lacs Reservation. As the D.C. Circuit reasoned in *Oglala Sioux*:

> The Tribe answers that the Indian Claims Commission Act does not bar suits to determine a reservation's boundaries. This is generally true, but the Tribe puts the matter much too broadly. The reservation boundary cases do not run afoul of the Indian Claims Commission Act because the courts were being called upon to interpret federal legislation and executive orders, not to set these sources aside or to treat them as void on the basis of centuries-old flaws in the ratification process.

*Id.* at 333. Because the Band's claims merely require the Court to interpret statutes, treaties, and agreements, not to "treat them as void," this case falls into the same class as the reservation boundary cases referenced in *Oglala Sioux*.

Accordingly, the Court finds that the ICCA does not bar the Band's claims.

### C.      Disestablishment of the Mille Lacs Reservation

As noted at the outset, in this litigation the Band seeks declaratory and injunctive relief regarding its law enforcement authority on the Mille Lacs Reservation. An issue essential to the Band's claims, and the issue brought before the Court on the present motions, is whether the Mille Lacs Reservation remains as it was under the Treaty of 1855, or whether subsequent treaties and Acts of Congress have disestablished or diminished the reservation. The County asserts that the Treaties of 1863 and 1864 disestablished the reservation, leaving only a temporary right of occupancy insufficient to constitute a "reservation" in the term's legal sense. The County also asserts that the reservation was disestablished by the Treaty of 1867, the Nelson Act, and three Acts of Congress at the turn of the nineteenth century. Before considering the effect of these treaties and statutes on the existence of the Mille Lacs Reservation, the Court will first examine the standards governing this important question.

### 1.      The Law of Reservation Disestablishment

It is undisputed that the Treaty of 1855, which "reserved and set apart" more than 61,000 acres at Lake Mille Lacs "for the permanent home[]" of the Mille Lacs Ojibwe, established a reservation. Treaty with the Chippewa art. 2, Feb. 22, 1855, 10 Stat. 1165. The question is to what extent that reservation exists today. As the Supreme Court recently explained, "To determine whether a tribe continues to hold a reservation, there is only one place we may look: the Acts of Congress." *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2462 (2020). Congress "wields significant constitutional authority when it comes to tribal relations, possessing even the authority to breach its own promises and treaties. But that

power . . . belongs to Congress alone." *Id.* (citation omitted). Thus, "only Congress can divest a reservation of its land and diminish its boundaries." *Solem v. Bartlett*, 465 U.S. 463, 470 (1984). But "[o]nce a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise." *Id.* (citation omitted); *see also City of New Town v. United States*, 454 F.2d 121, 125 (8th Cir. 1972) ("The opening of an Indian reservation for settlement by homesteading is not inconsistent with its continued existence as a reservation."). Congress's intent to disestablish a reservation "must be clear." *Nebraska v. Parker*, 577 U.S. 481, 488 (2016) (citation omitted).

The Supreme Court has described the standards governing disestablishment analysis, often referred to as the *Solem* framework, as "well settled." *Id.* at 487. "The most probative evidence of diminishment is, of course, the statutory language used to open the Indian lands." *Hagen v. Utah*, 510 U.S. 399, 411 (1994) (citation omitted). "Common textual indications of Congress' intent to diminish reservation boundaries include '[e]xplicit reference to cession or other language evidencing the present and total surrender of all tribal interests' or 'an unconditional commitment from Congress to compensate the Indian tribe for its opened land.'"[14] *Parker*, 577 U.S. at 488 (quoting *Solem*, 465 U.S. at

---

[14] *See DeCoteau v. Dist. Cty. Ct. for Tenth Jud. Dist.*, 420 U.S. 425, 445 (1975) (finding disestablishment where statute ratified an agreement providing that the tribe "hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation"); *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 597 (1977) (finding diminishment where statute provided that the tribe would "cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in" part of its reservation); *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 344–45 (1998) (finding diminishment where statute ratified

470). Language "providing for the total surrender of tribal claims in exchange for a fixed payment evinces Congress' intent to diminish a reservation, and creates an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished." *Id.* (citations and internal quotation marks omitted).

Courts have also considered extrinsic evidence of Congressional intent to disestablish a reservation. As the *Hagen* Court explained: "We have also considered the historical context surrounding the passage of the surplus land Acts, although we have been careful to distinguish between evidence of the contemporaneous understanding of the particular Act and matters occurring subsequent to the Act's passage." 510 U.S. at 411 (citation omitted). The context surrounding a statute's passage may indicate an intent to disestablish where the circumstances "unequivocally reveal a widely-held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation." *Solem*, 465 U.S. at 471. And courts have also considered subsequent demographic history and federal treatment of the reservation as having "some evidentiary value." *Id.*; *Hagen*, 510 U.S. at 411.

Although such extrinsic evidence of Congressional intent to disestablish a reservation has long been considered under the *Solem* framework, the Supreme Court in *McGirt* emphasized that such evidence is relevant only in the face of statutory ambiguity. The Court explained:

---

tribe's agreement to "cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation" in exchange for payment).

> [The] value such [extrinsic] evidence has can only be *interpretative*—evidence that, at best, might be used to the extent it sheds light on what the terms found in a statute meant at the time of the law's adoption, not as an alternative means of proving disestablishment or diminishment. . . .
>
> There is no need to consult extratextual sources when the meaning of a statute's terms is clear. Nor may extratextual sources overcome those terms. The only role such materials can properly play is to help "clear up . . . not create" ambiguity about a statute's original meaning. And, as we have said time and again, once a reservation is established, it retains that status "until Congress explicitly indicates otherwise."

*McGirt*, 140 S. Ct. at 2469 (citations omitted); *see Oneida Nation v. Village of Hobart*, 968 F.3d 664, 675 n.4 (7th Cir. 2020), *reh'g denied* (Sept. 18, 2020) ("We read *McGirt* as adjusting [the *Solem*] framework by establishing statutory ambiguity as a threshold for any consideration of context and later history.").

Throughout the disestablishment inquiry, "we resolve any ambiguities in favor of the Indians, and we will not lightly find diminishment." *Hagen*, 510 U.S. at 411 (citing *South Dakota v. Bourland*, 508 U.S. 679, 687 (1993) (Blackmun, Souter, JJ., dissenting) ("[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.")).

### 2.    The Treaties of 1863 and 1864

Following the 1862 uprisings by the Dakota Sioux and Chief Hole-in-the-Day, the United States endeavored to consolidate Minnesota's Chippewa at a reservation created near Leech Lake. After lengthy negotiations, during which the Mille Lacs Band's representatives made their opposition to removal from their reservation clear, Senator Rice obtained all the Ojibwe delegates' assent to the Treaty of 1863. Article I of that treaty provided: "The reservations known as Gull Lake, Mille Lac, Sandy Lake, Rabbit Lake,

Pokagomin Lake, and Rice Lake, as described in the [Treaty of 1855], are hereby ceded to the United States." Treaty of 1863 art. 1, 12 Stat. 1249. As "consideration [for] the foregoing cession," the United States created a reservation near Leech Lake, promised to make certain improvements to it, and agreed to extend the Indians' annuities provided for in the Treaty of 1855, furnish supplies for ten years, and pay the bands' chiefs money owed under an 1854 treaty. *Id.* arts. 2–5. But the treaty also provided that none of the Indians would be required to remove to Leech Lake until the United States had complied with its obligations, and that, "owing to the heretofore good conduct of the Mille Lac Indians, they shall not be compelled to remove so long as they shall not in any way interfere with or in any manner molest the persons or property of the whites." *Id.* art. 12.

The County reads Article 1 as "plain unmistakable language," by which "the six Mississippi Chippewa [b]ands ceded all 'their right, title and interest' to the" 1855 reservations, including Mille Lacs. (Mem. in Supp. of Def.'s Mot. for Summ. J. at 50.) According to the County, such language, together with the payments provided in Articles 3 and 5, creates "an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished." *Solem v. Bartlett*, 465 U.S. 463, 470–71 (1984). The County then interprets the Article 12 proviso separately, and concludes that the "temporary right of occupancy" there created does not constitute a "reservation."

Of course, Article 1 does not state that the Mille Lacs Band "ceded all their right, title and interest" in the Mille Lacs Reservation, as characterized by the County. Rather, Article 1 stated that the six reservations "are hereby ceded to the United States." *Cf. DeCoteau v. Dist. Cty. Ct. for Tenth Jud. Dist.*, 420 U.S. 425, 445 (1975) (finding

disestablishment where statute ratified an agreement providing that the tribe "hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation"); *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 597 (1977) (finding diminishment where statute provided that the tribe would "cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in" part of its reservation); *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 344–45 (1998) (finding diminishment where statute ratified tribe's agreement to "cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation" in exchange for payment).

Like any treaty between the United States and an Indian tribe, the Treaty of 1863 "must . . . be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians." *Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 676, *modified sub nom. Washington v. United States*, 444 U.S. 816 (1979) (quotation omitted). And like any matter of interpretation, the Court must read Article 1 in the context of the whole treaty. *See, e.g., Indian Country, U.S.A., Inc. v. Oklahoma ex rel. Okl. Tax Comm'n*, 829 F.2d 967, 979 (10th Cir. 1987) (concluding that separate sections of a statute, read *in pari materia*, did not reveal clear Congressional intent to divest reservation lands of their Indian country status).

The Court therefore must read Article 1, providing that the six reservations were "ceded" to the United States, together with the Article 12 proviso, which provided that the

Mille Lacs Band "shall not be compelled to remove so long as they shall not in any way interfere with or in any manner molest the persons or property of the whites." Treaty of 1863 arts. 1, 12. The Court concludes that, read together, these provisions do not clearly reflect a Congressional intent to disestablish the Mille Lacs Reservation. Although the treaty provided that "[t]he reservation[] known as . . . Mille Lac . . . [is] hereby ceded to the United States," courts look for "language evidencing the *present and total surrender of all tribal interests*." *Solem*, 465 U.S. at 470 (emphasis added). By Article 12, the Band expressly and unambiguously reserved its right to occupy the Mille Lacs Reservation. As persuasively explained by the Court of Claims more than a century ago:

> The language of the proviso would be difficult to construe in any other way than the granting of a right of occupancy to the Mille Lac Band. That they shall not be compelled to remove was certainly equivalent to a right to remain. Remain where? Why, on the Mille Lac Reservation, for all other reservations had been by the treaty ceded to the Government.

*Mille Lac Band of Chippewas v. United States*, 47 Ct. Cl. 415, 440–41 (1912), *rev'd on other grounds sub nom. United States v. Mille Lac Band of Chippewa Indians*, 229 U.S. 498 (1913). With respect to the Mille Lacs, at least, the Treaty of 1863 plainly did not constitute a "present and total surrender" of all the Band's rights in its reservation.

To the extent the juxtaposition of Articles 1 and 12 creates an ambiguity, permitting the Court to consider extrinsic evidence of Congressional intent under *McGirt*, that evidence compels the conclusion that the Treaty of 1863 did not disestablish the Mille Lacs Reservation. During the negotiations precipitating the treaty, the Band refused to leave its reservation, and repeated the Band members' belief that Commissioner Dole had promised them that they could remain on their reservation as a reward for their assistance during

Hole-in-the-Day's uprising. (*See* McClurken Rep. at 47-48, 51-57.) Following closed-door

negotiations led by Senator Rice, the Band's position was reflected in the Article 12

proviso, and Senator Rice reported that the delegates left Washington "satisfied with the

treaty." (*Id.* at 60.)

The County's contention that the treaty divested the Band of its reservation, granting

only a limited right of occupancy in its place, does not fit the record of the treaty

negotiations and cannot be squared with the Article 12 proviso's role as a reward to the

Mille Lacs for their aid during the 1862 uprisings. As the Court of Claims fittingly asked:

Was this proviso, "the reward for their signal services of loyalty," a "mere license to live

on their reservation, bury their dead there, build their improvements, and then . . . be

dispossessed at the pleasure of the advancing whites?" *Mille Lac Band of Chippewas*, 47

Ct. Cl. at 440. To the contrary, the Court finds, as did the Court of Claims in 1912, that the

treaty's historical context demonstrates that the proviso was intended by Congress and

understood by the Band, not as a mere license to occupy a former reservation's land, but

to preserve the Band's Indian title to the Mille Lacs Reservation.[15] Indeed, Senator Rice

himself—who claimed "[e]very word in [the treaty] . . . emanated from my pen," and who

"would not allow any changes" to the treaty—later confirmed that the Band's

---

[15] *Cf. id.* at 443 ("No mere license to fish and hunt was conferred upon the Mille
Lac Indians by article 12 of the treaty of 1864 . . . . What other Indian right, then, could
have been intended save the right of occupancy? . . . [The treaty] confirmed rather than
extinguished their rights under the treaty of 1855. The language of article 12 is not
ambiguous and if considered apart from the context of the whole instrument could convey
but one meaning.").

understanding of the proviso was correct: "[T]he understanding of the chiefs as to the treaty was right. [The Nelson Act] is the acknowledgment of the Government that you were right, that 'you have not forfeited your right to occupy the reservation.'" H.R. Exec. Doc. No. 51-247, at 164 (1890) [Doc. Nos. 230 & 230-1]; White Rep. at 98. And the mere rumor that the Band's negotiators had ceded their reservation resulted in "strong and credible threats against the negotiators' lives." (McClurken Rep. at 61.) Moreover, even Dr. Driben, one of the County's own experts, opined that the Mille Lacs Band did not understand the Treaty of 1863 to result in the loss of their rights to their reservation.[16]

To be sure, it is apparent that some federal officials anticipated, and even desired, that the Mille Lacs would remove to the new reservation near Leech Lake in short order.[17]

_____

[16] Q. Did band leaders state repeatedly that they understood the 1863 and 1864 treaties to preserve the reservation for them?

A. Yes. In fact, there's a number of documents in the list that you provided me where the Mille Lacs Anishinaabe are saying that quite clearly. From their perspective -- I want to emphasize from their perspective -- there was no change in the reservation in 1863, or '64, from their perspective.

Q. And do you have any reason to doubt that those statements accurately reflected their understanding of the treaties?

A. No. I think that those statements do reflect their understanding of the agreements of '63 and '64. . . .

(Driben Dep. at 66.)

[17] See, for example, Commissioner Dole's speech during the treaty negotiations:

I cannot promise but what it may be necessary that the government should use its power for their removal . . . . It may be barely possible that the people of Minnesota will consent to the Indians now living at Millac, to remain there . . . for the present. They may consent in the future for them to remain

But the Treaty of 1863 did not accomplish that result, and was, even under the County's interpretation, at most a first step toward that goal. As the Supreme Court recently explained regarding Congress's belief that allotting reservation land would precipitate the end of the reservation system: "[J]ust as wishes are not laws, future plans aren't either. Congress may have passed allotment laws to create the conditions for disestablishment. But to equate allotment with disestablishment would confuse the first step of a march with arrival at its destination." *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2465 (2020). Likewise, to equate the Treaty of 1863, which may have been designed to create the conditions for future removal of the Mille Lacs Band and the disestablishment of their reservation, with a final act of disestablishment would erroneously "confuse the first step of a march with arrival at its destination." *Id.*

Subsequent treatment of the reservation further bolsters the conclusion that the treaty did not disestablish the Mille Lacs Reservation. It is true that, following the treaty, local lumbermen spent decades attempting (quite successfully) to undermine the Band's possession of reservation timberland. *See supra* Section I.D. But it is equally true that the Band steadfastly opposed removal from its reservation. Although, at times, the Department of the Interior sided against the Band, such adverse decisions were quickly reversed or

---

there forever if they will become good citizens. But I am sure that it will not give satisfaction to the people of Minnesota . . . .

(McClurken Rep. at 54-55; *see also id.* at 56 (stating that the Mille Lacs "have earned this from the Government that they might . . . be allowed to remain where they are at least for the present").)

stayed. Ultimately, however, "only Congress can divest a reservation of its land and diminish its boundaries." *Solem*, 465 U.S. at 470. When *Congress* addressed the conflicting Interior decisions regarding the reservation's status, it stayed any further disposition of lands on the Mille Lacs Reservation. *See* Act of July 4, 1884, 23 Stat. 76, 89. And when Congress passed the Nelson Act in 1889—which applied only to the "reservations" in Minnesota—Congress "adjusted and composed" the controversy regarding the Band's rights, and "the government thus . . . consented to recognize the contention of the Indians." *United States v. Mille Lac Band of Chippewa Indians*, 229 U.S. 498, 507 (1913).

Because the Treaty of 1863, read as a whole, does not clearly reflect Congress's intent to disestablish the Mille Lacs Reservation, the Court finds that it did not do so. The treaty reserved to the Band an indefinite right to occupy its reservation, conditioned only on the Band's good behavior. That right is inconsistent with the "present and total surrender of all tribal interests" in the reservation. *Solem*, 465 U.S. at 470. Insofar as the treaty is ambiguous, the historical context, the contemporary understanding of the Band, and subsequent treatment of the reservation by Congress all support the conclusion that the Treaty of 1863 did not disestablish the reservation. At the very least, the record does not demonstrate the "clear" Congressional intention required for disestablishment. *Parker*, 577 U.S. at 488.

The Treaty of 1864 is in all material respects identical to the Treaty of 1863. Thus, for the same reasons that the Court finds the Treaty of 1863 did not disestablish the Mille Lacs Reservation, the Court finds that the Treaty of 1864 did not, either.

### 3.      The Treaty of 1867

The Court turns now to the Treaty of 1867. The Treaties of 1863 and 1864 served to consolidate Minnesota's Chippewa at a single reservation near Leech Lake. When lumber and railroad interests encroached on that reservation, and the unsuitability of its location became clearer, the United States negotiated to unite the Chippewa at White Earth instead. To that end, the Treaty of 1867 granted a new reservation at White Earth, and provided: "The Chippewas of the Mississippi hereby cede to the United States all their lands in the State of Minnesota, secured to them by the second article of their [Treaty of 1864]." Treaty of 1867, 16 Stat. 719.

The County appears to argue that this cession language applies to the Mille Lacs Reservation. But the Mille Lacs Reservation was "secured to [the Mille Lacs]" by the Treaty of 1855, not the Treaty of 1864. To the extent the County contends that the Mille Lacs Reservation was "secured" by the Article 12 proviso, and therefore ceded under the Treaty of 1867, the County misreads the treaty: the Treaty of 1867 ceded lands "secured . . . by the second article" of the Treaty of 1864, not Article 12. Because the Treaty of 1867 concerned only the reservation created near Leech Lake, the Court finds that it had no effect on the Mille Lacs Reservation.

### 4.      The Nelson Act

Next, the Court turns to the Nelson Act. The Nelson Act established a commission to negotiate with Minnesota's Chippewa "for the complete cession and relinquishment in writing of all their title and interest in and to all the reservations of said Indians in the State of Minnesota, except the White Earth and Red Lake Reservations . . . , for the purposes

and upon the terms hereinafter stated." Nelson Act § 1, 25 Stat. 642 (Jan. 14, 1889). If the commission obtained the Chippewas' assent to the Act, that assent would "operate as a complete extinguishment of the Indian title . . . for the purposes and upon the terms in this act provided." *Id.* The Act provided for the sale of reservation lands, and created a "permanent fund" within the Treasury Department, into which "all money accruing from the disposal of said lands"—after deducting certain expenses—would be deposited. *Id.* § 7. Some of the interest accruing on that fund would be distributed to the Chippewa; some would be "devoted exclusively to the establishment and maintenance of a system of free schools among said Indians." *Id.* The Act also permitted Congress to appropriate the fund's principal "for the purpose of promoting civilization and self-support among the said Indians." *Id.*

In addition, the Nelson Act provided for the removal of Minnesota's Chippewa to White Earth, where they would be entitled to allotments:

> [A]s soon as the census has been taken, and the cession and relinquishment has been obtained, approved, and ratified . . . , all of said Chippewa Indians in the State of Minnesota, except those on the Red Lake Reservation, shall . . . be removed to and take up their residence on the White Earth Reservation, and thereupon there shall . . . be allotted lands in severalty to the Red Lake Indians on Red Lake Reservation, and to all the other of said Indians on White Earth Reservation . . . .

*Id.* § 3. Section 3 contained a proviso, however, permitting "any of the Indians residing on any of said reservations" to "take his allotment in severalty under this act on the reservation where he lives at the time of [sic] the removal herein provided for is effected, instead of being removed to and taking such allotment on White Earth Reservation." *Id.* Finally, as a result of Senator Sabin's efforts to retain the lands acquired at Mille Lacs through the

Sabin-Wilder scheme, § 6 included a proviso prohibiting the sale of reservation lands on which a "subsisting, valid, pre-emption or homestead entry" existed, and permitting such entrants to attempt to perfect their title. *Id.* § 6.

The Nelson Act Agreement, obtained by the Chippewa Commission appointed under the Act, recorded the Mille Lacs Band's assent to the Act. By that Agreement, the Mille Lacs "consented and agreed to" the Nelson Act, and agreed to two forms of cession. First, the Band agreed to "grant, cede, relinquish, and convey to the United States all of our right, title, and interest in and to" lands at White Earth and Red Lake not required to make the allotments provided for by the Act. H.R. Exec. Doc. No. 51-247, at 46. Second, the Band also agreed to "forever relinquish to the United States the right of occupancy on the Mille Lac Reservation, reserved to us by the twelfth article of the [Treaty of 1864]." *Id.* After signing the Nelson Act Agreement, the Band requested to take its allotments at Mille Lacs pursuant to the § 3 proviso, and few agreed to remove to White Earth. *See id.* at 1–2; *see also* Slonim Decl., Ex. 64; McClurken Rebuttal at 5-12.

The Court begins its analysis with the text of the Nelson Act and Agreement. It is true, as the County emphasizes, that the Nelson Act established a commission to negotiate "the complete cession and relinquishment . . . of all [the Chippewas'] title and interest in and to all the reservations," and the Act provided that the Indians' assent would "operate as a complete extinguishment of the Indian title." Nelson Act § 1. This language was, however, accompanied by an important qualification that the County does not address: such "cession[s]," "relinquishment," and "extinguishment" were "for the purposes and upon the terms" of the Nelson Act. *Id.* That purpose was to permit the sale of reservation

timber and agricultural land not allotted to the Indians, and to create a permanent fund for the benefit of all the Chippewa, into which the proceeds from such sales would be placed in trust. *See id.*; *Leech Lake Band of Chippewa Indians v. Herbst*, 334 F. Supp. 1001, 1004–05 (D. Minn. 1971) ("It is apparent in light of events before and after the passage of the Nelson Act that its purpose was not to terminate the reservation or end federal responsibility for the Indian but rather to permit the sale of certain of his lands to homesteaders and others."); *State v. Forge*, 262 N.W.2d 341, 346 (Minn. 1977) ("Sales of the extensive agricultural and timber lands ceded [under the Nelson Act] were . . . to be conducted by the Federal government, and the proceeds of these sales were to be held in trust by the government for the benefit of the Indians.").

The Nelson Act, read as a whole, had three relevant features. First, it permitted Minnesota's Chippewa to obtain allotments, either at White Earth or on their present reservations. Nelson Act § 3, 25 Stat. 642. Second, it opened unallotted portions of the reservations to sale and settlement. *Id.* §§ 1, 4–6. And third, it provided that the proceeds of such sales would be placed in trust, for the benefit of the entire tribe.[18] *Id.* § 7. By the

---

[18] The County emphasizes that the Nelson Act "did not create a technical trust." *Chippewa Indians of Minnesota v. United States*, 307 U.S. 1, 3 (1939). The *Chippewa Indians* Court's statement was made, however, in the context of a claim that "by the Act of 1889, Congress abdicated its plenary power of administration of the Chippewas' property as tribal property, recognized that the reservations of the respective bands were not tribal property, and agreed to hold the proceeds of the ceded lands in strict and conventional trust for classes of individual Indians in accordance with the program outlined in the Act." *Id.* That the Nelson Act did not create a "strict and conventional trust" so as to support the particular equitable claims asserted in *Chippewa Indians* has no bearing on the disestablishment question. The point is that the Nelson Act did not offer the Chippewa a fixed sum in exchange for their land; rather, it provided for the sale of their land, and that the proceeds (less the Government's expenses) would be held in a fund, the interest on

Act's plain terms, the Act required "cession," "relinquishment," and "extinguishment" only for these purposes.

So understood, the statute does not reflect a clear Congressional intent to disestablish the Mille Lacs Reservation, despite the cession language included in the Act and Agreement. The Supreme Court has continuously held that neither allotting reservation land nor opening reservation land for sale to non-Indians necessarily results in the disestablishment of the subject reservation. *See McGirt v. Oklahoma*, 140 S. Ct. 2452, 2464 (2020) ("For years, States have sought to suggest that allotments automatically ended reservations, and for years courts have rejected the argument. . . . [T]his Court has explained repeatedly that Congress does not disestablish a reservation simply by allowing the transfer of individual plots, whether to Native Americans or others."); *Mattz v. Arnett*, 412 U.S. 481, 504 (1973) ("The presence of allotment provisions in the 1892 Act cannot be interpreted to mean that the reservation was to be terminated."); *see also City of New Town v. United States*, 454 F.2d 121, 125 (8th Cir. 1972) ("The opening of an Indian reservation for settlement by homesteading is not inconsistent with its continued existence as a reservation."). And, importantly, the § 3 proviso expressly permitted Band members to refuse removal to White Earth, and instead take their allotments at Mille Lacs.

Because the Nelson Act's cession language was not unqualified, it does not reflect the "present and total surrender of all tribal interests." *Solem v. Bartlett*, 465 U.S. 463, 470

---

which would be applied for the benefit of the entire tribe. Such an arrangement is, for all purposes here relevant, fairly considered a "trust."

(1984).[19] Nor did the Nelson Act's sale and trust provisions constitute the type of sum-certain compensation which may, together with language evidencing complete cession, create "an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished." *Id.*; *see Minn. Chippewa Tribe v. United States*, 11 Ct. Cl. 221, 226 (1986) ("[The Nelson Act] differed from most earlier treaties because it provided for the sale of the ceded land and the establishment of a trust held by the United States for the tribe, rather than for a cession in return for a sum certain paid to the Indians.").

Moreover, this Court and the Minnesota Supreme Court have previously held that the Nelson Act did not result in the disestablishment of subject reservations. In *Leech Lake Band of Chippewa Indians v. Herbst*, Judge Devitt, writing for this Court, found that the Leech Lake Band retained hunting and fishing rights on the Leech Lake Reservation. 334 F. Supp. 1001, 1004–05 (D. Minn. 1971). The Court reasoned: "It is apparent in light of events before and after the passage of the Nelson Act that its purpose was not to terminate the reservation or end federal responsibility for the Indian but rather to permit the sale of certain of his lands to homesteaders and others." *Id.* Because "the existence of this continuing [guardian-ward] relationship [between the Band and the United States] negatives any inference that the Leech Lake Reservation . . . was terminated," the Court

---

[19] *See also United States v. Grey Bear*, 828 F.2d 1286, 1290 (8th Cir.), *reh'g en banc granted in part, opinion vacated in non-relevant part*, 836 F.2d 1088 (8th Cir. 1987), *and on reh'g en banc*, 863 F.2d 572 (8th Cir. 1988) ("We conclude that the 'cede, surrender, grant, and convey' language of the 1904 Act, standing alone, does not evince a clear congressional intent to disestablish the Devils Lake Reservation. In the past, when Congress has intended to disestablish a reservation, it generally has forthrightly stated this intention." (collecting cases)).

held that the Band's hunting and fishing rights on reservation land had not been terminated by the Nelson Act. *Id.* at 1006; *accord State v. Forge*, 262 N.W.2d 341, 346 (Minn. 1977) ("Although the disestablishment effect of the Nelson Act is not free from doubt, we are convinced after a review of the voluminous authorities cited to us that the act did not terminate the Leech Lake Reservation.").

The Minnesota Supreme Court reached a similar conclusion regarding the White Earth and Grand Portage reservations. *State v. Clark*, 282 N.W.2d 902, 907 (Minn. 1979) (holding that the Nelson Act did not disestablish the White Earth reservation, because (1) it did not disestablish the Leech Lake Reservation, from which the Chippewa were expected to remove to White Earth; (2) Congress subsequently treated White Earth as a reservation; and (3) the Chippewa Commission's negotiations reflected the parties' belief that the act would preserve all but four townships of the White Earth Reservation); *Melby v. Grand Portage Band of Chippewa*, No. CIV 97-2065, 1998 WL 1769706, at *8 (D. Minn. Aug. 13, 1998) ("[T]he Court finds that the statutory language of the Nelson Act does not disestablish the entire [Grand Portage] reservation, because it reserved parcels of land for Indians who elected to remain on the reservation.").

The County emphasizes that, despite his decision regarding Leech Lake, Judge Devitt later held that the Nelson Act diminished the Red Lake and White Earth Reservations. *See United States v. Minnesota*, 466 F. Supp. 1382 (D. Minn. 1979), *aff'd sub nom. Red Lake Band of Chippewa Indians v. Minnesota*, 614 F.2d 1161 (8th Cir. 1980) [hereinafter *Red Lake Band*]; *White Earth Band of Chippewa Indians v. Alexander*, 518 F. Supp. 527 (D. Minn. 1981), *aff'd*, 683 F.2d 1129 (8th Cir. 1982) [hereinafter *White Earth*

*Band*]. In *Red Lake Band*, the Court reasoned that the language of the band's written agreement to the Nelson Act—that the band would cede "all right, title, and interest" to "so much of said Red Lake Reservation as is not embraced in the following described boundaries"—was "precisely suited for the purpose of eliminating Indian title and conveying to the government all the Band's interest in the ceded lands." 466 F. Supp. at 1385 (quotation omitted); *see* H.R. Exec. Doc. No. 51-247, at 27–28 (Red Lake Band's agreement to the Act). Similarly, in *White Earth Band*, the Court concluded that the same result obtained with respect to four townships on the White Earth Reservation, which had likewise been excluded from the land expressly reserved to the band in its written agreement to the Nelson Act. 518 F. Supp. at 1385–86; H.R. Exec. Doc. No. 51-247, at 37 (White Earth Band's agreement to the Act). In both cases, the Eighth Circuit affirmed without adding to the diminishment analysis.

But these cases are not inconsistent with the cases holding that the Nelson Act did not *disestablish* subject reservations, nor do they support the conclusion that the Mille Lacs Reservation was disestablished or diminished. Although the County asserts that Judge Devitt "changed his position on the Nelson Act," the cases are fully reconcilable with each other and with the rules for disestablishment articulated in *McGirt*. (Mem. in Opp'n to Pls.' Mot. for Summ. J. [Doc. No. 257], at 66.) "The Nelson Act treated various bands or tribes and reservations differently, and contemplated that a separate agreement would be negotiated with individual bands or tribes pursuant to the Act." *White Earth Band of Chippewa Indians v. Alexander*, 683 F.2d 1129, 1135 (8th Cir. 1982) (citation omitted). The Red Lake Band's agreement provided that the band ceded "so much of said Red Lake

Reservation as is not embraced in the following described boundaries," and went on to describe the reservation's intended post-Nelson Act boundaries. H.R. Exec. Doc. No. 51-247, at 27–28. In *Red Lake Band*, this Court held that the lands outside of the enumerated boundaries were no longer part of the reservation. Similarly, the White Earth Band agreed to cede "so much of said White Earth Reservation as is not embraced in the following described boundaries," and the agreement then listed thirty-two of the reservation's thirty-six townships. *Id.* at 37. In *White Earth Band*, this Court held that the four townships not listed in the agreement were no longer part of the reservation. And in both cases, the bands had been informed by the Chippewa Commission that their reservations would shrink.[20]

The Leech Lake agreement did not follow the same form as the White Earth and Red Lake agreements, but instead provided for the band's consent to the Nelson Act and for a general "cession" of the Leech Lake Reservation "for the purposes and upon the terms stated in said act." *Id.* at 49. This Court, as well as the Minnesota Supreme Court, held that the Leech Lake Reservation was not thereby disestablished or diminished. Similar to the Leech Lake Band, the Mille Lacs Band's agreement provided for the Band's consent to the

---

[20] *See* H.R. Exec. Doc. No. 51-247, at 80 (Senator Rice, stating to the Red Lake Band: "You must not, of course, expect to keep all your reservation . . . . You may think that you ought to have what we consider too much, and that what we consider is enough is too small; so we must talk it over calmly . . . ; but that territory which is now and always will be useless to you, you might as well part with and avoid a repetition of the difficulties between yourselves and the whites."); *White Earth Band*, 518 F. Supp. at 532 ("The transcripts of the negotiations between the Rice Commission and the [White Earth] Indians clearly reflect that the proposed cession of the four townships was fully considered by the Indians, and that it was understood that the reservation would be diminished by cession of those lands.").

Nelson Act, and that the Band "hereby forever relinquish . . . the right of occupancy . . . reserved to us by the [Article 12 proviso]." *Id.* at 45–46. Unlike the agreements with the Red Lake and White Earth Bands, the Mille Lacs' agreement did not expressly provide for the cession of a subset of the reservation's land. There is, therefore, no textual basis for a finding of diminishment, unlike in the *Red Lake* and *White Earth* cases.

Nor is there a textual basis for concluding that the Mille Lacs, by assenting to the Nelson Act and relinquishing its "right of occupancy" under the Article 12 proviso, thereby ceded their reservation. As explained above, the Nelson Act merely provided for the allotment and sale of reservation land, the proceeds to be held in trust for Minnesota's Chippewa. Each court to address the Nelson Act has concluded that it did not reflect Congressional intent to disestablish subject reservations. Although the Band agreed to "forever relinquish" its rights under the Article 12 proviso, the proviso was not the source of the Band's rights in its reservation. Rather, as explained previously, the Band held its reservation under the Treaty of 1855; the Article 12 proviso operated to express the parties' intention that the Treaties of 1863 and 1864 did not deprive the Band of that reservation so long as the Band maintained its good conduct. For all the foregoing reasons, the Court finds that, construed as a whole, the unambiguous language of the Nelson Act and Agreement do not evidence a clear Congressional intent to disestablish or diminish the Mille Lacs Reservation.

To the extent the Act and Agreement are ambiguous, their historical context bolsters the conclusion that the Mille Lacs Reservation was not disestablished. In explaining the

Nelson Act to the Band, Senator Rice—the author of the Treaty of 1863—represented that

the Nelson Act confirmed that the Band had retained its reservation, and that accepting

allotments under the Act "will not affect these old matters at all . . . but, on the contrary,

leaves you in a stronger position than before." H.R. Exec. Doc. No. 51-247, at 164–65. The

Band, which had itself suggested taking allotments at Mille Lacs in an 1888 petition,[21]

called Rice's explanation "perfect," and the Band's negotiators declared their intention to

take "our allotments on this reservation, and not be removed to White Earth." H.R. Exec.

Doc. No. 51-247, at 165–66, 168; *see also id.* at 74 ("They tell us we are going to stay here

forever, and that they are going to make allotments here to us.").

The County points to a number of subsequent events as evidence that the Nelson

Act was regarded as disestablishing the reservation. For example, the County contends that

disestablishment is evidenced by later decisions of the Department of the Interior, Acts of

---

[21] The County characterizes the Band's 1888 petition as an indication that the Band
desired to give up its reservation, having concluded that relinquishing the reservation in
exchange for allotments was the only way to prevent settlers' and lumbermen's persistent
encroachment. (*See* Driben Decl. ¶ 5; Driben Rep. at 57; Driben Dep. at 62, 128.) But the
Band's statements do not reflect a desire to terminate the reservation. The Band's petition
stated that "[w]e are told that we ceded our reservation at Mille Lac to the United States in
1863," but "we never intended to go away from our home at Mille Lac," and pleaded for
the opportunity to take allotments at Lake Mille Lacs. (Slonim Decl., Ex. 54, at 7.) This
petition reflects a desire to strengthen the Band's rights to its reservation, not forfeit them.
(*See* Valentine Rebuttal at 16-17 (opining that the 1888 petition "implies a desire to retain
their reservation, not to rid themselves of it").) Nor does the County explain why taking
allotments is inconsistent with continued reservation status—it plainly is not. *See McGirt*,
140 S. Ct. at 2464 ("For years, States have sought to suggest that allotments automatically
ended reservations, and for years courts have rejected the argument."); *Mattz v. Arnett*, 412
U.S. 481, 504 (1973) ("The presence of allotment provisions in the 1892 Act cannot be
interpreted to mean that the reservation was to be terminated.").

Congress,[22] the Mississippi Chippewa Tribe's 1936 constitution, cartographic records, and demographic evidence regarding changes to the reservation's population. (*See generally* Mem. in Supp. of Def.'s Mot. for Summ. J.; *see also supra* Section I.F.) Although such extrinsic evidence may have "some evidentiary value," *Solem v. Bartlett*, 465 U.S. 463, 471 (1984), the Court does not find it helpful, on these facts, in ascertaining whether *Congress* intended to disestablish the Mille Lacs Reservation through the Nelson Act. At the very least, such evidence does not override the language of the Nelson Act and Agreement, coupled with the contemporary evidence of the Nelson Act's meaning. Nor is such evidence so strong as to demonstrate the clear Congressional intent required for this Court to find disestablishment.

The County also argues that the Supreme Court, in its 1913 *Mille Lac Band* decision, necessarily held that the Nelson Act disestablished the Mille Lacs Reservation. The Court disagrees. There, the Supreme Court held that the existing controversy over the reservation's status under the Article 12 proviso was "adjusted and composed" by the

---

[22] As explained further in the next Section, the County points to Congressional Resolutions in 1893 and 1898 that allegedly reflect Congress's understanding that the Mille Lacs Reservation had been disestablished by the Nelson Act. But as the Supreme Court held in its 1913 *Mille Lac Band* decision, those Resolutions were made in violation of the Nelson Act. *See United States v. Mille Lac Band of Chippewa Indians*, 229 U.S. 498, 509 (1913) (holding that the United States' disposal of land on the Mille Lacs Reservation following the Nelson Act was "not for the benefit of the Indians, but in disregard of their rights," and was "clearly in violation of the trust" created by the Nelson Act). Because those resolutions were contrary to the Nelson Act—and in any event bear only "some evidentiary value," *Solem*, 465 U.S. at 471—the Court does not find them persuasive in discerning Congress's intention when passing the Nelson Act. Moreover, two other statutes, enacted in 1890, reflect the *opposite* understanding. *See supra* note 5.

Nelson Act. *United States v. Mille Lac Band of Chippewa Indians*, 229 U.S. 498, 506 (1913). According to the Court, the Nelson Act embodied a compromise, by which the United States agreed to recognize the Band's contention that the Treaties of 1863 and 1864 did not disestablish its reservation, on the condition that entries made prior to the Nelson Act would not be disturbed. *Id.* at 507. The Court reasoned that, therefore, the reservation's land was subject to disposal under the Nelson Act—except land subject to valid entries pre-dating the Nelson Act—and that by disposing of the land under the general land laws instead, the United States had violated the Nelson Act. *Id.* at 509. The Court did not address whether the Nelson Act, by permitting the allotment and disposal of reservation land, operated to disestablish the Mille Lacs Reservation, and it did not need to reach that question in order to determine that the United States had violated the Nelson Act.

Likewise, the Supreme Court's decision in *United States v. Minnesota* did not resolve whether the Nelson Act disestablished the reservation. 270 U.S. 181 (1926). There, the Court reiterated its holding that the Nelson Act "adjusted and composed" the controversy regarding the Band's rights to its reservation under the Treaties of 1863 and 1864. Because the Nelson Act's compromise recognized valid entries made prior to the Act, the Court concluded that the United States could not recover reservation swampland patented to Minnesota in 1871. *Id.* at 198. Contrary to the County's interpretation, this holding did not require the Court to find that the swampland was not reservation land as of 1871, and it certainly did not require the Court to examine whether the Nelson Act disestablished the reservation in 1889.

In sum, the Court finds that the Nelson Act and Nelson Act Agreement do not reflect clear Congressional intent to disestablish or diminish the Mille Lacs Reservation. The documents are unambiguous, and their import was to allot reservation lands, open the reservation to sale and settlement, and apply the proceeds of such sales for the benefit of Minnesota's Chippewa. These purposes are consistent with the continued existence of the reservation. And, importantly, the Nelson Act expressly permitted the Band to take allotments at Mille Lacs rather than White Earth, undermining the implication that the Act was intended to terminate the reservation. When viewed in the historical context of the Nelson Act and Agreement, the conclusion that Congress did not clearly intend to disestablish the Mille Lacs Reservation becomes plain. Although the Band was subsequently deprived of many of the benefits of the Act, including by the Congressional resolutions discussed below, the Chippewa Commission represented that the Band would strengthen its position at Mille Lacs—not forfeit it—by assenting to the Act. The historical record suggests the Band so understood the Act. The Court agrees with that understanding, and finds that the Nelson Act and Agreement did not disestablish or diminish the reservation.

### 5.    Post-Nelson Act Congressional Resolutions

The County argues that several additional acts disestablished the Mille Lacs Reservation—namely, the 1893 and 1898 Resolutions and the 1902 Act. The Court considers each in turn.

In the 1893 Resolution, Congress confirmed "all bona fide pre-emption or homestead filings or entries allowed for lands within the Mille Lac Indian Reservation"

made between the Interior Department's 1891 *Walters* decision, which held that the reservation's lands were open to entry under the general land laws, and the 1892 *Mille Lac Lands* decision, which resulted in the cancellation of all homestead and preemption entries made after the Nelson Act. J. Res. 5, 53rd Cong., 28 Stat. 576 (1893). The Court finds that this resolution does not reflect a clear intent to disestablish the Mille Lacs Reservation. The 1893 Resolution simply permitted disposal of reservation land under the general land laws, rather than under the Nelson Act. Merely opening reservation lands to sale and settlement to non-Indians does not necessarily result in disestablishment. *See McGirt v. Oklahoma*, 140 S. Ct. 2452, 2464 (2020) ("[T]his Court has explained repeatedly that Congress does not disestablish a reservation simply by allowing the transfer of individual plots, whether to Native Americans or others."); *see also City of New Town v. United States*, 454 F.2d 121, 125 (8th Cir. 1972) ("The opening of an Indian reservation for settlement by homesteading is not inconsistent with its continued existence as a reservation.").

And to the extent the resolution is ambiguous, its legislative history confirms that Congress's purpose was to protect the reliance interests of those settlers who made entries following the *Walters* decision—entries that covered 31,659 of the reservation's 61,000 acres—rather than to disestablish the reservation. *See* H.R. Rep. No. 53-149, at 1 (1893) ("The object of the pending bill is to confirm the entries . . . made in good faith under the [*Walters*] ruling . . . , and between that date and the time when said ruling was reversed . . . . The occupants of these lands made their entries and paid their money under the general land laws and in accordance with the ruling of the Secretary of the Interior. The

subsequent reversal of that ruling by the same Secretary ought not to deprive them of their equitable right to these lands.").

In 1898, Congress passed a second resolution, following mistaken reports that the Band did not desire to take allotments at Mille Lacs. *See supra* Section I.F.3. The 1898 Resolution provided:

> That all public lands formerly within the Mille Lac Indian Reservation . . . be, and the same are hereby, declared to be subject to entry by any bona fide qualified settler under the public land laws of the United States; and all preemption filings heretofore made . . . and all homestead entries or applications to make entry under the homestead laws, shall be received and treated in all respects as if made upon any of the public lands of the United States subject to preemption or homestead entry: *Provided*, That [certain land at Mille Lacs] be . . . perpetually reserved as a burial place for the Mille Lac Indians . . . .

J. Res. 40, 55th Cong., 30 Stat. 745 (1898). Although the 1898 Resolution reflects the *assumption* that the Mille Lacs Reservation was "public land[]" (and Congress therefore declared the lands open to entry), the resolution did not itself purport to return the reservation's lands to the public domain.[23] *Cf. Hagen v. Utah*, 510 U.S. 399, 412 (1994) (finding disestablishment where the statute provided that "all the unallotted lands within said reservation shall be restored to the public domain" (emphasis omitted)). And merely

---

[23] The County makes much of the fact that the title of the 1893 Resolution and the text of the 1898 Resolution refer to the "former" Mille Lacs Reservation. That Congress subsequently refers to a reservation as a "former" reservation does not necessarily mean that a prior statute was intended to disestablish the reservation. *See McGirt*, 140 S. Ct. at 2472–73 (finding no disestablishment despite Congressional references to a "former" reservation); *Solem v. Bartlett*, 465 U.S. 463, 479 (1984) (same). Indeed, that Congress believed in 1898 that the reservation had already been disestablished would undermine the claim that Congress intended to disestablish the reservation via the 1898 Resolution—that is, that Congress intended to do what it believed had already been done.

opening reservation lands to settlement does not result in disestablishment. *See McGirt*, 140 S. Ct. at 2464; *City of New Town*, 454 F.2d at 125. Rather, as the Supreme Court held in *Mille Lac Band*, the resolution was merely an assertion of power over land believed to be "the absolute property of the government" due to a "misapprehension of the true relation of the government to the lands." *United States v. Mille Lac Band of Chippewa Indians*, 229 U.S. 498, 510 (1913). The Court finds that the resolution does not reflect a clear Congressional intent to disestablish the Mille Lacs Reservation.

Finally, the Court turns to the 1902 Act. The Act provided for "payment to the Indians occupying the Mille Lac Indian Reservation . . . , to pay said Indians for improvements made by them . . . upon lands occupied by them on said Mille Lac Indian Reservation . . . upon condition of said Indians removing from said Mille Lac Reservation." Act of May 27, 1902, 32 Stat. 245, 268. The Act's provisos permitted Band members who purchased land on the reservation to remain, and permitted members to take allotments at any other reservation in Minnesota that was subject to allotment. *Id.*

The Court finds that there is no textual basis for the contention that the Act disestablished the Mille Lacs Reservation. Congress referred to the reservation as "the Mille Lac Indian Reservation," and offered a payment for improvements on the reservation to Band members who chose to leave for another reservation. The arrangement was voluntary. It reflects no intention, let alone a clear intention, to disestablish the reservation. Crucially, when the Band agreed to the Act, its written agreement expressly provided:

> It is understood that nothing in this agreement shall be construed to deprive the said Mille Lacs Indians of any benefits to which they may be entitled

under existing treaties or agreements not inconsistent with the provisions of this agreement, or the [Act of 1902].[24]

(Carter Decl., Ex. 61, at 25.) The Act and subsequent agreement, therefore, furnish no textual basis for a finding of disestablishment.

Nor does the Act's context indicate that Congress intended to disestablish the reservation. By the time Congress began to consider the Act, the Band had been largely dispossessed of the Mille Lacs Reservation, and no land remained for the allotments permitted under the Nelson Act. *See supra* Sections I.F.1–6. In negotiating with Inspector McLaughlin and Agent Michelet, the Band repeated its understanding that the Nelson Act preserved its reservation, and expressed its desire to remain there. (*See* Slonim Decl., Ex. 134, at 56, 73 ("[Senator Rice] pointed to the different directions defining our reservation and said that it would come to pass that this land would be allotted to us.").) And McLaughlin and Michelet expressly assured the Band that the Act contemplated only their removal, that it would not result in the forfeiture of the Band's "back claims" under the

---

[24] The County also emphasizes that the agreement referred to the reservation as a "former" reservation. But if *Congress's* use of the word "former" offers little evidence of Congressional intent to disestablish a reservation, *see supra* note 23, use of the word in an agreement penned by federal negotiators bears virtually no weight. *See Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675–76, *modified sub nom. Washington v. United States*, 444 U.S. 816 (1979) ("[I]t is the intention of the parties, and not solely that of the superior side, that must control any attempt to interpret the treaties. When Indians are involved, this Court has long given special meaning to this rule. It has held that the United States, as the party with the presumptively superior negotiating skills and superior knowledge of the language in which the treaty is recorded, has a responsibility to avoid taking advantage of the other side. '[T]he treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians.'" (quoting *Jones v. Meehan*, 175 U.S. 1, 11 (1899)) (second alteration in original)).

Nelson Act, and that they would lose "no rights by moving." (*Id.* at 67-71.) Finally, although the demographic record is complicated, it suggests that hundreds of Band members did not take advantage of the Act. *See supra* Section I.F.5.

### 6.     Summary

By the Treaty of 1855, the Band was promised a "permanent home[]" at Lake Mille Lacs. Following the Band's defense of the United States during the uprisings of 1862, the Band received special treatment in the Treaties of 1863 and 1864: While other bands were required to leave their reservations and be consolidated near Leech Lake, the treaties' Article 12 proviso permitted the Mille Lacs Band to remain on their reservation during their good behavior. The treaties, read as a whole—and particularly when viewed in their historical context—do not clearly reflect Congressional intent to disestablish the reservation. Nor does the Treaty of 1867, which pertained only to the White Earth and Leech Lake Reservations. By the Nelson Act, Congress "consented to recognize the contention of the Indians" that their reservation persisted, but as part of the Act's compromise, Congress permitted prior entries to proceed to patent. *United States v. Mille Lac Band of Chippewa Indians*, 229 U.S. 498, 507 (1913). The Act also provided for the sale of reservation pine and agricultural land, the proceeds to be held in trust for the Chippewa; but it expressly permitted the Mille Lacs to take allotments on the reservation. Again, the statutory scheme and the Band's agreement to it, viewed as a whole and especially when viewed in context, do not reflect the clear intention required for this Court to find disestablishment. Nor do the Resolutions of 1893 and 1898 (which merely permitted disposal of reservation lands in violation of the Nelson Act), or the 1902 Act (which

preserved the Band's rights under prior treaties), reflect the clear intention required for this Court to find disestablishment.

Over the course of more than 160 years, Congress has never clearly expressed an intention to disestablish or diminish the Mille Lacs Reservation. The Court therefore affirms what the Band has maintained for the better part of two centuries—the Mille Lacs Reservation's boundaries remain as they were under Article 2 of the Treaty of 1855.

## III.   CONCLUSION

Accordingly, for all the foregoing reasons, and based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 223] is **GRANTED**, and Defendants' Cross-Motion for Partial Summary Judgment [Doc. No. 239] is **DENIED**.

**IT IS SO ORDERED.**

Dated: March 4, 2022                         s/Susan Richard Nelson
                                             SUSAN RICHARD NELSON
                                             United States District Judge