# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Mille Lacs Band of Ojibwe, a federally recognized Indian Tribe; James West, in his official capacity as the Mille Lacs Band Chief of Police; and Derrick Naumann, in his official capacity as Sergeant of the Mille Lacs Police Department, | Case No. 17-cv-05155 (SRN/LIB) |
| Plaintiff, | **ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| County of Mille Lacs, Minnesota; Joseph Walsh, individually and in his official capacity as County Attorney for Mille Lacs County; and Donald J. Lorge, individually and in his official capacity as Sheriff of Mille Lacs County, | |
| Defendants. | |

Anna Brady, Beth Ann Baldwin, Marc D. Slonim, and Wyatt Golding, Ziontz Chestnut, 2101 Fourth Avenue, Suite 1230, Seattle, WA 98121; and Arielle Wagner, Charles N. Nauen, and David J. Zoll, Lockridge Grindal Nauen P.L.L.P., 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401, for Plaintiffs.

Brett D. Kelley, Kelley, Wolter & Scott, P.A., 431 South Seventh Street, Suite 2530, Minneapolis, MN 55415; Courtney E. Carter and Randy V. Thompson, Nolan Thompson Leighton & Tataryn PLC, 1011 First Street South, Suite 410, Hopkins, MN 55343; and Scott M. Flaherty and Scott G. Knudson, Taft Stettinius & Hollister LLP, 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402, for Defendant County of Mille Lacs, Minnesota.

Scott M. Flaherty and Scott G. Knudson, Taft Stettinius & Hollister LLP, 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402, for Defendant Joseph Walsh.

Brett D. Kelley, Douglas A. Kelley, Stacy Lynn Bettison, Steven E. Wolter, Garrett S. Stadler, and Perry Sekus, Kelley, Wolter & Scott, P.A., 431 South Seventh Street, Suite

2530, Minneapolis, MN 55415; and Scott M. Flaherty and Scott G. Knudson, Taft Stettinius & Hollister LLP, 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402, for Defendant Donald J. Lorge.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Plaintiffs' Motion for Summary Judgment Awarding Declaratory and Injunctive Relief [Doc. No. 317] and Defendants Joseph Walsh and Donald Lorge's Motion for Summary Judgment [Doc. No. 322]. Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court grants in part and denies in part Plaintiffs' motion, and grants in part, denies in part, and denies as moot in part Defendants Walsh and Lorge's Motion.

## I.      BACKGROUND

### A.      Parties and the Mille Lacs Indian Reservation

Plaintiffs are the Mille Lacs Band of Ojibwe, Mille Lacs Band Chief of Police James West[1], and Sergeant Derrick Naumann (collectively, "the Band"). In November 2017, the Band filed this lawsuit against the County of Mille Lacs, Mille Lacs County Attorney Joseph Walsh, and Sheriff Donald Lorge[2] (collectively, "the County") seeking declaratory and injunctive relief regarding the Band's law enforcement authority within the Mille Lacs Indian Reservation. (*See generally* Compl. [Doc. No. 1].) This Court maintains subject

---

[1] In April 2022, Chief of Police West was automatically substituted as a named plaintiff under Fed. R. Civ. P. 25(d), having succeeded former Chief of Police and named plaintiff, Sara Rice. (April 4, 2022 Jt. Letter [Doc. No. 314] at 3.)

[2] In March 2019, Sheriff Lorge was automatically substituted as an individual defendant for his predecessor, former Sheriff and individual defendant, Brent Lindgren. (Order on Stip. [Doc. No. 63].)

matter jurisdiction over this matter based on federal question jurisdiction.  (*See* Dec. 21, 2020 Order [Doc. No. 217] at 24–29.)

### 1.    History of the Dispute Regarding Tribal Law Enforcement Authority on the Reservation

Article 2 of the 1855 Treaty between the Minnesota Chippewa Tribe and the United States established the Mille Lacs Indian Reservation, which comprises about 61,000 acres of land. (10 Stat. 1165 (Feb. 22, 1855); Quist Decl. [Doc. No. 160] ¶ 3.)  Within the Reservation, the United States holds approximately 3,600 acres in trust for the benefit of the Band, the Minnesota Chippewa Tribe, or individual Band members.  (Quist Decl. ¶ 4.) Such lands are considered "trust lands."  *See* 25 U.S.C. § 2201(4)(i).  The Band owns in fee simple about 6,000 acres of the Reservation, and individual Band members own in fee simple about 100 acres of the Reservation.  (Quist Decl. ¶ 4.)  These lands, to which the Band or its members hold title, are referred to as "the Band's fee lands."[3]

Pursuant to state law, in 2008, the Band and the County entered into a cooperative law enforcement agreement ("2008 Cooperative Agreement").  (Baldwin Decl. [Doc. No. 150][4], Ex. H (Revocation & 2008 Coop. Agmt.) at 13–20.)  The 2008 Cooperative Agreement allowed Band law enforcement officers to exercise concurrent jurisdiction with

---

[3] Because "fee lands" denote that a person holds title to the land, to the extent the Court refers to lands to which nonmembers or non-Indians hold title, the Court will refer them as "nonmember fee lands" or "non-Indian fee lands."

[4] Unless otherwise indicated, citations to "Baldwin Decl." refer to the Declaration of Beth Baldwin in Support of Plaintiffs' Motion for Summary Judgment on Standing, Ripeness, and Mootness, found at Doc. No. 150.

the Mille Lacs County Sheriff's Department to enforce Minnesota criminal law, consistent with Minn. Stat. § 626.90.   (*Id.*)    Minnesota Statute § 626.90 provides that if certain regulatory and liability requirements are met, the Band and the Mille Lacs County Sheriff possess concurrent jurisdictional authority as follows:   (1) over all persons in the geographical boundaries of the trust lands; (2) over all Minnesota Chippewa tribal members within the boundaries of the 1855 Treaty; and (3) over any person who commits or attempts to commit a crime in the presence of an appointed band peace officer within the boundaries of the 1855 Treaty.  Minn. Stat. § 626.90, subd. 2(c).   However, the statute makes clear that "[n]othing in this section shall be construed to restrict the band's authority under federal law."  Minn. Stat. § 626.90, subd. 6.

In approximately 2013, the Band applied to the U.S. Department of Justice for concurrent federal jurisdiction over crimes committed in the Band's Indian country,[5] pursuant to the Tribal Law and Order Act (TLOA), 18 U.S.C. § 1162(d).  (Baldwin Decl., Ex. D (M-Opinion) at 1–2 n.2.)  During the application process, the County submitted

---

[5] "Indian country" means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.  18 U.S.C. § 1151.

The Court uses the term "Indian" as defined in 25 U.S.C. § 1301(4), and "non-Indian" to refer to persons who do not fall within the definition of § 1301(4).

comments in opposition, asserting that the Reservation, as established by the 1855 Treaty, had been disestablished such that the 1855 Treaty boundaries no longer constitute the Band's Indian country.  (*Id*. at 2 & n.3.)  The Band responded to the contrary, maintaining that the 1855 Treaty boundaries remain intact.  (*Id*. & n.4.)

In response to the dispute, in November 2015, the U.S. Department of the Interior's Office of the Solicitor ("DOI Solicitor") issued an opinion entitled *Opinion on the Boundaries of the Mille Lacs Reservation*, Solicitor's Opinion M-37032 (the "M-Opinion").  (*Id*. at 1–2.)  In the 37-page, single-spaced M-Opinion, the DOI Solicitor recounted the establishment of the Mille Lacs Reservation in 1855, the applicable treaties, the Nelson Act, the historical treatment of the land, Supreme Court authority, and Interior Department positions regarding the Reservation.  (*Id*. at 2–22.)  After analyzing the complicated history of the Reservation and the applicable law, the DOI Solicitor found no evidence of clear congressional intent to disestablish the Reservation sufficient to overcome the general rule that "doubtful expressions are to be resolved in favor of the Indians."  (*Id*. at 36 & n.260 (citing *Lower Brule Sioux Tribe v. South Dakota*, 711 F.2d 809, 816 (8th Cir. 1983) (quoting *DeCoteau v. Dist. Cnty. Court*, 420 U.S. 425, 444 (1975) (cleaned up)).)  Thus, the DOI Solicitor concluded the M-Opinion by finding that the Reservation, as it was established by the 1855 Treaty, remained intact.  (*Id*. at 36.)

The M-Opinion and its findings on the Reservation's boundaries prompted the County to terminate the 2008 Cooperative Agreement between the County and the Band regarding their concurrent authority to enforce state criminal law.  (Revocation & 2008 Coop. Agmt. at 1–5.)  Walsh explained, "The primary motivating factor of the revocation,

as stated in the revoking resolution, was the M-opinion, and what I think the board viewed as the Band using their law enforcement authority to improve their position vis-à-vis the boundary." (Baldwin Decl., Ex. KK (Walsh Dep.) at 318:23–319:3.) Indeed, in the County's July 21, 2016 resolution to revoke the 2008 Cooperative Agreement, the County expressly "reject[ed] the conclusions of the M Opinion and the Mille Lacs Band of Ojibwe's use of the criminal justice system to address the disputed boundary of the Mille Lacs Indian Reservation in violation of Minn. Stat. § 626.90(7) and paragraph 10 of the Cooperative Agreement." (Revocation & 2008 Coop. Agmt. at 4.) The Revocation Resolution provided that the 2008 Cooperative Agreement would expire within thirty days of the Band and Sheriff receiving notice. (*Id*. at 3–4.)

In July 2016, County Attorney Walsh asked then-Minnesota Attorney General Lori Swanson for an opinion regarding whether the Band's police department remained a state law enforcement agency under Minnesota law. (Aug. 27, 2021 Walsh Decl. [Doc. No. 306-1] ¶ 7.) Swanson denied the request for an opinion and recommended that Walsh advise the County as he deemed appropriate. (*See id*. ¶ 8.)

### 2.   The Opinion and Protocol:  The Undisputed Record

Shortly thereafter, on July 18, 2016, Walsh issued an Opinion and Protocol, addressing the Band's state law enforcement authority. (Baldwin Decl., Ex. I (hereafter, "Opinion").) Walsh stated that he developed the Opinion and Protocol "to ensure that the evidence being presented to me for potential prosecution would be admissible in court," precluding jurisdictional challenges that might arise "if a Band police officer made an illegal stop." (Aug. 27, 2021 Walsh Decl. ¶ 13.)

In the "Opinion" portion of the Opinion and Protocol, Walsh opined that "the nature and extent of [the Band's] inherent tribal criminal authority is presently unknown." (Opinion at 14.)  Walsh stated that the Band's police department was created by Minn. Stat. § 626.90, and its state law enforcement authority within the County "is entirely dependent upon the interpretation of that statute." (*Id*. at 3.)  Under a "plain reading" of the statute, Walsh opined, the Band was only allowed to provide law enforcement services in the County if it entered into a mutual aid/cooperative agreement with the Sheriff.  (*Id*.) Because the County had revoked the 2008 Cooperative Agreement and no other agreement was forthcoming, Walsh addressed the scope of the Band's state law enforcement authority, absent a cooperative agreement.

### a.    Scope of Authority

As an initial matter, Walsh addressed geographic limitations on the Band's jurisdiction, drawing distinctions between part of the Reservation that lies in Pine County and part in Mille Lacs County, at issue here.  (*Id*. at 2–3, 6.)  A statute similar to Minn. Stat. § 626.90 provides for shared law enforcement jurisdiction between the Band and the Pine County Sheriff.  *See* Minn. Stat. § 626.93, subd. 3.[6]  Because the Band and the Pine

---

[6] The statute applicable to Pine County broadly provides that subject to certain requirements, and if the tribe enters into a cooperative agreement, "the tribe shall have concurrent jurisdictional authority under this section with the local county sheriff *within the geographical boundaries of the tribe's reservation* to enforce state criminal law." Minn. Stat. § 623.93, subd. 3 (emphasis added).  By contrast, the statute applicable to Mille Lacs County contains additional distinctions between the persons subject to the Band's concurrent jurisdiction ("all persons," "all Minnesota Chippewa tribal members," or "any person") and their location, ("in the geographical boundaries of the property held by the United States in trust for the Mille Lacs Band or the Minnesota Chippewa tribe," or "within the boundaries of the [1855 Treaty]").  Minn. Stat. § 626.90, subd. 2(c)(1)–(3).  Moreover,

County Sheriff had a cooperative agreement in place, Walsh opined that for criminal offenses occurring in Pine County, Band officers maintained all of their defined law enforcement authority, but for offenses occurring in Mille Lacs County, the Band lacked the jurisdictional authority of peace officers, since the Band and Mille Lacs County had no cooperative agreement in place.  (*Id*. at 6–7 ("The Mille Lacs Band Police Department no longer has lawful state law jurisdiction within Mille Lacs County unless and until a new cooperative agreement pursuant to Minn. Stat. § 626.90 is reached.").)  Rather, he found the Band's officers generally maintained only the state law enforcement authority of private citizens in Mille Lacs County.  (*Id*. at 6.)

Specifically, Walsh opined as to the Band's authority to engage in arrests and citizen's arrests, issue citations, perform investigations, sign state criminal complaints, sign state law search warrant applications, use force under state law, carry firearms under state law, and use deadly force under state law.  (*Id*. at 6–11.)  As to the power to arrest, Walsh opined that Band officers in Mille Lacs County possessed a peace officer's power to make warrantless arrests only when facing circumstances that permit the use of deadly force by a peace officer.  (*Id*. at 6–7 (citing Minn. Stat. §§ 629.40(4); 609.066).)  Absent such circumstances, Band officers in Mille Lacs County were limited to "the same powers of arrest that an ordinary citizen would possess."  (*Id*. at 7 (citing Minn. Stat. § 629.40(4)).)  Under Minnesota law, a private person may arrest another:  (1) for a public offense

---

any agreement between the Band and the Mille Lacs County Sheriff must "define the trust property involved in the joint powers agreement."  *Id*., subd. 2(b).

committed or attempted in the arresting person's presence; (2) when the person arrested

has committed a felony, although not in the arresting person's presence; or (3) when a

felony has in fact been committed, and the arresting person has reasonable cause to believe

the person arrested committed it.  Minn. Stat. § 629.37.  Walsh opined:

> In practice, Mille Lacs Band Police Officers may be present wherever a
> private person may lawfully be under the circumstances.  They may provide
> security and observe.  When there is probable cause of one of the three
> circumstances justifying a citizens' arrest . . . , they may conduct an arrest
> and turn over the arrested person to a [] County Deputy or another peace
> officer under state law within their lawful jurisdiction.

(Opinion at 8.)

With respect to issuing citations for violations of state law, because citations must

be issued by peace officers and not private persons, (*id*. (citing Minn. R. Crim. P.

6.01(1)(a))), Walsh found that Band officers were precluded from issuing state law

citations in Mille Lacs County.  (*Id*.)  Rather, if a Band officer observed a violation

warranting a state law citation, the officer was to inform a County Sheriff's deputy.  (*Id*.)

As to Band officers' authority to conduct investigations, Walsh opined that the fruits

of any investigations conducted outside of Pine County were "not likely to be admissible

in state court."  (*Id*.)  He noted that under state law, citizens do not have the power to make

investigative stops or to administer preliminary breath tests.  (*Id*.)  Walsh opined that if the

Band's officers conducted an investigation of a state-law violation "where they have no

state law enforcement jurisdiction, the goals of public safety in Minnesota's criminal

justice system will be jeopardized."  (*Id*. at 9.)  Moreover, to "ensure the admissibility of

evidence in state court," Walsh directed that any evidence gathered as a result of state law

violations in Mille Lacs County be given to either the Sheriff or applicable municipal police department.  (*Id*.)

Walsh also found that the Band's officers were precluded from signing state-law criminal complaints, stating, "It is the policy of the Mille Lacs County Attorney's Office that, absent extraordinary circumstances, all criminal complaints shall be signed by a peace officer acting within his or her state law jurisdiction."  (*Id*.)  Similarly, because state search warrants must be directed to a "peace officer," (*id*. at 10 (citing Minn. Stat. § 626.05)), Walsh stated, "Search warrants executed by [the Band's officers] on or after July 22, 2016 are likely to be inadmissible in state court."  (*Id*. (citing Minn. Stat. § 629.40; *State v. Horner*, 617 N.W.2d 789, 795 (Minn. 2000)).)  However, Walsh "encouraged" the Band's officers to refer investigations potentially involving search warrants to "a peace officer with state law enforcement jurisdiction in Mille Lacs County,"  and permitted the Band to assist in the execution of the warrant, provided the licensed peace officer who applied for the warrant was present and involved in its execution.  (*Id*.)

With respect to the use of force by Band officers, Walsh identified the following circumstances in which Band officers "outside of their jurisdiction as a 'peace officer'" could employ force under Minnesota law:  (1) to assist a public officer under the officer's direction (a) in effecting a lawful address; (b) in the execution of legal process; (c) in enforcing an order of the court; or (d) in executing any duty imposed upon the public officer by law; (2) to conduct a lawful citizen's arrest; (3) to resist or aid another to resist an offense against the person; (4) to resist a trespass or other unlawful interference with real property; (5) to prevent the escape, or to retake following the escape, of a person lawfully held on a

charge or conviction of a crime.  (*Id*. at 10–11 (citing applicable portions of Minn. Stat. §
609.06).)

Despite Walsh's prohibitions against Band officers' authority to perform certain
state law enforcement tasks in Mille Lacs County, discussed above, he opined that Band
officers were permitted to carry a firearm within Mille Lacs County because they are
"peace officers."  (*Id*. at 10 (citing Minn. Stat. § 624.714).)

Finally, Walsh advised that if confronted with circumstances justifying a peace
officer's use of deadly force pursuant to Minn. Stat. § 609.066, a Band officer could "make
a lawful warrantless arrest *as a peace officer*, including the same right to use deadly force
possessed by a peace officer."  (*Id*. at 11 (citing Minn. Stat. §§ 609.066, 629.40(4),
629.34).)

### b.   Legal Liability

In the Opinion, Walsh also warned of legal liability that might follow Band officers'
unauthorized law enforcement conduct in the County.  (*Id*. at 11–12.)  With respect to
citizen's arrests, he noted that an arrested person may file a civil lawsuit alleging false
imprisonment against a private citizen making a citizen's arrest, (*id*.), and the arresting
citizen could be subject to felony liability for confining or restraining another without valid
consent while "knowingly lacking lawful authority to do so."  (*Id*.)  In addition, Walsh
advised that when conducting a citizen's arrest, a Band officer's use of firearms to cause
fear of immediate bodily harm or death in another would constitute a felony offense,
subject to a mandatory three-year sentence.  (*Id*. (citing Minn. Stat. §§ 609.224, 609.222,
609.11(5), (9)).)  Also, making a citizen's arrest "without declaring the cause to be a

citizen's arrest under apparent authority as a peace officer within Mille Lacs County or while pretending to be a peace officer within Mille Lacs County" could subject a Band officer to criminal liability for a gross misdemeanor offense. (*Id.* at 12 (citing Minn. Stat. § 629.402).)

More generally, Walsh cautioned against the unauthorized practice of a law enforcement officer, generally a misdemeanor offense, which involves "'a person who is not a peace officer' (1) making a representation of being a peace officer or (2) performing or attempting to perform an act, duty or responsibility reserved by law for licensed peace officers." (*Id.* (citing Minn. Stat. § 626.863).) He opined that "[t]his would include conducting investigative stops and other investigations not permitted under state law if those actions obstruct or interfere with a peace officer's investigation." (*Id.*) Similarly, Walsh warned of the "risks inherent in peace officers' out-of-jurisdiction citizen's arrests." (*Id.*)

### c.    Legal Authority

Walsh also opined as to the impact of Public Law 280, adopted by Minnesota, which grants criminal and civil jurisdiction to certain states over activities occurring in Indian country. (*Id.* at 13.) Stating that "[t]his seemingly universal grant of jurisdiction has been limited by subsequent decisions of the [] Supreme Court," Walsh noted that state-law jurisdiction applies to criminal or prohibitory laws, but not civil regulatory laws. (*Id.* (citing *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 209–10 (1987)).) He further advised that in Minnesota, traffic offenses are considered civil/regulatory. (*Id.* (citing *State v. Stone*, 572 N.W.2d 725 (Minn. 1997)).)

Walsh opined that the U.S. Supreme Court "has never determined the scope of retained inherent tribal jurisdiction over criminal matters by a Band or Tribe in a Public Law 280 state," and as the Band "now asserts inherent tribal jurisdiction, . . . there is little clarity in the law on what that may mean from a practical standpoint." (*Id.* at 14 (distinguishing *United States v. Wheeler*, 435 U.S. 313, 318 (1978), as a decision concerning a non-Public Law 280 state, and *Walker v. Rushing*, 898 F.2d 672, 675 (8th Cir. 1990), for its statement "*in dicta* that 'Public Law 280 did not divest Indian tribes of their sovereign power to punish their own members for violations of tribal law.'").)

Describing the state of the law as "anything but clear," Walsh nevertheless provided the following "conclusions that may be tentatively reached (pending future clarification):"

(1) The Mille Lacs Band of Ojibwe may retain inherent criminal jurisdiction over Mille Lacs Band of Ojibwe members and may also have inherent criminal jurisdiction over members of other Indian tribes and bands on tribal trust lands, but not for "major crimes" or felony offenses;

(2) The Mille Lacs Band of Ojibwe has exclusive jurisdiction over members of the Mille Lacs Band of Ojibwe in civil regulatory cases arising in "Indian country;"

(3) Criminal jurisdiction by tribes does **not** extend to non-Indians (with one narrow potential exception under the Violence Against Women Act);

(4) Inherent tribal jurisdiction is limited to "Indian country." Indian country includes land held in trust and land within an Indian Reservation. The Milles Lacs Band and the State of Minnesota including Mille Lacs County differ on the extent of "Indian country" in Mille Lacs County. The State and County believe that "Indian country" in Mille Lacs County is limited to tribal trust lands.[7]

---

[7] The Court notes that in this case, in 2021, the State of Minnesota appeared as amicus curiae in support of the Band's Motion for Summary Judgment on the boundary issue. The State observed that the question of whether the Reservation had been diminished or disestablished was, for a long period, an open question, and at various times, state

13

(5) The State of Minnesota has criminal jurisdiction over all criminal/prohibitory offenses committed by Indians anywhere in the State of Minnesota;

(6) The State of Minnesota has civil/regulatory jurisdiction over Indians who are not on their own reservation or own tribe's trust land.

(*Id.*)

### d.    Protocol

At Sheriff Lindgren's request, Walsh prepared the "Protocol" portion of the Opinion and Protocol to provide "practical conclusions as to what Band police officers may or may not do and what state police officers may or may not do[.]" (Aug. 27, 2021 Walsh Decl. ¶ 12.)  In the introduction to the Protocol, Walsh announced the County's general position that "inherent criminal authority doesn't extend (1) outside of trust lands or (2) to non-members of the Mille Lacs Band." (Baldwin Decl., Ex. J (Protocol) at 1.)  In an additional prefatory paragraph, Walsh stated, in bold-faced text,

> **Mille Lacs Band Police Officers are peace officers of the State of Minnesota with state law enforcement jurisdiction within <u>Pine County only</u>.  In Mille Lacs County, they have significant powers of <u>arrest</u> as outlined below, but must turn over arrested persons without delay to a Mille Lacs County peace officer so an <u>investigation</u> admissible in state court may be conducted.**

(*Id.*)

---

officials had weighed in on the question.  (State's Amicus Mem. [Doc. No. 250] at 2.) However, in light of emerging legal authority, including *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020), the State found no clear expression of congressional intent to diminish or disestablish the Reservation.  (*Id.* at 2–9.)  Accordingly, the State supported the Band's summary judgment motion and asserted that the Reservation continues to consist of the approximately 61,000 acres identified in the 1855 Treaty.  (*Id.* at 10.)

Walsh then summarized his opinions on the Band's specific law enforcement authority as follows:

**Mille Lacs Band Police Officers May**:

1) Conduct warrant arrests as a peace officer pursuant to court order.  Minn. Stat. §§ 629.40 & 629.32.

2) Conduct warrantless arrests as a peace officer when (1) the arrest is for a crime arising out of reservation land in Pine County or (2) when presented with circumstances justifying a peace officer's use of deadly force.  *See* Minn. Stat. §§ 629.40 & 609.066.

3) Conduct a valid citizens' arrest pursuant to Minn. Stat. §§ 629.37–.40 and/or temporarily seize an arrested person until Mille Lacs County peace officers arrive to investigate.

4) Aid a Mille Lacs County peace officer upon request including making arrests, retaking anyone who has escaped from custody, executing legal process, and assisting in the execution of search warrants.  Minn. Stat. §§ 387.03, 629.403, & 626.13.

5) Provide witness statements *or* written reports to Mille Lacs County peace officers.

6) Use force to the same degree as a private citizen pursuant to Minn. Stat. §§ 609.06–.065.

7) Carry a firearm with a valid license pursuant to Minn. Stat. § 624.714.

**Mille Lacs Band Police Officers May Not Lawfully**:

1) Issue state law citations and/or tab charges.

2) Apply for search warrants in state district court.

3) Use firearms to affect [sic] a citizen's arrest pursuant to Minn. Stat. §§ 629.27–.40.

4) Conduct investigations regarding violations of state law including statements, investigative stops, traffic stops, and gathering evidence.

15

5) Impersonate a peace officer, obstruct justice, or engage in the unauthorized practice of a peace officer, primarily by interfering with investigations within Mille Lacs County.

(*Id.*)

In a footnote, the Protocol clarified that Band officers "may conduct investigations where they have tribal jurisdiction (e.g., civil/regulatory citations to Band members and investigations related to inherent tribal criminal authority)." (*Id.* at 1 n.1.)

It is beyond dispute that compliance with the Opinion and Protocol was mandatory. (Baldwin Decl. [Doc. No. 150] Ex. K (Walsh Dep.) at 305 (testifying that he never "suggested [compliance with the Protocol] was voluntary."). Further, Walsh stated that Band officers' violations of the Opinion and Protocol could violate state criminal law. (*Id.* at 297–98.)

After Walsh issued the Opinion and Protocol, then-Sheriff Lindgren "instructed [his] staff and deputies to follow the County Attorney's Opinion and Protocol." (Lindgren Decl. [Doc. No. 180] ¶ 3; Lorge Decl. [Doc. No. 306-2] ¶ 4.)  Assistant County Attorney Gardner testified to his understanding that the Band's officers could not exercise authority on non-trust lands, or investigate violations of state law on trust lands, and that County "officers were advised that they could arrest tribal police officers if they" violated the Protocol.  (Baldwin Decl., Ex. L (Gardner Dep.) at 60.)

Lindgren attests that he is unaware of any Sheriff's Office employees threatening the arrest of Band police officers for violations of the Opinion and Protocol, nor did the County Attorney expressly instruct the Sheriff's Office to make such arrests.  (Lindgren Decl. ¶ 5.)  The Band's former Police Chief, Rice, testified that although Sheriff Lindgren

informally advised that Band officers would not be arrested or prosecuted, she was skeptical about his assurances because he was committed to following the Protocol's mandates. (Baldwin Decl., Ex. GG (Rice Dep.) at 157, 204-05; *see also* Lindgren Decl. ¶ 6 (confirming conversation with Rice that included assurance of no arrests for violations of the Opinion and Protocol.)  Rice acknowledged that no Band officers had been arrested, but she believed that was simply "[b]ecause we followed the [P]rotocol."  (Rice Dep. at 205.)  The Band's then-Deputy Police Chief, West, testified to Band officers' fears of "getting arrested for impersonating officers" under the Protocol. (Baldwin Decl., Ex. BB (West Dep.) at 37–38.)  West confirmed that "[o]fficers followed the [P]rotocol."  (*Id.* at 42.)  More specifically, Walsh acknowledged that the Band's officers' investigative role had been assumed by the Sheriff's deputies, even on trust lands, as well as in response to calls for service, i.e., 911 calls, on non-trust lands.  (Walsh Dep. at 375–78.)

In a December 2016 letter, Walsh advised the U.S. Attorney's Office for the District of Minnesota and the U.S. Department of Justice of the current law enforcement arrangement.  (Baldwin Decl., Ex. JJ (Undated Letter from Walsh to Luger); Walsh Dep. at 378.)  Walsh made clear that "the Mille Lacs County Sheriff's Office has taken on all state law enforcement services provided in the entirety of Mille Lacs County" and that a "tenuous status quo has been followed by the Mille Lacs County Sheriff's Office and the Mille Lacs Band Police Department based on my Opinion and Protocol." (Undated Letter from Walsh to Luger; Walsh Dep. at 378.)  In his deposition, Walsh conceded that his letter did not advise federal officials of some of the particulars of the law enforcement arrangement, such as the fact that investigations of all violations of state law on trust lands

were performed by the County Sheriff's Office, which had also assumed responsibility for responding to all calls and investigating all violations of state law on non-trust lands. (Walsh Dep. at 377-78.)

### 3.     Enforcement of Federal Law in Indian Country

In late 2016, pursuant to TLOA, Pub. L. No. 111-211, 124 Stat. 2258, the Band and the Bureau of Indian Affairs ("BIA") entered into an agreement (the "Deputation Agreement") through which Band officers were deputized and issued Special Law Enforcement Commissions ("SLECs") to enforce federal law within the Band's Indian country, as defined by 18 U.S.C. § 1151.  (Baldwin Decl., Ex. LL (DOJ Letter); *id.*, Ex. MM (Deputation Agmt.).)  Pursuant to the Deputation Agreement, the BIA authorized Band officers to assist the BIA in enforcing all federal laws applicable within Indian country, including the authority "to make lawful arrests."  (Deputation Agmt. at 1–2, ¶ 3.A.)   In particular, the parties agreed to cooperate with each other "to provide comprehensive and thorough law enforcement protection, including but not limited to effecting arrests, responding to calls for assistance from all citizens and also from other law enforcement officers, performing investigations, providing technical and other assistance, dispatching, and detention."  (*Id.* at 2 ("Purpose").)

The Deputation Agreement notes that "[l]awful actions pursuant to this federal Agreement and a commission issued under it supersede any contrary Tribal, State, or local law, ordinance, or practice."  (*Id.* ¶ 3.C.)  In addition, it states that "[i]rrespective of their location, officers holding SLECs may only respond to violations of exclusively State law to the extent consistent with that State's law.  Officers carrying SLECs may respond to

concurrent violations of State and Tribal or Federal laws to the extent consistent with Tribal

or Federal law." (*Id.* ¶ 6.E.)

The Deputation Agreement contains a general acknowledgement concerning the

official determination of jurisdiction:

> Both parties to this Agreement recognize that when law enforcement officers
> arrest a criminal suspect, the officers may not know whether the suspect or
> the victim is an Indian or non-Indian or whether the arrest of the suspected
> crime has occurred in Indian country, . . . , and that therefore there is great
> difficulty in determining immediately the proper jurisdiction for the filing of
> charges. It is further recognized that the official jurisdictional determination
> will be made by a prosecutor or court from one of the various jurisdictions,
> not by cross-deputized arresting officers who may deliver the offender to the
> appropriate detention facility.

(*Id.* at 2.)

Despite the issuance of the SLECs, Walsh maintained that the Opinion and Protocol

remained in force and that Band officers holding SLECs could not exercise SLEC authority

on non-trust lands within the 1855 Treaty boundaries. (Walsh Dep. at 384–85.) Defendants

asserted that "the only lands comprising Indian Country within Mille Lacs County [were]

lands held in trust by the United States, and that the Band ha[d] no inherent *or* federally

delegated law enforcement authority except on trust lands." (Jt. Mot. to Defer [Doc. No.

208] at 2.)

### 4.    The 2018 Law Enforcement Agreement

After the Band filed this lawsuit in November 2017, the Band, County, and former

Mille Lacs County Sheriff Brent Lindgren entered into an interim law enforcement

agreement (the "2018 Agreement"). (Baldwin Decl., Ex. AAA (Mut. Aid/Coop. Agmt.).)

On a temporary basis, the 2018 Agreement grants the Band concurrent jurisdiction with

the Sheriff over all persons on trust lands, all Band members within the boundaries of the 1855 Treaty, and any person who commits or attempts to commit a crime within the presence of a Band officer within the boundaries of the 1855 Treaty. (*Id*.) Under its own terms, the 2018 Agreement automatically terminates 90 days after the final resolution of this case. (*Id*.)

## II.   PROCEDURAL HISTORY

### A.   Early Summary Judgment Motions on Standing and Immunity

The parties proceeded to file early dispositive motions on several issues pertaining to standing and immunity. On December 21, 2020, the Court issued a ruling, granting Plaintiffs' Motion for Summary Judgment on Standing, Ripeness, and Mootness, and denying Defendants Walsh and Lorge's Motion for Summary Judgment.

In addition to the undisputed evidence on which the Court also relies here, *supra* at 1–19, as well as additional evidence submitted by the parties, the Court found that Plaintiffs had established standing and ripeness, and the case was not moot. (Dec. 21, 2020 Order at 29–36.) As to standing, the Court found that Defendants' enactment and enforcement of the Opinion and Protocol had injured Plaintiffs, citing County law enforcement officers' repeated interference with Band officers' law enforcement measures. (*Id*. at 6–13.) Specifically, the Court found that Defendants had interfered with the Band's authority by taking control of crime scenes, duplicating investigatory work performed by Band officers, and taking over in-progress interviews and vehicle searches. (*Id*.) In addition, the Court found that County Sheriffs' deputies had monitored Band officers' compliance with the Protocol and had tracked violations, (*id*.), and that Band officers could not effectively

perform their work because of fear of potential liability. (*Id*. at 13.) Furthermore, the Court found a decline in Band officers' morale and an increase in resignations, as well as a lack of law enforcement response to criminal activity on the Reservation. (*Id*. at 14–20.) The Court found these injuries were all "fairly traceable to the Defendants' challenged conduct," for which declaratory and injunctive relief were an appropriate remedy to the Band's alleged harm.[8] (*Id*. at 34.)

In Walsh and Lorge's summary judgment motion, the Court found that prosecutorial immunity under the Tenth Amendment was inapplicable, as were *Younger* abstention and related principles of federalism and comity. (*Id*. at 36–41.) In addition, the Court determined that Eleventh Amendment immunity did not bar Plaintiffs' claims against Walsh and Lorge, nor did prosecutorial immunity. (*Id*. at 41–46.) Finally, the Court declined to consider Walsh and Lorge's arguments seeking the dismissal of the Band's official-capacity claims and individual-capacity claims on certain bases, nor did the Court consider their qualified immunity arguments related to Plaintiffs' request for attorneys' fees. (*Id*. at 46.) Because the pretrial scheduling order did not authorize Walsh and Lorge to seek early dispositive relief on such issues, the Court did not address them, but noted that Walsh and Lorge could raise the arguments again, if appropriate. (*Id*.)

---

[8] For purposes of standing, the Court properly considered this evidence of instances of interference and deterrence—which Defendants were free to rebut. However, here, on the merits, the Band argues that because it seeks only declaratory and injunctive relief, it is unnecessary to revisit specific instances of interference and deterrence. (Jt. Letter [Doc. No. 343] 20.) The Court discusses this issue its analysis of Plaintiffs' motion, *infra* at III.B.1.

## B.     Walsh and Lorge's Interlocutory Appeal to the Eighth Circuit

In January 2021, Walsh and Lorge filed an interlocutory appeal [Doc. No. 218] with the Eighth Circuit Court of Appeals, challenging certain aspects of the Court's December 21, 2020 ruling.  Specifically, they argued that the Court lacked jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331, that Plaintiffs failed to state a "cause of action" against them, and that they were immune from suit pursuant to various immunity doctrines. (Baldwin Decl. [Doc. No. 309], Ex. B (W&L Opening 8th Cir. Brief).)  After the parties filed their appellate briefs and were awaiting oral argument, Walsh and Lorge voluntarily moved to dismiss their appeal on mootness grounds, citing the Supreme Court's June 1, 2021 decision in *United States v. Cooley*, 141 S. Ct. 1638 (2021).  (Baldwin Decl. [Doc. No. 309], Ex. C (W&L 8th Cir. Mot. to Dismiss) at 1.)  The Eighth Circuit treated the motion as one for voluntary dismissal and summarily dismissed the appeal pursuant to Federal Rules of Appellate Procedure 42(b) and 39(a)(4).[9]  (8th Cir. J. [Doc. No. 292]; Mar. 3, 2022 Order [Doc. No. 312] at 9–10.)

---

[9] After dismissal of the interlocutory appeal, and in response to Plaintiffs' memorandum in opposition, Walsh and Lorge filed a "reply" memorandum, stating that if the Eighth Circuit concluded that Plaintiffs' case was moot "it should say so[.]"  (Baldwin Decl. [Doc. No. 309], Ex. E (W&L 8th Cir. Reply) at 2.)  After the Eighth Circuit issued no response to Walsh & Lorge's reply memorandum, Walsh & Lorge moved to recall the mandate, and sought a ruling that *Cooley* mooted the case against them.  (*Id.*, Ex. F (W&L 8th Cir. Mot. to Recall Mandate).)  In a one-sentence order, the Eighth Circuit denied the motion.  (*Id.*, Ex. H (Oct. 2021 8th Cir. Order).)

Because jurisdiction then returned to this Court, the parties addressed the procedural question of whether the Eighth Circuit had ruled on the merits of Defendants' mootness argument, and if it had not, whether the 2018 Agreement or the *Cooley* decision rendered the Band's claims against Walsh and Lorge moot.  (Mar. 3, 2022 Order at 8–9.)  The Court found the following:  (1) the Eighth Circuit had not ruled on the merits of Walsh and

**C.     Cross-Motions for Partial Summary Judgment on Reservation Boundaries**

At the parties' request, the December 2020 Order was limited as described and did not address whether Defendants' conduct was unlawful, nor did it resolve the "extent and scope of the Band's sovereign law enforcement authority." (*Id*. at 30–32.) The parties agreed that

> [i]f the Court were to determine that the 1855 Reservation has not been disestablished or diminished, the Band's inherent and federally delegated law enforcement authority [would] extend, at least to some extent, to all lands within the Reservation, including Band-owned and non-Band-owned fee lands, and it [would] be necessary to determine the precise extent of the Band's authority on such lands (as well as trust lands).

(Mem. Supp. Jt. Mot. [Doc. No. 208] at 3.)

Accordingly, in February 2021, in their Cross Motions for Partial Summary Judgment [Doc. Nos. 223 & 239], the parties addressed the question of the geographic scope of the Band's law enforcement authority. Ruling in the Band's favor, the Court held that the Mille Lacs Reservation's boundaries remain as they were under Article 2 of the Treaty of 1855, and Congress has never clearly expressed the intent to disestablish or

---

Lorge's mootness argument; (2) their argument for mootness based on the 2018 Agreement was an untimely motion for reconsideration, but even if it were procedurally proper, the 2018 Agreement failed to establish mootness; (3) *Cooley* did not moot the Band's claims against Walsh and Lorge, particularly because it did not address the issue of reservation boundaries; and (4) it was not speculative for the Court to find the case was not moot. (*Id*. at 9–26.)

diminish the Reservation.  (Mar. 4, 2022 Summ. J. Order on Geo. Boundaries [Doc. No. 313] at 92–93.)

**D.  Instant Cross-Motions for Summary Judgment**

The parties now move for summary judgment, with Walsh and Lorge renewing their arguments for the dismissal of the Band's individual-capacity and official-capacity claims, and precluding the Band from obtaining attorneys' fees and costs from them, and Plaintiffs moving for summary judgment on the merits, seeking declaratory and injunctive relief regarding the extent of the Band's law enforcement authority.

## III.  DISCUSSION

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016).  And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In evaluating a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the moving party bears the burden of establishing the lack of a genuine issue of fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a

genuine issue for trial." *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

### A.    Walsh and Lorge's Motion for Summary Judgment [Doc. No. 322]

#### 1.    Individual Capacity Claims Against Walsh and Lorge

In their renewed argument, Walsh and Lorge assert that Plaintiffs lack standing to seek declaratory and injunctive relief against them in their individual capacities because (1) this case challenges only official-capacity conduct, therefore no harm is fairly traceable to Defendants' individual conduct; (2) claims for equitable relief against state officials in their individual capacities are nonjusticiable; and (3) Lorge is entitled to summary judgment in his individual capacity as no allegations in the Complaint refer to him.  (Defs.' Walsh & Lorge's Mem. ("W&L's Mem.") [Doc. No. 321] at 11–13.)

Plaintiffs do not oppose the dismissal of their individual-capacity claims against Walsh and Lorge, provided the Band's official-capacity claims are sufficient to invoke the doctrine of *Ex parte Young*, 209 U.S. 123 (1908).  (Pls.' Opp'n [Doc. No. 326] at 1 (citing Pls.' July 29, 2020 Summ. J. Opp'n [Doc. No. 173] at 52).)

The Court finds that Plaintiffs' claims against Walsh and Lorge are based on actions taken in their official capacities.  As the Band acknowledges, "[P]laintiffs' claims arise directly from the official actions of Walsh as County Attorney and Lorge's predecessor as

25

County Sheriff, and the relief plaintiffs seek is directed specifically to Walsh and Lorge as County Attorney and County Sheriff." (*Id*. at 3.) Also, the Band states that it has "made clear that they are not seeking attorneys' fees or costs from Walsh and Lorge in their individual capacities and, therefore, there is no dispute before the Court with respect to such claims." (*Id*. at 2.) Previously, when the Band addressed Defendants' Eleventh Amendment immunity argument in 2020, they acknowledged that the "individual-capacity claims against Walsh and Lorge arise under the *Ex parte Young* doctrine and were made to ensure that plaintiffs' request for declaratory and injunctive relief would survive an assertion of Eleventh Amendment immunity." (Pls.' July 29, 2020 Opp'n at 52.) Plaintiffs appear to have asserted the individual-capacity claims for strategic reasons, as opposed to the capacity in which Walsh and Lorge acted. Under these circumstances, the Court dismisses the Band's individual-capacity claims against Walsh and Lorge.

Because Walsh and Lorge are entitled to the dismissal of Plaintiffs' individual-capacity claims on this basis, the Court declines to address their additional arguments in support of dismissal, i.e., that these claims are non-justiciable and Lorge is not subject to any allegations in the Complaint.

For all of the foregoing reasons, the portion of Defendants' motion seeking to dismiss the individual-capacity claims against Walsh and Lorge is granted.

### 2.    Official Capacity Claims Against Walsh and Lorge

#### a.    Applicability of *Ex parte Young*

As noted, Plaintiffs did not oppose the dismissal of their individual-capacity claims against Walsh and Lorge, provided the *Ex parte Young* doctrine applies to the Band's

official-capacity claims against Walsh and Lorge.   The Court need not reach this issue, however.   *Ex parte Young* represents an exception to Eleventh Amendment immunity.  209 U.S. at 159–60.  Under the doctrine, "a private party can sue a state officer in his official capacity to enjoin a prospective action that would violate federal law."   *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011).   The state official must have "some connection with the enforcement of the [challenged] act."   *Reprod. Health Servs. of Planned Parenthood v. Nixon*, 428 F.3d 1139, 1145 (8th Cir. 2005) (citing *Ex parte Young*, 209 U.S. at 157).   "Sovereign immunity, however—as well as the *Ex parte Young* exception to it—generally applies only to state officials, not county officials.   *Schultz v. Alabama*, 42 F.4th 1298, 1314 (11th Cir. 2022) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) (noting that Eleventh Amendment immunity does not extend to counties and similar municipal corporations.)).

When ruling on the parties' earlier summary judgment motions in December 2020, the Court found Eleventh Amendment immunity was inapplicable to the official-capacity claims against Walsh and Lorge.  (Dec. 21, 2020 Order at 41–42.)  The Court noted that the Supreme Court has consistently declined to extend Eleventh Amendment immunity to counties, limiting its protection to "states and arms of the State."  (*Id*. at 41 (citing *N. Ins. Co. v. Chatham Cnty.*, 547 U.S. 189, 193 (2006)).)  Finding that county officials Walsh and Large were not functioning as "arms of the state," the Court concluded they were not entitled to Eleventh Amendment immunity.  (*Id*. at 43.)

The Court continues to hold that Walsh and Lorge (and Lorge's predecessor, Lindgren) are not acting as state officials or "arms of the state," for the reasons previously

identified.  (*Id.*)  Moreover, the Opinion and Protocol is a county policy, and Plaintiffs seek no monetary relief.  *See Schultz*, 42 F.4th at 1314 (finding Eleventh Amendment immunity inapplicable to county sheriff where he was not acting as a state official with respect to county's bail system and arrestee was seeking injunctive relief, as opposed to monetary relief).

Because Walsh and Lorge "are not entitled to Eleventh Amendment immunity in the first instance, [the Court] need not reach the *Ex parte Young* analysis."  *Id.*  Plaintiffs acknowledge this corollary themselves.  They observe that because the Court previously found Walsh and Lorge, as county officials, were not entitled to Eleventh Amendment immunity, "the Court did not need to address the applicability of *Young* or to decide whether plaintiffs' individual-capacity claims were necessary to invoke *Young*."  (Pls.' Opp'n at 8–9 (citing Dec. 21, 2020 Order at 41–43).)  Accordingly, because Defendants are not entitled to Eleventh Amendment immunity, the Court need not apply *Ex parte Young*.[10]

### b.    Redundancy

Walsh and Lorge also move to dismiss the official-capacity claims against them, arguing they are redundant of the Band's claims against the County. (W&L's Mem. at 11–

---

[10] However, if Walsh and Lorge could be viewed as state officials or "arms of the state," *Ex parte Young* would apply as an exception to sovereign immunity.  Plaintiffs seek declaratory and prospective injunctive relief to prohibit Walsh and Lorge from violating federal law.  *281 Care Comm.*, 638 F.3d at 632.  Moreover, both Walsh and Lorge, in their official capacities, have "some connection with the enforcement of the [challenged] act."  *Reprod. Health Servs.*, 428 F.3d 1139.

13 (stating, "Because a suit against a government official in his or her official capacity is a suit against the official's office, official-capacity claims against a government officer should be dismissed as redundant when the employing governmental entity is also a party.").)  Pursuant to Rule 65(d)(2)(B), Walsh and Lorge contend that as "officers, agents, servants, employees, [or] attorneys" of a party, they would be bound to comply with any injunctive relief, even if they were dismissed as parties.  (*Id.*)

The Band opposes the motion on several bases, including that dismissal of the official-capacity claims is discretionary; the claims against Walsh and Lorge are claims against independently elected officials rather than against the "County" or "County employees;" Walsh and Lorge exercise independent prosecutorial and law enforcement authority, free of the County's supervision or control; and Defendants' argument is untimely at this stage of the litigation.  (Pls.' Opp'n at 13–16.)

The Eighth Circuit has observed that an official-capacity lawsuit against a government official is equivalent to a suit against the employing governmental entity, such that the official-capacity suit "should be dismissed as redundant if the employing entity is also named."  *King v. City of Crestwood, Mo.*, 899 F.3d 643, 650 (8th Cir. 2018) (citing *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010)); *see also Banks v. Slay*, 875 F.3d 876, 878 (8th Cir. 2017) ("[A]n official-capacity suit is a suit against a government entity in all respects other than name[.]") (quotations omitted).  Unlike this case, the dismissal of such official-capacity claims often arises in the context of § 1983 or

*Monell* claims for damages.[11]  *See, e.g., Veatch*, 627 F.3d at 1257 (finding official-capacity § 1983 claim against arresting police officer redundant of claim against city/employer); *Artis v. Francis Howell N. Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1182 (8th Cir. 1998) (affirming dismissal of official-capacity § 1983 racial discrimination claim against school band director as redundant of claim against school district); *Corrigan v. City of Savage*, No. 18-cv-2257 (ADM/BRT), 2019 WL 2030002, at *11 n.14 (D. Minn. Jan. 14, 2019) (dismissing official-capacity *Monell* claim against sheriff as redundant of claim against county).  Under the unique facts here, however, the Band seeks declaratory and injunctive relief that would most directly come from Walsh and Lorge.

Relying on Federal Rule of Civil Procedure 65, Defendants argue that because Walsh and Lorge would be obliged to comply with any injunction the Court might issue, they should be dismissed as redundant defendants.  (W&L's Mem. at 11–13.)  Rule 65 concerns injunctions and restraining orders, and provides that the persons bound by such orders include "the parties' officers, agents, servants, employees, and attorneys," subject to receiving actual notice.  Fed. R. Civ. P. 65(d)(2)(B).  However, the only authority on which Defendants rely that actually involved Rule 65(d) in finding a defendant redundant and subject to dismissal, is *Anderson v. Indep. Sch. Dist. No. 97*, No. 98-cv-2217 (JRT RLE), 2001 WL 228424, at *2 (D. Minn. Feb. 21, 2001).  That case involved the dismissal of an individual defendant because he was an employee of the governmental entity, a

---

[11] Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), a municipality can be liable under § 1983 if an "action pursuant to official municipal policy of some nature caused a constitutional tort."

school district, against whom any injunction could be adequately tailored to apply to the employee. *Id*. However neither that case, nor Rule 65(d) itself, mandate dismissal here.

Unlike the individual defendant in *Anderson* who was employed by the school-district defendant, it is not entirely clear whether Walsh and Lorge are "employees" of the County. While they self-identify as county employees for purposes of their redundancy argument, they have also argued, unsuccessfully, that they are state employees in order to invoke sovereign immunity.[12] (W&L July 8, 2020 Mem. Supp. Summ. J. [Doc. No. 164] at 39–42; W&L Aug. 12, 2020 Opp'n Mem. [Doc. No. 198] at 9.) Strictly speaking, Walsh and Lorge are elected public officials. Minn. Stat. § 382.01. They can only be removed from office through a voter-petition process, and the County lacks the authority to hire or fire them. Minn. Stat. §§ 351.15–.23; *id*. § 351.14, subd. 5. As elected law enforcement

---

[12] The Minnesota Supreme Court has addressed whether Walsh and Lorge are state employees in a state-court declaratory judgment action in which Walsh and Lorge sought indemnification and defense under Minnesota's State Tort Claims Act for the instant federal lawsuit. *Walsh v. State*, 975 N.W.2d 118, 123–30 (Minn. 2022). In that lawsuit, Walsh and Lorge distinguished the Band's claims against them from the Band's claims against the County, because the claims against the County were expressly not subject to state indemnification by statute, Minn. Stat. § 645.19. *Id*. at 124. In reaching its conclusion that Walsh and Lorge are not state employees for purposes of the State Tort Claims Act, the Minnesota Supreme Court compared the language of that statute with the Municipal Tort Claims Act, noting that Walsh and Lorge were indisputably covered "employees and officers of the County" under the terms of the latter statute. *Id*. at 127. Rejecting Walsh and Lorge's argument that they were state employees by virtue of their statutory authority to enforce state criminal laws, the Minnesota Supreme Court stated that "carrying out such duties is part of performing their role as a county official." *Id*. at 129. Further, the Minnesota Supreme Court considered the alleged conduct at issue in the instant lawsuit for which Walsh and Lorge sought indemnification, finding such conduct was "undertaken in their general roles as county attorney and county sheriff," rather than pursuant to a duty delegated by the state. *Id*. at 130.

officials, they maintain independent authority and discretion.  Minn. Stat. § 387.03 ("sheriff shall keep and preserve the peace of the county"); *Gramke v Cass Cnty.*, 453 N.W.2d 22, 26 (Minn. 1990) (describing county sheriff's "broad grant of authority" to keep and preserve the peace); Minn. Stat. § 388.051, subd. 3 (granting county attorneys authority to adopt their own charging and plea negotiation policies and procedures).  In other contexts under Minnesota law, courts have not treated county officials as employees.  *Spaulding v. Bd. of Cnty. Comm'rs*, 238 N.W.2d 602, 604 (1976) (stating, in retired sheriff's case against county for accrued sick leave, "There is a well-recognized distinction between county employees and county officers. The sheriff is a county officer.") (citations omitted); *see also* Minn. Stat. § 179A.03, subd. 14(a)(1) (stating that elected public officials are not employees of a public entity for purposes of public employment labor relations); *but see* Minn. Stat. § 176.011, subd. 9(a)(3), (6) (listing as "employees" for purposes of state workers' compensation, a sheriff, if engaged in law enforcement or pursuit of a suspect, and "an elected [] official [] of a county," provided the county has adopted an ordinance or resolution to that effect).

Somewhat confusingly, Walsh and Lorge assert, on the one hand, "Plaintiffs have not asserted any claims directly against the County," and that "[a]ll of Plaintiffs' claims are asserted against the County Attorney and the County Sheriff." (W&L's Reply [Doc. No. 336] at 6.)  On the  other hand, they state, "Plaintiff's complaint asserts claims directly against Mille Lacs County and attributes to it all the allegations against Walsh and Lorge." (*Id*. at 7.)

Regardless of whether Plaintiffs' claims against the County are "direct" or whether Walsh and Lorge can be characterized as "employees," Defendants recognize the central role of the Individual Defendants in this case. As Plaintiffs note, their official-capacity claims against Walsh and Lorge "are best understood as claims against the County Attorney and County Sheriff as independently elected officials, not as claims against the County." (Pls.' Opp'n at 15.) Unlike typical cases in which individual defendants are dismissed for having limited involvement in the conduct in question, the Individual Defendants here are the primary actors—Walsh drafted the Opinion and Protocol, and Lorge, as the official-capacity replacement for former Sheriff Lindgren, enforced it. *See, e.g.*, *Corrigan*, 2019 WL 2030002, at *11 n.14 ("Because Corrigan has not alleged any specific act or omission against [Sheriff] Hennen, the [§ 1983] claim against Hennen in his official capacity should be dismissed as redundant[.]").

In *American Civil Liberties Union of Minnesota v. Tarek Ibn Ziyad Academy*, 788 F. Supp. 2d 950, 958–59 (D. Minn. 2011), the court declined to dismiss official capacity claims against the individual defendants on the basis of redundancy. The court pointed to evidence and allegations that the individuals there, not unlike the allegations against Walsh and Lorge here, had "taken actions as individuals that violate the law." Similarly, in *Chase v. City of Portsmouth*, 428 F. Supp. 2d 487, 490 (E.D. Va. 2006), the court observed that "[a]lthough it is well-settled that damages can only be assessed against the City of Portsmouth, the Council Members who are named in the Third Amended Complaint are ultimately responsible for denying the Use Permit Application." The court found that "where elected officials are alleged to have violated federal laws protecting a local

33

constituency," the official-capacity claims should remain in the case "even though damages cannot be obtained from [the elected officials] [.]" *Id.* Here, the Band does not seek money damages, but instead seeks declaratory and injunctive relief.

Based on the unique roles of Walsh and Lorge, the Court finds it appropriate that they should remain in the case. Accordingly, the Court denies this portion of Defendants' summary judgment motion.

### 3. Qualified Immunity for Attorneys' Fees

Walsh and Lorge also argue that they are entitled to qualified immunity from Plaintiffs' demand for attorneys' fees and costs for the claims asserted against them in their individual capacities.[13] Because the Court has dismissed Plaintiff's individual capacity claims, *see Pearson v. Callahan.* 555 U.S. 223, 231 (2009), and, in any event, Plaintiffs maintain that they seek no such relief from Walsh and Lorge, (Pls.' Opp'n at 7, 11), the Court denies this portion of Defendants' motion as moot.

### B. Plaintiffs' Motion for Summary Judgment [Doc. No. 317]

### 1. Preliminary Dispute Regarding Factual Record

Because the Court found the Band had standing to pursue its claims in the December 2020 Order, and subsequently resolved the boundary dispute in the March 2022 Order, the Band argues that the Court may now rule on the merits of this case—that is, the extent of

---

[13] In the Complaint, Plaintiffs seek "an award of their costs and attorneys' fees in this action," (Compl. at 8), however, Plaintiffs cite no authority for such an award, nor do Plaintiffs seek such relief in their Motion for Summary Judgment. Accordingly, the Court does not address it.

the Band's law enforcement authority on all lands within the Reservation.  (Pls.' Mem. [Doc. No. 319] at 4–5.)

However, after filing its response in opposition, and prior to the hearing on the instant motions, Defendants sought permission to file a supplemental response to Plaintiffs' motion "due to the peculiar procedural and substantive effect of Plaintiffs having established Article III standing by a motion for summary judgment." (Jt. Letter [Doc. No. 343] at 2.)  Defendants argued that if the Court were to rely upon the same factual record from Plaintiffs' motion on standing to determine the merits of Plaintiffs' instant motion, the Court would lack an adequate factual basis to address the merits of the Band's claims of interference and deterrence.  (*Id*. at 3.)  Defendants asserted that the standard Plaintiffs met for purposes of establishing standing was far lower than the standard required "for proving the merits of a claim through summary judgment or at trial." (Aug. 11, 2022 Tr. [Doc. No. 340] at 27.)  Defendants therefore requested the opportunity to present rebuttal evidence and supplemental briefing related to disputed instances of actual interference and deterrence.  (*Id*.)

In response, the Band acknowledged that the Court's December 2020 Order was not a ruling on the merits, as the Court did not determine whether the Defendants' conduct was unlawful, nor did it resolve the boundary issue.  (Pls.' Mem. at 4–5.)  However, as the Court has now resolved the boundary dispute, and because the Band seeks only declaratory and injunctive relief regarding the scope of the Band's inherent law enforcement authority, as called into question by the Opinion and Protocol, and does not seek damages for any instance of interference or deterrence, the Band argues that the record relevant to the relief

sought on the merits is undisputed.  (Jt. Letter at 20.)  As the Band asserts, "Given the limited relief plaintiffs seek, the only question on the merits is whether the restrictions defendants imposed on plaintiffs' exercise of law enforcement authority were unlawful, a question that turns on the scope of plaintiffs' inherent and federally delegated law enforcement authority."  (*Id.*)

Procedurally, Plaintiffs filed the summary judgment motion on standing in accordance with Rule 56.  Rule 56 permits a party to move for summary judgment, "identifying each claim or defense—or part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  Standing is "an indispensable part of the plaintiff's case," *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007) (citation omitted), and plaintiffs in other cases have moved for a summary judgment ruling on standing.  *See, e.g.*, *Wieland v. HHS*, 196 F. Supp. 3d 1010, 1013, 1015–17 (E.D. Mo. 2016) (granting plaintiffs' motion on standing and the merits on parties' cross motions for summary judgment); *Schwendimann v. Arkwright Advanced Coating, Inc.*, No. 11-cv-820 (ADM/JSM), 2012 WL 3288487, at *3–9 (D. Minn. Aug. 10, 2012) (granting plaintiffs' stand-alone motion for standing on summary judgment) *Roe v. Milligan*, 479 F. Supp. 2d 995, 997–98 & n.1, 1002–05 (S.D. Iowa 2007) (finding that plaintiffs established standing on motion for summary judgment on the merits); *Americans United for Separation of Church & State v. Prison Fellowship*, No. 4:03-cv-90074, 2005 U.S. Dist. LEXIS 47991, at *9–32, 53–54 (S.D. Iowa 2005) (granting plaintiffs' motion for summary judgment on standing on parties' cross motions for summary judgment on standing and the merits); *DMJ Assocs., L.L.C. v. Capasso*, 288 F. Supp. 2d 262, 270–72 (E.D.N.Y. 2003) (granting

plaintiffs' stand-alone motion for summary judgment on standing).  As a practical matter, because Defendants did not move to dismiss on the basis of standing, but stated that they did not waive the defense during discovery, (Jt. Letter at 21), Plaintiffs found it necessary and appropriate to resolve the issue and could only do so through a summary judgment motion.

At the November 2, 2022 status conference at which the parties addressed Defendants' request for supplemental briefing, the Court denied the request, finding that the record relevant to the merits of the Band's claims is undisputed.  (Nov. 2, 2022 Tr. [Doc. No. 348] at 28–29.)  The relevant and undisputed facts material to the question of the Defendants' restrictions on the Band's inherent law enforcement authority are tethered entirely to the Opinion and Protocol and its implementation and enforcement.  There is no dispute on this record that Defendants placed restrictions on the Band's law enforcement authority as to geography and scope of authority.  (Opinion at 14 (opining that Band's inherent tribal jurisdiction is limited to "Indian County," which is limited to tribal trust lands); Protocol at 1 (addressing Band's officers' authority to arrest, issue citations, and conduct investigations (including taking statements, making investigative stops and traffic stops, and gathering evidence)).)  The restrictions on the Band's scope of authority further delineated between the persons subject to the Band's authority (Band members, non-member Indians, and non-members), and the Band's subject matter jurisdiction (specifically, the authority to enforce state law).  (Opinion at 14 (opining that Band officers have inherent criminal jurisdiction over Band members and may have such jurisdiction over other Indians on trust lands, except for major or crimes or felonies); Protocol at 1

(providing that Band officers may not issue state law citations, apply for search warrants in state court, or conduct investigations of violations of state law)).)

It is undisputed that Defendants enforced the restrictions. Then-Sheriff Lindgren testified that he instructed his staff and deputies to follow the Opinion and Protocol and to document any perceived violations by Band police officers. (Lindgren Decl. ¶¶ 3, 4.) Lorge, an officer at the time, testified that they followed them. (Lorge Decl. ¶ 4.) Further, Walsh testified that following the Opinion and Protocol was not voluntary. (Walsh Dep. at 305.) None of these facts are in dispute, as evidenced by the Opinion and Protocol, the declarations of Walsh and Lorge (and Lorge's predecessor, Lindgren), and their deposition testimony. The Court will consider only these undisputed facts when analyzing the merits of Plaintiffs' claims for declaratory and injunctive relief.

Additional facts concerning specific incidents of interference and deterrence, some of which the Band relied upon to establish standing (and which Defendants had a full opportunity to rebut), are unnecessary to address the merits of Plaintiffs' claims for relief. Granted, facts relating to specific incidents of deterrence and interference may very well be in dispute. If the Band had sought damages for such incidents, incident-specific facts might be relevant on summary judgment. However, the Band seeks only declaratory and injunctive relief, for which the record of undisputed facts provides a sufficient basis for the Court to rule on the merits.

### 2. General Principles of Tribal Sovereignty

While the primary jurisdictional dispute here concerns tribal authority to enforce state criminal law, criminal jurisdiction in Indian country implicates three levels of

government:  federal, state, and tribal.  Attempting to determine which governing entity possesses law enforcement authority to investigate and prosecute crimes is a complicated matter, and the source of the parties' dispute here.

"A basic attribute of full territorial sovereignty is the power to enforce laws against all who come within the sovereign's territory, whether citizens or aliens." *Duro v. Reina*, 495 U.S. 676, 685 (1990).  As a general principle, Indian tribes retain "attributes of sovereignty over both their members and their territory." *Cabazon Band*, 480 U.S. at 207 (citation omitted), *superseded on other grounds by* 25 U.S.C. § 2701; *see also Plains Commerce Bank v. Long Fam. Land & Cattle Co.*, 554 U.S. 316, 330 (2008).  At one time, Indian tribes "exercised virtually unlimited power over their own members as well as those who were permitted to join their communities." *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 851 (1985).  However, courts have long recognized the "unique and limited character" of Indian tribes' sovereignty due to the tribes' incorporation into the United States.  *Cooley*, 141 S. Ct. at 1642 (citing *United Wheeler*, 435 U.S. at 323).  Accordingly, tribes do not possess full attributes of sovereignty.  *Wheeler*, 435 U.S. at 323 (citation omitted).

A prerequisite to the exercise of tribal law enforcement authority is the establishment of such authority.  In *Ortiz-Barraza v. United States*, 512 F.2d 1176, 1179 (9th Cir. 1975), the court stated, "[A]s a general proposition, we have little difficulty in concluding that an Indian tribe may employ police officers to aid in the enforcement of tribal law and in the exercise of tribal power." (citing, *inter alia*, 25 U.S.C. § 13 (providing that BIA may expend appropriations "for the benefit, care, and assistance of the Indians

throughout the United States for . . . the employment of [] Indian police."); *see also Restatement of the Law of Am. Indians* § 24 ("The power to establish law-enforcement agencies such as police is inherent in tribal nationhood, and is subject to enhancement or restriction by treaty or federal statute.")

As the Court discusses below, the Supreme Court has generally conditioned tribes' law enforcement authority based on issues of "who, what, and where," that is, (1) the status of the person over whom the tribe seeks to assert jurisdiction (e.g., member, nonmember, or non-Indian); (2) the type of authority that the tribe seeks to exert (e.g., civil/regulatory or criminal); and (3) the status of the land where the offense occurred (e.g., Indian country, portions of the reservation, or non-reservation land).

### a.      Tribal Law Enforcement Authority Over Indians

In terms of the actors involved—the "who" over whom a tribe may exercise law enforcement authority—"[a]n Indian tribe's power to punish members who commit crimes within Indian country is a fundamental attribute of the tribe's sovereignty." *Walker*, 898 F.2d at 674.

In *Duro*, 495 U.S. at 696–97, the Supreme Court held that an Indian tribe could not assert criminal jurisdiction over a nonmember Indian by requiring him to stand trial in tribal court. Nevertheless, the Court found that tribes possess certain preliminary types of law enforcement authority over "those who disturb public order on the reservation," stemming from tribes' "traditional and undisputed power to exclude persons whom they deem to be undesirable from public lands." 495 U.S. at 697.   Thus, as to tribal authority over nonmembers, "[w]here jurisdiction to try and punish an offender rests outside the tribe,

tribal officers may exercise their power to detain the offender and transport him to the proper authorities." *Id*.

In response to *Duro*, Congress subsequently passed 25 U.S.C. § 1301—sometimes referred to as "the *Duro* fix." *United States v. Lara*, 541 U.S. 193, 215–15 (2004) (Thomas, J., concurring). The statute provides that tribes possess the inherent authority to exercise criminal jurisdiction over *all* Indians, including nonmembers of the tribe in question. 25 U.S.C. § 1301(2) (providing that "powers of self-government" means "the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians").

By statute, prosecutorial authority for certain "major crimes" and felonies committed by Indians in Indian country falls within federal jurisdiction. 18 U.S.C. § 1153 (stating that any Indian who commits these offenses "shall be subject to the same law and penalties as all other persons committing any of [these] offenses, within the exclusive jurisdiction of the United States."). Major crimes include murder, manslaughter, kidnapping, maiming, incest, assault of a person under age 16, felony child abuse or neglect, arson, burglary, and robbery. *Id.* § 1153(a).

### b.    Tribal Law Enforcement Authority Over Non-Indians

While tribes generally possess law enforcement authority over Indians for offenses in Indian country, the Supreme Court has held that tribes lack the inherent sovereign authority to subject non-Indians to criminal tribal jurisdiction. *Oliphant v. Suquamish Tribe*, 435 U.S. 191, 212 (1978). In other words, a tribe's inherent sovereign authority

does not generally permit it to try and punish non-Indian offenders for violations of tribal, state, or federal law, unless Congress authorizes such jurisdiction.[14]  *Id.* at 210.

However, based on tribal law enforcement authority derived from the tribes' traditional power to exclude, *see, e.g.*, *Duro*, 495 U.S. at 697, courts have extended some forms of tribal law enforcement authority over non-Indians.   In *United States v. Terry*, 400 F.3d 575, 580 (8th Cir. 2005), the Eighth Circuit considered whether the search of a non-Indian's vehicle by tribal officers on the Pine Ridge Indian Reservation violated the Fourth Amendment.   Tribal officers responding to a report of domestic violence at a tribal member's private residence on the reservation found the defendant, Terry, sitting in a pickup truck parked outside the home.  *Id.* at 578.   Smelling alcohol on Terry's breath, tribal officers handcuffed him, and subsequently observed ammunition on the truck's dashboard.  *Id.*  A search of Terry's vehicle revealed a rifle and alcohol.  *Id.*  Tribal officers arrested Terry on tribal violations for driving while intoxicated, spousal abuse, liquor violations, and disorderly conduct.  *Id.*   When the officers determined that Terry was not an Indian, they promptly called the local county sheriff, and temporarily held Terry in the tribal jail until the sheriff could pick him up the following morning.  *Id.* at 579.

In his subsequent federal prosecution for unlawful possession of a firearm, Terry argued that as a non-Indian, tribal officers lacked jurisdictional authority over him, rendering his search and seizure invalid.  *Id.*  Relying on *Duro*'s holding that tribal officers

---

[14] One such specific grant of congressionally-conferred authority arises under the Violence Against Women Act, 25 U.S.C. § 1304(b)(4)(B).

are authorized to detain and transport offenders based on the tribe's sovereign authority to exclude non-Indians from tribal lands, the Eighth Circuit reasoned, "because the power of tribal authorities to exclude non-Indian violators from the reservation would be meaningless if tribal police were not empowered to investigate such violations, tribal police must have such power." *Id*. (citing *Duro*, 495 U.S. at 697). However, the court cautioned that tribal officers' exercise of such investigative authority was subject to Fourth Amendment standards prohibiting unreasonable search or seizure. *Id*. (citing 25 U.S.C. § 1302(2)). Accordingly, the Eighth Circuit held that tribal officers had the authority to seize Terry and search him, and further found the search met Fourth Amendment standards. *Id*. at 580–81.

Relying on federal authority, including *Terry*, the Minnesota Supreme Court has also held that a tribal police officer is authorized to detain, investigate, and remove a non-Indian who violates state law on the reservation, based on the tribe's traditional power to exclude.[15] *State v. Thompson*, 937 N.W.2d 418, 421–22 (Minn. 2020). In *Thompson*, the tribal officer observed that the defendant, who had driven into a hospital parking lot, had watery and bloodshot eyes and slurred speech. *Id*. at 419. The tribal officer's "investigation" consisted of conducting preliminary breath tests and field sobriety tests with the defendant's consent. *Id*. at 419–22. After the defendant failed the tests, the tribal officer then contacted the county sheriff and arranged for transfer of custody. *Id*. Because

---

[15] Minnesota courts have recognized that "state court jurisdiction over matters involving Indians is governed by federal statute or case law." *Stone*, 572 N.W.2d at 728 (citing *Gavle v. Little Six, Inc*., 555 N.W.2d 284, 289 (Minn. 1996)).

the tribal officer was acting within his proper authority to detain and transport the defendant, the detention was lawful. *Id*. at 421–22 (citing *Terry*, 400 F.3d at 579–80).

In addition to tribal authority over non-Indians based on the traditional power to exclude, in *Montana v. United States*, the Supreme Court announced two exceptions to the "general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." 450 U.S. 544, 564–66 (1981) (citing *Oliphant*, 435 U.S. at 212). The second exception is relevant here.[16]

Under the second exception, a "tribe may . . . retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id*. at 566. While *Montana* concerned regulatory authority, it applies to both regulatory and adjudicatory tribal jurisdiction. *Att'y's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of Miss. in Iowa*, 609 F.3d 927, 936 (8th Cir. 2010) ("*Montana*'s analytic framework now sets the outer limits of tribal civil jurisdiction—both regulatory and adjudicatory—over nonmember activities on tribal and nonmember land."). Additionally, while the second *Montana* exception refers to tribes' inherent power to exercise civil authority over non-Indians, in *Cooley* and other cases discussed herein, courts have applied the second *Montana* exception in the context of

---

[16] Under the first exception, a "tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana*, 450 U.S. at 566.

tribes' law enforcement authority over potential violations of criminal law.  *See, e.g.*, *Cooley*, 141 S. Ct. at 1641–44.

The Supreme Court's ruling in *Strate v. A-1 Contractors*, 520 U.S. 438, 456 (1997), involved the question of tribal jurisdiction over tort claims arising from an accident on a state highway running through a reservation, involving a non-Indian driver, who was the widow of a tribal member and mother of tribal members.  *Strate* implicated the first *Montana* exception, which the Court found inapplicable, noting, among its reasons, that the right-of-way was open to the public and traffic on it was subject to the state's control. *Id*. at 455–56.  In a footnote, however, the Court commented, "We do not here question the authority of tribal police to patrol roads within a reservation . . . and to detain and turn over to state officers nonmembers stopped on the highway for conduct violating state law."  *Id*. at 456 n.11.

### 3.  *United States v. Cooley*

In 2021, the Supreme Court considered the second *Montana* exception in *Cooley*, 141 S. Ct. at 1643, finding the exception fit the facts of the case "like a glove."  In *Cooley*, a tribal police officer approached a truck parked on a public right-of-way within an Indian reservation, to determine whether the occupant required roadside assistance.  *Id*. at 1641–42.  The officer noticed that the driver had watery, bloodshot eyes, appeared to be non-native, and that two semiautomatic rifles were lying on the front seat.  *Id*. at 1642.  Fearing violence, the tribal officer ordered Cooley out of the truck, conducted a pat-down search, and called tribal and county officers for assistance.  *Id*.  As the tribal officer awaited back-up, he returned to the truck, where he further observed a glass pipe and plastic bag

containing methamphetamine. *Id.* When the other officers arrived, including a BIA officer, they directed the tribal officer to seize all contraband in plain view, which led the tribal officer to discover additional methamphetamine. *Id.* Cooley moved to suppress the drug evidence, which the district court granted, finding the tribal police officer lacked the authority to investigate "nonapparent violations of state or federal law by a non-Indian on a public right-of-way crossing the reservation." *Id.* The Ninth Circuit affirmed the suppression determination, prompting the government to appeal. *Id.*

On certiorari, the Supreme Court observed that in *Duro*, it had previously recognized that even where jurisdiction to try and punish an offender lies outside the tribe, tribal officers may still "detain the offender and transport him to the proper authorities." *Id.* at 1644 (citing *Duro*, 495 U.S. at 687–88). In *Cooley*, the Court found the authority to search a non-Indian prior to transport was ancillary to the authority it had previously recognized. *Id.* (citing *Ortiz-Barraza*, 512 F.2d at 1180–81). In fact, the Court observed that "several state courts and other federal courts have held that tribal officers possess the authority at issue here." *Id.* (citing, *inter alia*, *Terry*, 400 F.3d at 579–80).

The Court acknowledged that while it had traced the relevant tribal authority in *Duro* to a tribe's "right to exclude non-Indians from reservation land," it based its decision in *Cooley* on a tribe's "'inherent sovereignty independent of th[e] authority arising from their power to exclude'"—the authority to protect the health or welfare of the tribe. *Id.* at 1643–44 (citation omitted). The Court reasoned that to deny tribal police officers the authority to search and detain criminal suspects for a reasonable time "would make it difficult for tribes to protect themselves against ongoing threats." *Id.* at 1643. Examples

of such threats that the Court identified were "non-Indian drunk drivers, transporters of contraband, or other criminal offenders operating on roads within the boundaries of a tribal reservation." *Id.* (citing *State v. Schmuck*, 850 P.2d 1332, 1341 (Wash. 1993) ("Allowing a known drunk driver to get back in his or her car, careen off down the road, and possibly kill or injure Indians or non-Indians would certainly be detrimental to the health or welfare of the Tribe.")). Accordingly, the Court reaffirmed tribal authority to detain and transport non-Indian offenders, and held that, ancillary to that authority, the tribal officer was within his authority to conduct a limited pat-search of Cooley, while waiting for the appropriate authorities to arrive. *Id.* at 1644–45.

Although the Supreme Court issued *Cooley* relatively recently, some federal and state courts have since applied the decision in cases involving tribal law enforcement authority over non-Indians. For example, in *United States v. Metts*, No. 3:21-CR-91 (DRL-MGG), 2022 WL 1421370, at *4 (D.N.D. May 4, 2022), a non-Indian defendant charged with unlawful possession of a firearm moved to suppress evidence on several bases, including the tribal officer's jurisdictional authority. Relying on *Cooley*, the court found that tribal officers had the authority to investigate a state or federal crime committed on tribal land, to search and detain a suspect regardless of tribal status prior to transporting him or her to the proper authorities, and, pursuant to a federal cross-deputization agreement, make a warrantless arrest for a felony, supported by probable cause. *Id.* In particular, tribal officers had interviewed the defendant prior to transporting him to jail and conducted a search of his rented vehicle. *Id.* at *2–3.

Similarly, in *State v. Suelzle*, 965 N.W.2d 855, 859–60 (N.D. 2021), the North Dakota Supreme Court affirmed the denial of a suppression motion filed by a non-Indian defendant.  There, a federal law enforcement officer who was working for a tribal drug enforcement agency had stopped the defendant within the exterior boundaries of the reservation, after observing the defendant's vehicle swerve across the road multiple times. *Id*. at 858.  Citing *Cooley*, the court held that the officer had jurisdiction to detain the defendant for a reasonable time while awaiting a state officer with prosecutorial authority. *Id*.  at 860.

However, the court in *Texas v. Astorga*, 642 S.W.3d 69, 81–83 (Tex. Ct. App. 2021), distinguished *Cooley* from the facts before it.  In *Astorga*, a tribal police officer observed a traffic violation on tribal land.  *Id*. The officer stopped the vehicle, at which time he observed open alcoholic beverage containers, also in violation of the tribe's traffic code. *Id*.  Joined by another tribal officer, they performed a brief pat search of the non-Indian driver, Astorga, and, when retrieving the open containers from the car, discovered a clear glass pipe on the floorboard that appeared to contain methamphetamine, in violation of the tribe's peace code.  *Id*. at 74.  The officers then handcuffed Astorga, conducted a more thorough search of his person, read him and his passenger their *Miranda* rights, and transported them to tribal police headquarters for processing.  *Id*.  At the headquarters, officers conducted another search of Astorga's person before placing him in a cell.  *Id*. Based on information provided by the passenger, officers later performed a strip search of Astorga and discovered a baggie containing a substance that tested positive for

methamphetamine. *Id*. Nearly five hours after the initial stop, the tribal officers contacted the El Paso Police Department and turned the matter over to it. *Id*. at 75.

Subsequently, Astorga was indicted in state court on a felony drug charge. *Id*. He successfully moved to suppress the evidence resulting from the traffic stop, arguing that it was illegal and he was unlawfully detained for longer than necessary. *Id*. On the government's appeal, the Texas Court of Appeals held that while the initial stop and pat-down search was authorized under *Cooley*, the tribal officers' subsequent actions were not. *Id*. at 80–81. The court noted that before the tribal officers discovered the glass pipe, they could have issued citations to Astorga and released him. *Id*. at 81. However, the court found that after the tribal officers found the pipe, they "could have contacted the [El Paso Police Department] or other state officers to determine if they wished to take custody of Astorga for the alleged drug paraphernalia offense." *Id*. at 82. The court noted that had they done so, "they would have neatly fit the fact pattern in *Cooley* by temporarily detaining Astorga at the scene until [El Paso Police Department] officers arrived. But this is not what happened." *Id*. Rather, the court found that because the tribal officers lacked the authority to arrest Astorga, "and because their actions went beyond their inherent 'policing authority' as contemplated by *Cooley*," Astorga's detention was unlawful. *Id*. at 83.

### 4.    Questions Presented

The Declaratory Judgment Act provides that any federal court, "[i]n a case of actual controversy within its jurisdiction, . . . may declare the rights and other legal relations of any interested party seeking such declaration whether or not further relief is or could be sought." 28 U.S.C. § 2201. A "case of actual controversy" refers to cases and

controversies "that are justiciable under Article III." *Maytag Corp. v. Int'l Union, United Auto., Aero. & Agric. Implement Workers of Am.*, 687 F. 3d 1076, 1081 (8th Cir. 2012) (citation omitted); *see also Rosebud Sioux Tribe v. United States*, 9 F.4th 1018, 1025 (8th Cir. 2021) (stating that a claim under the Declaratory Judgment Act must involve a "substantial controversy" that presents a "concrete and specific question.") (citation omitted).

The Court has found that Plaintiffs' claims are justiciable under Article III, (Dec. 21, 2020 Order at 29–36), and they remain so. Among other things, the County continues to assert that the law enforcement authority recognized in *Cooley* is foreclosed by the Constitution and is inapplicable in a Public Law 280 state. (Defs.' Opp'n [Doc. No. 327] at 16–25.) Further, the Court finds that this case involves a "substantial controversy" that presents the following specific questions posed by the Band: (1) whether the Band's inherent and federally delegated law enforcement authority extends to all lands within the Mille Lacs Reservation; (2) whether such authority includes the authority to investigate violations of federal and state criminal law; and (3) whether, with respect to non-Indians, the Band has investigatory authority in addition to the authority to detain and turn over violators to jurisdictions with prosecutorial authority. (Pls.' Mem. at 4–5.)

Before turning to these questions, however, the Court briefly addresses two matters that are *not* at issue here. First, the parties do not appear to dispute the Band's authority to proscribe and enforce tribal laws applicable to Band members and nonmember Indians. *See* 25 U.S.C. § 1301(2) (recognizing Indian tribes' powers of self-government, and providing that "powers of self-government . . . means the inherent power of Indian tribes,

hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians."); *Lara*, 541 U.S. at 210 (holding that tribes may prosecute nonmember Indians as an exercise of their inherent tribal authority); *Wheeler*, 435 U.S. at 324–25 (finding tribe's power to prosecute its own members is inherent); *Walker*, 898 F.2d at 674 ("An Indian tribe's power to punish members who commit crimes within Indian country is a fundamental attribute of the tribe's sovereignty.").   In exercising such authority, tribes are subject, by statute, to several requirements identical to those found in the Bill of Rights, including, for example, prohibitions against unreasonable search and seizure, double jeopardy, and compelled testimony against oneself.  25 U.S.C. § 1302(a).  In addition, Congress has generally limited tribes' authority to prosecute Indians for offenses subject to punishments of greater than one year of imprisonment, a fine of $5,000, or both.  *Id*. § 1302(a)(7)(B).

Second, this case is not about the Band's authority to try and punish non-Indians in tribal court.  Defendants contend that Plaintiffs' requested relief would constitute "a de facto overruling of *Oliphant* [], which held that '[b]y submitting to the overriding sovereignty of the United States, Indian tribes therefore necessarily give up their power to try non-Indian citizens of the United States except in a manner acceptable to Congress.'" (Defs.' Opp'n at 16.)  Defendants mischaracterize the relief the Band seeks.  The Band does not claim the general authority, absent congressionally conferred authority, to try and punish non-Indians for criminal violations in tribal court, nor has it sought declaratory and injunctive relief in this regard.  Accordingly, Defendants' arguments concerning criminal jurisdiction to try and punish non-Indian offenders are moot. (*See id*. at 16.)

> **a.**    **Whether the Band's Federally Delegated and Inherent Law Enforcement Authority Extends to All Lands Within the Mille Lacs Reservation**
>
> **(i)**    **Federally Delegated Law Enforcement Authority**

As to the geographic scope of the Band's federally delegated law enforcement authority, the Deputation Agreement between the Band and the federal government makes clear that Band officers who are deputized as SLECs possess the authority "to enforce federal laws *in Indian country*," and are "authorized to assist the BIA in its duties to provide law enforcement services and to make lawful arrests *in Indian country* within the jurisdiction of the Tribe or as described in section 5." (Deputation Agmt. at 1–2 (emphasis added).)  Section 5 of the Deputation Agreement provides that "[t]he ordinary duty stations of BIA police officers are *located within the boundaries of Indian country*." (*Id*. ¶ 5 (emphasis added).)  The Deputation Agreement further refers to Indian country, "as defined by 18 U.S.C. § 1151." (*Id*. at 2.)

As applicable here, under 18 U.S.C. § 1151, "Indian country" consists of "all land within the limits of any Indian reservation."  *See also Cabazon Band*, 480 U.S. at 208 n.5 (stating that definition of Indian country in 18 U.S.C. § 1151 applies to questions of both criminal and civil jurisdiction.") (citing *DeCoteau,* 420 U.S. at 427, n.2; *State v. Davis*, 773 N.W.2d 66, 68 n.2 (Minn. 2009) (applying definition of Indian country under 18 U.S.C. § 1151 to jurisdictional dispute involving tribal or state courts).  Here, in the M-Opinion letter to Walsh, the DOI Solicitor stated that under federal law, "all of the Band's reservation is included [in Indian country], not just the trust lands." (M-Opinion at 2 n.1.)

In addition, this Court has ruled that "[o]ver the course of more than 160 years, Congress has never clearly expressed an intention to disestablish or diminish the Mille Lacs Reservation." (Mar. 4, 2022 Summ. J. Order on Geo. Boundaries at 92–93.) Thus, the Court has affirmed the Band's position that "the Mille Lacs Reservation's boundaries remain as they were under Article 2 of the Treaty of 1855." *Id.* Accordingly, pursuant to the Deputation Agreement, the Band's federally delegated law enforcement authority applies within Indian country, which consists of all lands within the boundaries of the Mille Lacs Indian Reservation, as established by the 1855 Treaty.[17]

### (ii)   Inherent Law Enforcement Authority

Turning to the geographic scope of the Band's *inherent* law enforcement authority, the Band argues that such authority encompasses the entire Reservation, and *Cooley*'s

---

[17] While the question the Band presents here concerns the geographic reach of its federally delegated authority, the Court briefly addresses the geographic scope of any state delegated authority. As noted earlier, under state law, Minn. Stat. § 626.90 contemplates that the Band and County will enter into a cooperative law enforcement agreement. Under such an agreement, and subject to certain preliminary requirements, the Band and County share concurrent law enforcement authority, under certain conditions. Minn. Stat. § 626.90, subd. 2(c). The scope of such authority is limited by geography. Under the statute, the Band has concurrent jurisdictional authority over all persons on trust lands, over all Band members within the boundaries of the 1855 Treaty, and over any person who commits a crime or attempts to do so in the presence of a Band officer within the boundaries of the 1855 Treaty. *Id.* However, the statute also provides that "[n]othing in this section shall be construed to restrict the band's authority under federal law." *Id.*, subd. 7. Accordingly, if federal law holds that a tribe's inherent law enforcement authority over violations of state and federal law extends across all reservation lands, it would appear to control. *See Thompson*, 937 N.W.2d at 422 (affirming district court's finding that the state did not have the power to grant or deny law enforcement authority to Red Lake police officer where officer had inherent detain-and-remove authority to detain, investigate, eject, and transfer state-law offender to county sheriff).

recognition of tribal law enforcement authority is not specifically limited to "public rights-of-way within a reservation patrolled by tribal police." (Pls.' Mem. at 18 (distinguishing *Cooley*, 141 S. Ct. at 1646 (Alito, J., concurring)).)  In support of its position, the Band asserts the following:  (1) the *Montana* exception on which *Cooley* relies contains no such limitation; (2) criminal activity on non-Indian fee lands within a reservation threatens the health and welfare of a tribe just as criminal activity on public rights-of-way does; (3) the authority to investigate and detain non-Indians for violations of state or federal law does not unlawfully subject non-Indians to tribal law, which is just as true on non-Indian fee lands as on public rights-of-way; (4) in his concurring opinion, Justice Alito himself limited the reach of *Cooley* to public rights-of-way *patrolled by tribal police*, as any such limitation to roads patrolled by tribal police was not in the question presented to the Court, nor is it supported by *Montana*'s second exception, on which *Cooley* is grounded; and (5) any limitation based on a land's status as a public right-of way or fee land is impractical and contrary to congressional intent in defining Indian country to include all land within a reservation  (*Id*. at 16–19.)

In response, Defendants argue that the Band overstates the reach of *Cooley*, asserting that the relief the Band seeks "would extend even in non-Indian homes on non-Indian owned fee lands." (Defs.' Opp'n at 12; *see also id*. at 14.)  Defendants argue the Band's inherent law enforcement authority does not extend to non-Indian fee lands, asserting that *Cooley* affirmed inherent tribal authority in a specific set of circumstances, not present here.  (*Id*. at 12.)  For example, Defendants note that the stop in *Cooley* occurred on the Crow Reservation, a large Montana reservation spanning over two million acres; on

a public right-of-way primarily patrolled by tribal police, as Justice Alito observed; and it involved a tribal officer who was not cross-deputized with federal or state law enforcement authority.  (*Id*. at 13.)

The Court recognizes that in *Cooley*, 141 S. Ct. at 1642–45, the Supreme Court held that a tribal police officer has the inherent authority, when the tribe's health or welfare is threatened, "to detain temporarily and to search non-Indians traveling on public rights-of-way running through a reservation for potential violations of state or federal law."

Because the Supreme Court found the facts of *Cooley* fit the second *Montana* exception "like a glove," 141 S. Ct. at 1643, this Court turns to *Montana*, to inform the geographic reach of *Cooley*.  *Montana*'s second exception recognizes tribes' inherent civil authority over the conduct of non-Indians on non-Indian fee lands within a reservation. 450 U.S. at 566.  That exception contains no limitation to public rights-of-way, and expressly provides that in response to threats to a tribe's health or welfare, and as a matter of inherent sovereign power, tribal authority even extends to the conduct of non-Indians on non-Indian fee lands within a reservation.  *Id*.  In fact, as Plaintiffs note, criminal conduct that constitutes a threat to tribal health or welfare is just as likely to occur on non-Indian fee lands as on public rights of way.  (Pls.' Mem. at 16–19.)  The second *Montana* exception also lacks Justice Alito's additional limitation in *Cooley* that the public right-of-way be primarily patrolled by tribal officers.  *Cooley*, 141 S. Ct. at 1646 (Alito, J., concurring).

Defendants argue that the ownership status of the land is relevant to the question of inherent tribal law enforcement authority, asserting that *Montana*'s extension of tribal

authority has rarely been extended over nonmembers on non-Indian land.  (Defs.' Opp'n at 15–16 (citing *Plains Commerce Bank*, 554 U.S. at 330; *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 654 (2001); *Nevada v. Hicks*, 533 U.S. 353, 360 (2001)).)  But Defendants' legal authority involves *Montana*'s first exception, which grants tribes the authority to "regulate . . . the activities of nonmembers who enter into consensual relationships with the tribe or its members[.]" *Montana*, 450 U.S. at 565.  These cases, where the ownership status of land or property was directly related to the regulatory authority at issue, are inapposite. *See Plains Commerce Bank*, 554 U.S. at 330 (involving sale of non-Indian fee land to non-Indians and adjudication of resulting lawsuit in tribal court); *Atkinson Trading Co.*, 532 U.S. at 647–48 (addressing imposition of hotel occupancy tax); *Hicks*, 533 U.S. at 356 (concerning question of tribal jurisdiction over tribal member's civil rights and tort action).  Even in such cases, the Supreme Court has observed that "[t]he ownership status of land . . . is only one factor to consider in determining whether regulation of the activities of nonmembers is 'necessary to protect tribal self-government or to control internal relations.'" *Hicks*, 533 U.S. at 360 (quoting *Montana*, 450 U.S. at 564).

Notably, in *Duro*, the Supreme Court made no distinction as to whether the offending conduct occurred on non-Indian fee lands, Indian fee lands, or trust lands. *See* 495 U.S. at 697.  Rather, it referred to tribal authority to restrain persons who disturb public order "on the reservation." *Id.*  Nor did such distinctions factor into the Eighth Circuit's analysis in *Terry*, 400 F.3d at 580, a case on which the Supreme Court relied in *Cooley*. As noted, the Eighth Circuit found that tribal police officers possessed the authority to detain a non-Indian offender outside a private residence within Indian country and turn

over the offender to the proper authorities—with no discussion of trust lands, fee lands, or non-fee lands.  *Id*.  Rather, the Eighth Circuit based the tribe's authority on its "traditional and undisputed power" to exclude undesirable persons "from tribal lands," such that they have 'the power to restrain those who disturb public order *on the reservation*, and if necessary to eject them.'"  *Id*. at 579 (quoting *Duro*, 495 U.S. at 696–97) (emphasis added). In *Ortiz-Barraza*, 512 F.2d at 1180, the court expressly rejected a limitation of tribal law enforcement authority to public rights-of-way, finding that it "avail[ed] the defendant nothing," explaining, "Rights of way running through a reservation remain part of the reservation and within the territorial jurisdiction of the tribal police."

In the underlying appellate decision in *Cooley*, the Ninth Circuit held that tribal police officers lacked the power to exclude non-Indians on public rights-of-way, and could only detain and investigate a non-Indian, provided the suspect's Indian status was unknown, on such lands if there was an apparent violation of state or federal law.  919 F.3d 1135, 1141–42 (9th Cir. 2019).  However, the Supreme Court unanimously reversed such limitations.  *Cooley*, 141 S. Ct. at 1644–45.  It held that tribes have the authority to investigate and temporarily detain violators of state and federal law, without first determining the suspect's Indian status, even on public rights of way that cross tribal land, because of *Montana*'s health-or-welfare exception.

Further, the Court agrees with Plaintiffs that, from a practical standpoint, recognizing inherent tribal law enforcement authority on all lands within the Reservation would eliminate a patchwork approach to policing. (Pls.' Mem. at 19–20 (citing *Seymour v. Supt. of Wash. State Penitentiary*, 368 U.S. 351, 358 (1962)).)

Defendants assert that "[t]hat rationale does not apply in a [Public Law] 280 state, and it particularly does not apply in Mille Lacs County where the Cooperative Agreement sets forth the trust vs. non-trust lands based on maps." (Defs.' Opp'n at 30.) Subject to certain exceptions inapplicable here, through Public Law 280, Congress granted states such as Minnesota criminal jurisdiction over Indian country within the state. *Stone*, 572 N.W.2d at 728–29 (citing 18 U.S.C. § 1162, 25 U.S.C. §§ 1321–24, 28 U.S.C. § 1360). However, regardless of Minnesota's status as a Public Law 280 state, and the County's familiarity with Reservation trust lands versus non-trust lands, finding that the Band's inherent tribal authority encompasses the entire Reservation—which is supported by the statutory and legal authorities discussed above—would reduce unnecessary complications involved in a parcel-by-parcel approach to tribal law enforcement authority.

Accordingly, the Court finds that the inherent law enforcement authority that the Band possesses, discussed below, applies to all lands within the Mille Lacs Reservation.

>    **b.   Whether the Band's Federally Delegated and Inherent Law Enforcement Authority Encompasses the Authority to Investigate Violations of Federal and State Criminal Law, Including Violations by Non-Indian Offenders**

The Court combines the Band's two remaining questions[18] into a single question, because courts generally address inherent tribal law enforcement authority in cases

---

[18] The two remaining questions the Band identifies are: (1) whether the Band's inherent and federally delegated law enforcement authority includes the authority to conduct investigations of federal and state criminal law; and (2) whether, with respect to non-Indians, the Band has investigatory authority in addition to the authority to detain and turn over violators to jurisdictions with prosecutorial authority. (Pls.' Mem. at 1.)

involving non-Indian offenders.  The Court agrees with the Band that tribes' retained authority over Indians within their reservations is at least as broad as it is over non-Indians. (Pls.' Mem. at 9 (citing *Wheeler*, 435 U.S. at 326).)  Accordingly, the extent of a tribe's law enforcement authority to investigate violations of federal and state law by non-Indians informs the extent of a tribe's authority over Indians.  (*Id*.)  Thus, the Court considers whether the Band's federally delegated and inherent law enforcement authority encompasses the authority to investigate violations of federal and state criminal law, including violations by non-Indian offenders.

### (i)      Federally Delegated Law Enforcement Authority

The Band argues that it maintains federally delegated authority to investigate violations of federal law within the Reservation, subject to the civil rights provisions of the Constitution, including the prohibition against unreasonable searches and seizures.  (Pls.' Mem. at 28–29; Pls.' Proposed Order [Doc. No. 320] at 2–3.)

Indeed, the Deputation Agreement expressly authorizes the Band to investigate violations of federal criminal law.  It provides,

> [B]oth parties to this Agreement shall cooperate with each other to provide comprehensive and thorough law enforcement protection, including but not limited to effecting arrests, responding to calls for assistance from all citizens and also from other law enforcement officers, *performing investigations*, providing technical and other assistance, dispatching and detention.

(Deputation Agmt. ¶ 1) (emphasis added).  The Deputation Agreement also states, "Nothing in this Agreement limits, alters or conveys any judicial jurisdiction, including the authority to issue warrants for arrest or search and seizure or to issue service of process." (*Id*. ¶ 3.C.)

59

With regard to state law, the Deputation Agreement expressly provides that officers holding SLECs may only respond to violations of *exclusively* state law to the extent consistent with state law. (*Id.* ¶ 6 (emphasis added).) However, "Officers carrying SLECs may respond to *concurrent* violations of State and Tribal or Federal Laws to the extent consistent with Tribal or Federal law." (*Id.*) (emphasis added).

The Deputation Agreement does not distinguish between tribal law enforcement authority over Indians and non-Indians. Rather, it acknowledges that tribal officers may not immediately know whether a suspect or victim is Indian or non-Indian, or whether the conduct occurred in Indian country. (*Id.* at 2.) Accordingly, the Agreement recognizes that "there is great difficulty in determining immediately the proper jurisdiction for the filing of charges." (*Id.*) The Deputation Agreement therefore provides that "the official jurisdictional determination will be made by a prosecutor or court from one of the various jurisdictions, not by cross-deputized arresting officers who may deliver the offender to the appropriate detention facility." (*Id.*)

The Court finds that based on the clear language of the Deputation Agreement, the Band possesses federally delegated authority to investigate violations of federal law. The terms of the Deputation Agreement set forth the actions that tribal police officers may take in exercising that federally-delegated authority.

The Band's authority to investigate concurrent violations of state law depends upon its inherent tribal authority recognized under federal law, discussed below, and any terms in a cooperative law enforcement agreement to which the Band and the County have agreed to be bound.

### (ii)   Inherent Law Enforcement Authority

Pursuant to Supreme Court and other judicial authority, the Band asserts that it maintains inherent law enforcement authority to investigate violations of tribal, state, and federal law within the Reservation.  (Pls.' Mem. at 29–30; Pls.' Proposed Order at 1.) However, with respect to non-Indians, it limits such authority to temporarily detaining and investigating a suspect for a reasonable time prior to conveying the suspect to the appropriate prosecutorial authority.  (Pls.' Mem. at 29–30; Pls.' Proposed Order at 1.)  The Band appears to assert that its general authority over Indians may include, among other things:  (1) carrying and using a gun; (2) patrolling roads within the Reservation; (3) making traffic and investigative stops; (4) taking statements; (5) conducting searches and gathering and retaining evidence; and (6) detaining, investigating, and arresting suspects. (Pls.' Proposed Order at 2.)

In response, the County again contends that the Band overstates the holding of *Cooley*, expanding it beyond the unique circumstances of that case, and well beyond the limited second *Montana* exception.  (Defs.' Opp'n at 13–15.)  In addition, the County argues that neither the Constitution nor Congress permit the Court to grant the Band the authority to investigate state crimes committed by nonmembers.  (*Id*. at 19.)  Further, the County asserts that the Band's requested relief "exceed[s] this Court's Article III authority and will not provide the same protections for individual liberties as the Bill of Rights."[19] (*Id*. at 31.)

---

[19] The County reasserts some of these arguments, and also presents additional arguments in opposition to the Band's request for injunctive relief.  The Court will address

### (A)  Interpretation of *Cooley*

As Defendants note, in *Cooley*, the Supreme Court observed that the "*Montana* exceptions are limited" and "cannot be construed in a manner that would swallow the rule." 141 S. Ct. at 1645 (quoting *Plains Commerce Bank*, 554 U.S. at 330).  Yet the Supreme Court recognized that "we have also repeatedly acknowledged the existence of the exceptions and preserved the possibility that 'certain forms of nonmember behavior' may 'sufficiently affect the tribe as to justify tribal oversight.'"  *Id*. at 1645 (citations omitted); *see also id*. at 1643 (noting that the two *Montana* exceptions demonstrate that *Montana*'s "general proposition" is "not an absolute rule.")

Grounded in the second *Montana* exception, *Cooley* reaffirmed the inherent tribal law enforcement authority to temporarily detain suspected violators of state and federal law, including non-Indians, and further recognized that such inherent authority includes the authority to search suspects.  *Id*. at 1644–45.  In terms of Supreme Court jurisprudence, the Supreme Court thus "expanded" the second *Montana* exception applicable to conduct that threatens the health or welfare of the tribe.  *Id*. at 1643–44 (citing *Montana*, 450 U.S. at 566).  The Supreme Court provided examples of such threats, including the risks posed by drunk drivers and transporters of contraband.  *Id*. at 1643.

The County concedes that some types of criminal activity may threaten the health or welfare of the tribe, but argues that the health-or-welfare exception "cannot be the basis

---

these arguments, to the extent necessary, in its discussion of injunctive relief, *supra* at III.B.6.

for the extraordinary expansion of authority sought by Plaintiffs under an *exception* to the general rule that tribes lack authority over non-Indians and on fee lands." (Defs.' Opp'n at 15.) The County provides examples of criminal activity that, in its opinion, does not rise to the threat-level sufficient to invoke *Montana*, e.g., non-Indian drug possession without distribution; domestic disputes within non-Indian households; child neglect in nonmember families; and theft by and against non-Indians. (*Id.* at 15 n.7.)

As to the type of conduct that might constitute a threat to a tribe's health or welfare, the examples in *Cooley* were not exclusive. 141 S. Ct. at 1643. ("Such threats may be posed by, for instance, . . . ."). The Supreme Court explained that "[t]o deny a tribal police officer authority to search and detain for a reasonable time any person he or she believes *may commit or has committed a crime* would make it difficult for tribes to protect themselves against ongoing threats." *Id.* (emphasis added). *Cooley* does not require crime-specific categorization of threatening criminal conduct—it requires a tribal officer's belief that a crime may be committed or has been committed. Moreover, Defendants' examples of allegedly non-threatening criminal conduct fail to account for the myriad circumstances in which criminal activity can develop and threaten a tribe's health or welfare.

### (B)   Constitutional Limitations

Citing two concurring opinions in *Lara*, 554 U.S. at 337 (Kennedy, J., concurring), *id.*, 554 U.S. at 219 (Thomas, J., concurring), Defendants argue that the Band's inherent law enforcement authority must be defined by Congress, and that "the Constitution does not allow the Court or Congress to recognize inherent tribal authority to investigate state

law crimes committed by nonmembers." (Defs.' Opp'n at 16–23.)  But Defendants'
argument cannot be reconciled with *Cooley*.  141 S. Ct. at 1643–45 (citing, *e.g.*, *Montana*,
450 U.S. at 566; *Duro*, 495 U.S. at 687–88).  Moreover, as this Court observed in its
December 21, 2020 Order, "Federal courts have often treated the scope of a tribe's
sovereign authority as a matter of federal common law." (Dec. 21, 2020 Order at 26 (citing
*Lara*, 541 U.S. at 205–07; *Oliphant*, 435 U.S. at 206, 212; *Terry*, 400 F.3d at 579–80).)

Again, the County contends that granting the Band its requested relief would violate
principles of federalism. (Defs.' Opp'n at 19–20.)  The Court has already rejected
Defendants' arguments based on federalism principles, as well as Defendants' argument
that the Court lacks subject matter jurisdiction, and will not repeat those rulings here, which
are incorporated by reference. (Dec. 21, 2020 Order at 24–29, 39–41.)

The County also argues that the imposition of tribal law enforcement authority over
non-Indians who have no voice in the election of tribal leadership would be
unconstitutional, in violation of the Guarantee Clause. (Defs.' Opp'n at 19–22, 32–33.)
Among other things, the County asserts that the application of such authority would
impinge upon non-Indians' voting rights and "the right to ensure all [of the County's]
citizens can participate in the political process that oversees law enforcement." (*Id.* at 19–
21 (citing *New York v. United States*, 505 U.S. 144, 169 (1992)).)  However, the Supreme
Court rejected similar arguments in *Cooley*, recognizing that the inherent tribal authority
to investigate violations of state law "do[es] not subsequently subject [non-Indians] to
tribal law, but rather only to state and federal laws that apply" regardless of an individual's
presence in Indian country.  141 S. Ct. at 1644–45.

The County also contends that "[i]f the Band wants its officers to have the power to investigate all state law violations, not just of its members, the Band should do what Minnesota law requires by ensuring its officers have that authority through the agreement required by Minn. Stat. § 626.90."[20]   (Defs.' Opp'n at 23.)   However, a cooperative agreement does not provide the sole source of the Band's authority to investigate violations of state law.   As numerous cases make clear, based on a tribe's inherent authority, tribal officers may search and temporarily detain a suspected violator of state or federal law in Indian country, even where "jurisdiction to try and punish an offender rests outside the tribe."   *Cooley*, 141 S. Ct. at 1644; *Terry*, 400 F.3d at 579–80; *Ortiz-Barraza*, 512 F.2d at 1180–81; *Metts*, 2022 WL 1421370, at *4; *Suelzle*, 965 N.W.2d at 860; *Schmuck*, 850 P.2d at 1341; *State v. Pamperien*, 967 P.2d 503, 504–06 (Or. Ct. App.); *State v. Ryder*, 649 P.2d 756, 759 (N.M. Ct. App. 1982).   Recognizing such inherent authority, the Minnesota Supreme Court has held that a tribal police officer "d[oes] not need to be authorized under Minnesota law to detain or arrest [a suspected offender] to remove him from the reservation and transport him [to county authorities]."   *Thompson*, 937 N.W.2d at 422.

Defendants also contend that because inherent tribal authority is "outside the Constitution," the "individual liberties granted therein are thus unavailable." (Defs.' Opp'n at 19.)  However, the exercise of all such authority is subject to the provisions of the Indian Civil Rights Act, 25 U.S.C. §§ 1301–04, including the proscription against unreasonable

---

[20] The Court observes that, as a factual matter, it was the County that revoked the then-existing 2008 Cooperative Agreement with the Band.   (Revocation & 2008 Coop. Agmt. at 5.)

searches and seizures in 25 U.S.C. § 1302(a)(2).  Moreover, many courts have addressed inherent tribal law enforcement authority in the context of criminal suppression motions and then have proceeded to address the defendants' constitutional challenges.  *See, e.g.*, *Lara*, 124 S. Ct. at 197; *Terry*, 400 F.3d at 580–82; *Metts*, 2022 WL 1421370, at *1; *Astorga*, 642 S.W.3d at 83–84.

### (C)   Public Law 280

The County asserts that Public Law 280 "overrides the Band's interests in self-government," and "grant[s] Minnesota primacy over criminal law enforcement jurisdiction throughout Indian country in Minnesota."  (Defs.' Opp'n at 24 (citing *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486 (2022)).)  But *Castro-Huerta*, on which the County relies, does not confer "primacy" on states.  Rather, it holds that the federal government and states share concurrent jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian country.  *Castro-Huerta*, 142 S. Ct. at 2502–05.  While the Supreme Court observed that Public Law 280 generally affords states broad criminal jurisdiction over state-law offenses committed by or against Indians in Indian country, *id*. at 2500, the case did not involve the issue of tribal law enforcement authority, much less Public Law 280's effect on such authority.  While the Court commented that absent Public Law 280, state jurisdiction over Indian country crimes committed by Indians "could implicate principles of tribal self-government," *id*., it did not state that Public Law 280 grants states jurisdictional primacy or that it overrides a tribe's interests in self-government.

In fact, divesting tribes of tribal law enforcement authority would subvert Congress's goal in enacting Public Law 280 to improve law enforcement on reservations.

*Schmuck*, 850 P.2d at 1344 ("Given that one of the primary goals of Public Law 280 is to improve law enforcement on reservations, holding that Public Law 280 divested a tribe of its inherent authority to detain and deliver offenders would squarely conflict with that goal.").   Courts have consistently held that Public Law 280 does not supplant tribal authority, including law enforcement authority.  *See, e.g.*, *Walker*, 898 F.2d at 675 (holding that Public Law 280 contains no clear expression of congressional intent to divest tribes of their inherent law enforcement jurisdiction to try and punish their own members for violations of tribal criminal law); *TTEA v. Ysleta Del Sur Pueblo*, 181 F.3d 676, 685 (5th Cir. 1999) (finding that nothing in Public Law 280's text or legislative history precludes concurrent tribal court authority); *Confederated Tribes of the Colville Rsrv. v. Sup. Ct. of Okanogan Cnty.*, 945 F.2d 1138, 1140 n.4 (9th Cir. 1991) (same); *Cabazon Band of Mission Indians v. Smith*, 34 F. Supp.2d 1195, 1200 (C.D. Cal. 1998) (observing that Public Law 280 "is not a divestiture statute," but "was designed not to supplant tribal institutions, but to supplement them.")  (quoting *Native Vill. of Venetie I.R.A. Council v. Alaska*, 944 F.2d 548, 560 (9th Cir. 1991); *Schmuck*, 850 P.2d at 1344 (holding that Public Law 280 did not strip a tribe of its authority "to stop and detain non-Indian motorists allegedly violating state and tribal law while traveling on reservation roads.").

Accordingly, the Court finds that the Band's request for relief is not precluded simply because Minnesota is a Public Law 280 state.

### 5.    Declaratory Relief

As the Court previously stated, the Declaratory Judgment Act provides that a federal court "may declare the rights and other legal relations of any interested party seeking such

declaration whether or not further relief is or could be sought."  28 U.S.C. § 2201.  The Court finds that the Band is entitled to declaratory relief.  With respect to the three questions posed by the Band, (Pls.' Mem. at 1), the Court finds as follows:  (1) the Band's inherent and federally delegated law enforcement authority extends to all lands within the Mille Lacs Reservation; (2) such authority includes the authority to investigate violations of federal and state criminal law, consistent with *Cooley*, 141 S. Ct. at 1643–45, *Terry*, 400 F.3d at 579–80, related authority discussed herein, and this Order; and (3) with respect to non-Indians, in addition to the authority to detain and turn over violators to jurisdictions with prosecutorial authority, the Band has the authority to investigate violations of federal and state criminal law, consistent with *Cooley*, 141 S. Ct. at 1643–45, *Terry*, 400 F.3d at 579–80, related authority discussed herein, and this Order.

Courts have not identified all aspects of investigative authority that tribal police possess when exercising their inherent law enforcement authority, nor will this Court speculate and identify which specific acts may be "investigative."  While the Deputation Agreement identifies several examples of the Tribe's federally delegated investigative authority, (Deputation Agmt. ¶ 1), typically, courts have only addressed a tribe's inherent investigative authority in response to specific facts involving the actual exercise of such authority.  Accordingly, the Court declines to grant declaratory relief that itemizes various forms of investigative authority, and instead finds that the Band possesses the investigative authority recognized by *Cooley*, *Terry*, and related authority discussed herein.

The County's actions, particularly as reflected in the Opinion and Protocol, caused harm to the Band's tribal sovereignty.  Many courts have recognized such an injury as

harmful, typically in the context of injunctive relief. *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1005-06 (10th Cir. 2015) (Gorsuch, J.) (finding county prosecution of tribal member for on-reservation traffic offense irreparably harmed tribe as an "infringement on tribal sovereignty"); *Poarch Band of Creek Indians v. Hildreth*, 656 Fed App'x 934, 944 (11th Cir. 2016) (finding state tax assessment of Indian trust property "would amount to irreparable violation of tribal sovereignty"); *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1255 (10th Cir. 2006) ("an invasion of tribal sovereignty can constitute irreparable injury"); *EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1077 (9th Cir. 2001) (observing that "the prejudice of subjecting the Tribe to a subpoena for which the agency does not have jurisdiction results in irreparable injury vis-a-vis the Tribe's sovereignty"); *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250–51 (10th Cir. 2001) (stating that interference with tribe's motor vehicle registration system threatened to interfere with tribal self-government and constituted irreparable injury); *Mashpee Wampanoag Tribe v. Bernhardt*, Civ. No. 18-2242 (PLF), 2020 WL 3034854, at *3 (D. D.C. June 5, 2020) ("The most obvious harm that the Tribe will suffer [absent injunctive relief] is the loss of sovereign authority over the Tribe's historic lands.").

Defendants' actions were unlawful. Among other things, the geographic scope of the Opinion and Protocol improperly limited the Band's inherent law enforcement authority to trust lands, having defined "Indian country" as such, (Opinion at 14), when Indian country is comprised of all land within the Reservation. 18 U.S.C. § 1151; *Cabazon Band*, 480 U.S. at 208 n.5. This Court has ruled that the Reservation's boundaries remain

as they were under Article 2 of the Treaty of 1855. (Mar. 4, 2022 Summ. J. Order on Geo. Boundaries at 92–93.)

Defendants also acted unlawfully in prohibiting band officers from investigating violations of state law, even on trust lands. (Opinion at 14; Protocol at 1.) Since at least 1975, federal and state courts have repeatedly recognized that tribes have inherent authority to investigate potential violations of state law within their reservations, including violations by non-Indians. *Ortiz-Barraza*, 512 F.2d at 1180–81; *see also Terry*, 400 F.3d at 579–80; *Thompson*, 937 N.W.2d at 421–22; *Schmuck*, 850 P.2d at 1341; *Pamperien*, 967 P.2d at 504–06; *Ryder*, 649 P.2d at 759. The Eighth Circuit's 2005 decision in *Terry*, 400 F.3d at 575, is one of the cases *Cooley* relied upon for the proposition that several state courts and other federal courts had *already* held that tribal officers possessed the authority at issue in *Cooley*. 141 S. Ct. at 1644.

The Opinion and Protocol also unlawfully stated that tribal police officers could be subject to certain criminal penalties for performing law enforcement duties that courts have recognized as lawful exercises of inherent tribal law enforcement authority. (Opinion at 12; Protocol at 1.) Again, the Band's police officers possess inherent law enforcement authority consistent with *Cooley*, *Duro*, *Montana*, *Terry*, and *Thompson*.

To the extent the temporary cooperative agreement currently in place limits the geographic scope of the Band's inherent law enforcement authority to only trust lands, it is also unlawful. Further, to the extent the temporary cooperative agreement limits the Band's inherent law enforcement authority inconsistent with this ruling, such limitations are also unlawful.

Accordingly, pursuant to 28 U.S.C. § 2201, and the records and files herein, the Court grants in part, and denies in part Plaintiffs' Motion for Summary Judgment as it relates to declaratory relief, and declares:

1.  As a matter of federal law, the Mille Lacs Band of Ojibwe ("Band") possesses inherent sovereign law enforcement authority within the Mille Lacs Indian Reservation as established in Article 2 of the Treaty with the Chippewa, 10 Stat. 1165 (Feb. 22, 1855). This inherent sovereign law enforcement authority includes the authority of Band police officers to investigate violations of federal, state, and tribal law.  With respect to non-Indian suspects (i.e., persons who are not Indians as defined in 25 U.S.C. § 1301(4)), except as otherwise authorized by the Violence Against Women Act, 25 U.S.C. § 1304, or other applicable federal law, the Band's inherent law enforcement authority to detain a suspect is limited to the authority to temporarily detain and investigate the suspect for a reasonable period of time until the suspect can be turned over to a jurisdiction with prosecutorial authority, and does not include the authority to arrest the suspect.  The Band's investigative authority is the authority recognized by the courts in *Cooley*, *Terry*, *Thompson*, and their progeny.  The exercise of all such authority is subject to the provisions of the Indian Civil Rights Act, 25 U.S.C. §§ 1301–04, including the proscription against unreasonable searches and seizures in 25 U.S.C. § 1302(a)(2).

2. Pursuant to 18 U.S.C. § 1162(d), 25 U.S.C. §§ 2801 and 2804, the Deputation Agreement between the Band and the Bureau of Indian Affairs, and the Special

Law Enforcement Commissions ("SLECs") issued to Band police officers by the Bureau of Indian Affairs, Band police officers holding SLECs have federal authority to investigate violations of applicable federal law within the Mille Lacs Indian Reservation as established in Article 2 of the Treaty with the Chippewa, 10 Stat. 1165 (Feb. 22, 1855), and may exercise such authority as defined in the Deputation Agreement.   The exercise of all such authority is subject to the provisions of the United States Constitution, including the Fourth Amendment's proscription against unreasonable searches and seizures, other applicable provisions of federal law, and the Deputation Agreement, including any successor agreement.

### 6.    Injunctive Relief

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). Where a less drastic remedy is sufficient to redress an injury, injunctive relief is unwarranted.  *Id*.  The Supreme Court has observed that "Congress plainly intended declaratory relief to act as an alternative to the strong medicine of the injunction[.]" *Steffel v. Thompson*, 415 U.S. 452, 466 (1974).

The County argues that a permanent injunction is unnecessary to prevent future irreparable harm, accusing the Band of "look[ing] backward[]" to prior injuries.  (Defs.' Opp'n at 36–37.)  The County also contends that Plaintiffs' Proposed Order "contains sweeping, advisory declarations of rights unconnected to any specific, concrete fact in this case."  (*Id*. at 36.)

The Court finds that while Plaintiffs have been harmed by Defendants' conduct, prospective injunctive relief is unwarranted, as the Court has granted, in part, the less drastic remedy of declaratory relief. *Monsanto*, 561 U.S. at 165; *Steffel*, 415 U.S. at 466. The Band does not argue that Defendants will violate the declaratory judgment that the Band seeks. Moreover, Defendants raise valid concerns about the scope of the Band's requested injunctive relief. The declaratory judgment carefully limits the scope of the Band's relief to the law enforcement authority recognized by the Supreme Court and other federal courts.

This Court declines the invitation to permanently enjoin Defendants' conduct because, on this record, any specific terms would be advisory as to the specifics of any given scenario, not present in this record. However, in the future, if the Band's law enforcement authority is disputed in a situation in which Band officers believe there is a threat to the health or welfare of the tribe, the Band may certainly seek relief, if appropriate, from the Court. Accordingly, the Court denies without prejudice the Band's request for permanent injunctive relief.

## IV.    CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Plaintiffs' Motion for Summary Judgment Awarding Declaratory and Injunctive Relief [Doc. No. 317] is **GRANTED IN PART** and **DENIED IN PART** as to declaratory relief; and **DENIED IN PART WITHOUT PREJUDICE** as to injunctive relief.

2.      With respect to Plaintiffs' declaratory judgment, the Court declares:

**a**.      As a matter of federal law, the Mille Lacs Band of Ojibwe ("Band") possesses inherent sovereign law enforcement authority within the Mille Lacs Indian Reservation as established in Article 2 of the Treaty with the Chippewa, 10 Stat. 1165 (Feb. 22, 1855). This inherent sovereign law enforcement authority includes the authority of Band police officers to investigate violations of federal, state, and tribal law.  With respect to non-Indian suspects (i.e., persons who are not Indians as defined in 25 U.S.C. § 1301(4)), except as otherwise authorized by the Violence Against Women Act, 25 U.S.C. § 1304, or other applicable federal law, the Band's inherent law enforcement authority to detain a suspect is limited to the authority to temporarily detain and investigate the suspect for a reasonable period of time until the suspect can be turned over to a jurisdiction with prosecutorial authority, and does not include the authority to arrest the suspect.  The Band's investigative authority is the authority recognized by the courts in *Cooley*, *Terry*, *Thompson*, and their progeny.  The exercise of all such authority is subject to the provisions of the Indian Civil Rights Act, 25 U.S.C. §§ 1301–04, including the proscription against unreasonable searches and seizures in 25 U.S.C. § 1302(a)(2).

**b**.      Pursuant to 18 U.S.C. § 1162(d), 25 U.S.C. §§ 2801 and 2804, the Deputation Agreement between the Band and the Bureau of Indian Affairs, and the Special Law Enforcement Commissions ("SLECs") issued to Band police officers by the Bureau of Indian Affairs, Band police officers holding SLECs have federal authority to investigate violations of applicable federal law within the Mille Lacs Indian Reservation as established in Article 2 of the Treaty with the Chippewa, 10 Stat. 1165 (Feb. 22, 1855), and may exercise such authority as defined in the Deputation Agreement.  The exercise of all such authority is subject to the provisions of the United States Constitution, including the Fourth Amendment's proscription against unreasonable searches and seizures, other applicable provisions of federal law, and the Deputation Agreement, including any successor agreement.

3.      Defendants Walsh and Lorge's Motion for Summary Judgment [Doc. No. 322] is **GRANTED IN PART, DENIED IN PART**, and **DENIED AS MOOT IN PART**.

4.      Plaintiffs' individual capacity claims against Defendants Walsh and Lorge are **DISMISSED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: January 10, 2023                      s/Susan Richard Nelson
                                                SUSAN RICHARD NELSON
                                                United States District Judge